DA 11-0451

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 288

_____

JAN DONALDSON and MARY ANNE
GUGGENHEIM, MARY LESLIE and STACEY
HAUGLAND, GARY STALLINGS and RICK
WAGNER, KELLIE GIBSON and DENISE
BOETTCHER, JOHN MICHAEL LONG
and RICHARD PARKER, NANCY OWENS
and MJ WILLIAMS,

                                         OPINION
                                           and
         Plaintiffs and Appellants,                  ORDER

     v.

STATE OF MONTANA,

         Defendant and Appellee.

_____

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Plaintiffs are individuals from a variety of professional backgrounds who are in committed same-sex relationships. In 2010 they sued the State of Montana, complaining that they are unable to obtain protections and benefits that are available to similarly-situated different-sex couples who marry under State law. Plaintiffs expressly do not challenge Montana law's restriction of marriage to heterosexual couples, do not seek the opportunity to marry, and do not seek the designation of marriage for their relationships. They contend however that there is a "statutory structure" in Montana law that prohibits them from enjoying "significant relationship and family protections and obligations automatically provided to similarly-situated different-sex couples who marry."

¶2     Plaintiffs contend that this statutory structure interferes with their rights under Article II of the Montana Constitution, including their rights to equal protection, due process, and the rights to privacy, dignity and the pursuit of life's necessities. They seek a declaration that the State's failure to provide them access to the statutory scheme available to different-sex couples denies them the rights guaranteed by Article II. They seek an injunction prohibiting the State from continuing to deny them access to the statutory scheme.

¶3     The District Court denied Plaintiffs' motion for summary judgment and granted the State's motion to dismiss under M. R. Civ. P. 12(b)(6). The District Court noted that Plaintiffs do not seek a declaration that any specific statutes are unconstitutional. The District Court concluded that granting the relief sought—ordering the Legislature to enact a statutory scheme to address Plaintiffs' goals of achieving equal treatment—would be an inappropriate exercise of judicial power. Doing so, according to the District Court, would run afoul of the separation of powers required by Article III, section 1 of the Montana Constitution.

¶4     The District Court was also concerned that granting broad declaratory relief would likely impact a large number of statutes in potentially unknown and unintended ways. In the District Court proceedings Plaintiffs parenthetically listed a number of Montana statutes that they contend are within the "statutory scheme" that denies them equal access to rights and responsibilities. The District Court concluded, however that "what plaintiffs want here is not a declaration of the unconstitutionality of a specific statute or set of statutes but rather a direction to the legislature to enact a statutory arrangement." The

2

District Court determined that while this had some appeal, such relief was "unprecedented and uncharted in Montana law." The District Court concluded that "the proper ways to deal with Plaintiffs' concerns are specific suits directed at specific, identifiable statutes." Plaintiffs appealed after the District Court denied their motion to alter or amend.

¶5 On appeal Plaintiffs argue, without reference to specific statutes, that they are "excluded from the statutory scheme of benefits and obligations the state has associated exclusively with marriage." Plaintiffs contend that a strict level of review is required, but that even at the lowest levels of constitutional scrutiny the State cannot show a legitimate governmental interest in the current statutory scheme, and that it violates their rights under Article II of the Montana Constitution. Plaintiffs contend that the State excludes them from access to unnamed benefits and obligations in violation of Montana's constitutional rights of privacy, dignity and the pursuit of life's basic necessities. Plaintiffs contend that they are entitled to a declaratory judgment and to injunctive relief to redress the violation of their rights. Plaintiffs contend that while they can obtain relief without a judicial order requiring the Legislature to act, such an order is a remedy well within established constitutional bounds.

¶6 Plaintiffs ask that the judgment of the District Court be reversed and the case remanded to grant Plaintiffs' motion for summary judgment as well as a declaratory judgment and injunction. We affirm in part, reverse in part and remand for further proceedings.

¶7    As a general rule, this Court will not disturb a district court's determination that declaratory relief is not necessary or proper unless the district court abused its discretion. *Miller v. State Farm*, 2007 MT 85, ¶ 5, 337 Mont. 67, 155 P.3d 1278 (citing *Northfield Ins. v. Mont. Assoc. of Counties*, 2000 MT 256, ¶ 8, 301 Mont. 472, 10 P.3d 813).  We review a district court's interpretation of law to determine whether the interpretation is correct. *Miller*, ¶ 5.

¶8    In the past Montana courts have held specific statutes unconstitutional, and in some cases have directed the Legislature to act to comply with specific duties.  *Helena Elementary School Dist. No. 1 v. State*, 236 Mont. 44, 769 P.2d 864 (school funding); *Snetsinger v. Mont. Univ. System*, 2004 MT 390, 325 Mont. 148, 104 P.3d 445 (provision of employment benefits).  In the present case, however, Plaintiffs do not seek a declaration that any particular statute is unconstitutional or that its implementation should be enjoined.  Rather, Plaintiffs seek a general declaration of their rights and seek orders enjoining the State to provide them a "legal status and statutory structure" that protects their rights.

¶9    We agree with the District Court that Plaintiffs' requested relief exceeds the bounds of a justiciable controversy, *Gryczan v. State*, 283 Mont. 433, 442, 942 P.2d 112, 117 (1997), and decline to provide the declaratory relief requested.  It is the opinion of this Court that the broad injunction and declaratory judgment sought by Plaintiffs would not terminate the uncertainty or controversy giving rise to this proceeding.  Instead, a broad injunction and declaration not specifically directed at any particular statute would lead to confusion and further litigation.  As the District Court aptly stated:  "For this

4

Court to direct the legislature to enact a law that would impact an unknown number of statutes would launch this Court into a roiling maelstrom of policy issues without a constitutional compass." A district court may refuse to enter a declaratory judgment if it would not terminate the uncertainty or controversy giving rise to the proceedings, § 27-8-206, MCA; *Miller*, ¶ 7. Courts do not function, even under the Declaratory Judgments Act, to determine speculative matters, to enter anticipatory judgments, to declare social status, to give advisory opinions or to give abstract opinions. *Mont. Dept. Nat. Res. & Cons. v. Intake Water Co*., 171 Mont. 416, 440, 558 P.2d 1110, 1123 (1976).

¶10    In addition, declaring the parameters of constitutional rights is a serious matter. This Court, for example, avoids deciding constitutional issues whenever possible. *Weidow v. Uninsured Employers' Fund*, 2010 MT 292, ¶ 22, 359 Mont. 77, 246 P.3d 704. Statutes are presumed to be constitutional. *Oberson v. U.S. Forest Service*, 2007 MT 293, ¶ 14, 339 Mont. 519, 171 P.3d 715. That presumption can only be overcome after careful consideration of the purpose and effect of the statute, employing the proper level of scrutiny. *Oberson*, ¶ 22 (analyzing the constitutionality of the snowmobile liability statute, § 23-2-653, MCA). Broadly determining the constitutionality of a "statutory scheme" that may, according to Plaintiffs, involve hundreds of separate statutes, is contrary to established jurisprudence.

¶11    This Court may fashion the relief warranted by any appeal. Section 3-2-204, MCA. It is this Court's opinion that Plaintiffs should be given the opportunity, if they choose to take it, to amend the complaint and to refine and specify the general constitutional challenges they have proffered. For example, the record contains several

5

affidavits from the named Plaintiffs and others that assert that they have suffered discrimination from the State's failure to recognize their relationships. While Plaintiffs' brief listed Title 40 of the Montana Code as an area of family law that furthers such discrimination, the dismissal of this action because of Plaintiffs' broad claims has precluded the development of claims that specific statutes promote or cause discrimination. These are important issues and should be decided only after the statutes involved are specifically identified and specifically analyzed in district court proceedings.

¶12 Montana law generally favors allowing a party to amend its pleadings. Rule 15, M. R. Civ. P.; *Hobble-Diamond Cattle Co. v. Triangle Irrig. Co.*, 249 Mont. 322, 325, 815 P.2d 1153, 1155 (1991); *Aldrich & Co. v. Ellis*, 2002 MT 177, ¶ 27, 311 Mont. 1, 52 P.3d 388 (remand to allow plaintiff to add claim). The purpose of amending a complaint is to give the defendant adequate notice of the plaintiff's claims. *Kudloff v. City of Billings*, 260 Mont. 371, 375, 860 P.2d 140, 142 (1993). The decision to allow a plaintiff to amend a complaint is essentially an equitable one. *Stundal v. Stundal*, 2000 MT 21, ¶ 17, 298 Mont. 141, 995 P.2d 420, and leave to amend may be denied when the amendment would be futile or legally insufficient. *Hickey v. Baker School Dist. No. 12*, 2002 MT 322, ¶ 33, 313 Mont. 162, 60 P.3d 966.

¶13 The Plaintiffs should be afforded the opportunity to amend their complaint and to develop an argument as to the nature of the State's interest in advancing specific laws as well as the level of constitutional scrutiny that should be applied to those laws by the courts. Plaintiffs of course may choose to not amend, and that decision is theirs to make. If they do amend they will need to choose what statute or statutes to put in issue and upon

what legal grounds. The dissent may be disappointed in the majority's approach to this case. However, that does not change the fact that the Plaintiffs chose to pursue an overly broad request for a declaratory judgment and injunctive relief, without developing a factual record in the District Court and without identifying a specific statute or statutes that impose the discrimination they allege.

¶14 For the reasons set out above, the decision of the District Court is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion, in a schedule to be determined by the District Court.

¶15 The Clerk is directed to provide copies hereof to all counsel of record and to the Honorable Jeffrey M. Sherlock, District Judge.

DATED this 17th day of December, 2012.

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice Jim Rice, concurring.

¶16 I join in the Court's decision affirming the District Court. I agree with the Court and the District Court that the remedy sought in Plaintiffs' prayer for relief—that the court issue an order requiring the State to offer Plaintiffs "a legal status and statutory structure that confers the protections and obligations that the State provides to different-sex couples who marry"—is overly broad and not justiciable. Opinion, ¶ 8. Further, I

have no objection to remanding the case to allow Plaintiffs an opportunity to amend their pleadings to start the case anew. Opinion, ¶¶ 12-13. This is the procedural equivalent to filing a different legal challenge after dismissal of a case, which the Plaintiffs are entitled to pursue. Thus, I have signed the Court's Opinion.

¶17 I write separately to address the District Court's analysis of the Marriage Amendment to the Montana Constitution, and to explain the Amendment's application to Plaintiffs' substantive equal protection contentions set forth in Count I of their complaint. I believe that the Amendment provides another basis to affirm the District Court's dismissal of Count I, in addition to the overly broad nature of the relief sought.

¶18 The District Court reasoned that, while "this Court does not necessarily feel that Montana's marriage amendment bars it from acting," nonetheless "the existence of the marriage amendment plays into the jurisprudential decision that Plaintiffs' requested relief constitutes an impermissible sojourn into the powers of the legislative branch." I agree that the Marriage Amendment is applicable, but believe the District Court understated its significance. With its passage, the law's historical designation of marriage as between a man and a woman—and the exclusive treatment premised thereon—became an expressly constitutional classification.

¶19 Count I alleges that "Plaintiffs are similarly situated in every material respect to [] different-sex couples" and that the State's exclusion of Plaintiffs from the benefits and obligations "that the State offers to similarly-situated different-sex couples through the legal status of marriage impermissibly subjects Plaintiffs to unequal treatment" and constitutes "State discrimination." With all due respect to Plaintiffs, I believe their equal

8

protection claim must fail under longstanding and deeply rooted legal principles, in both Montana and national jurisprudence. Under the law, discussed below, marriage between a man and woman is a unique relationship, dissimilar to all other relationships and alone essential to the nation's foundation and survival, and the State errs neither by recognizing it as such nor by giving it exclusive treatment. In sum, it is not discrimination to treat uniquely that which is unique.

¶20 Plaintiffs emphasize that they are not seeking the right to marry, but nonetheless claim in Count I that they are entitled to all of the "protections, rights, benefits, duties, responsibilities, and obligations" which the State grants based upon marriage. During oral argument, Plaintiffs' counsel acknowledged that the relief sought would strip from the law the exclusive treatment of marriage as a basis for providing any concrete legal benefit. The only exclusive meaning left to marriage, counsel said, would be aspirational: "How people view it, how symbolic and how important and how solemn it is." The question thus posed by Plaintiffs' equal protection claim is whether the State is barred by the Constitution from using marriage as an exclusive basis for granting any concrete legal entitlement.

¶21 As we have explained, "[t]he first step in an equal protection analysis is to 'identify the classes involved, and determine if they are similarly situated.'" *Jaksha v. Silver Bow Co.*, 2009 MT 263, ¶ 16, 352 Mont. 46, 214 P.3d 1248 (citation omitted). "'If the classes are not similarly situated, then . . . it is not necessary for us to analyze the challenge further.'" *Kershaw v. Dept. of Transp.*, 2011 MT 170, ¶ 17, 361 Mont. 215, 257 P.3d 358. The classes here have been identified as same-sex couples, represented by

9

Plaintiffs, and married couples. To analyze whether these classes are similarly situated, I begin by summarizing the extensive jurisprudence on the issue of marriage, particularly, as it stood when Montanans were asked to adopt the Marriage Amendment, and then turn to the Amendment itself.

¶22 It is so well established that marriage between a man and a woman is a fundamental constitutional right I need not belabor the point. *See Turner v. Safley*, 482 U.S. 78, 95, 107 S. Ct. 2254, 2265 (1987) ("[T]he decision to marry is a fundamental right"); *Zablocki v. Redhail*, 434 U.S. 374, 384, 98 S. Ct. 673, 680 (1978) (quoting *Meyer v. Neb.*, 262 U.S. 390, 399, 43 S. Ct. 625, 626 (1923)) ("the right 'to marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause"); *Conaway v. Deane*, 932 A.2d 571, 618 n. 63 (Md. 2007) (citations omitted) ("It is beyond doubt that the right to marry is a fundamental liberty interest protected by the Constitution."). Likewise, this Court has stated, "[w]e too have recognized that marriage is a fundamental right." *State v. Guill*, 2011 MT 32, ¶ 66, 359 Mont. 225, 248 P.3d 826.[1]

¶23 Marriage between a man and woman has been declared a fundamental right because of the critical functions it performs and the purposes it fulfills for the greater society. "[M]arriage involves interests of basic importance in our society." *Boddie v. Conn.*, 401 U.S. 371, 376, 91 S. Ct. 780, 785 (1971) (citations omitted). Marriage is "the relationship that is the foundation of the family in our society." *Zablocki*, 434 U.S. at 386, 98 S. Ct. at 681. Maintenance of marriage is an issue in which "the public is deeply

---

[1] *See also Loving v. Va.*, 388 U.S. 1, 12, 87 S. Ct. 1817, 1824 (1967); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40, 94 S. Ct. 791, 795 (1974); *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996).

interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress." *Maynard v. Hill*, 125 U.S. 190, 210-11, 8 S. Ct. 723, 729 (1888). Our Court has explained that "upon [marriage's] permanence depends the family, the foundation of the home, 'upon the preservation of which, in turn, depends good citizenship and the permanency of a republican form of government.'" *Walker v. Hill*, 90 Mont. 111, 124, 300 P. 260, 263-64 (1931) (citations omitted); *accord Franklin v. Franklin*, 40 Mont. 348, 350, 106 P. 353, 354 (1910) (Upon marriage "depends the home, upon the preservation of which, in turn, depends good citizenship and the permanency of a republican form of government. The state therefore favors the institution of marriage"). "Marriage is a foundation stone in the bedrock of our state and communities." *Cook v. Cook*, 104 P.3d 857, 862, ¶ 18 (Ariz. App. Div. 1 2005).[2]

¶24　Beyond these reasons of family, societal stability, governance and progress, as important as they are, courts analyzing marriage have focused upon even more compelling reasons: its exclusive role in procreation and in insuring the survival, protection and thriving of the human race. Marriage is "'fundamental to our very existence and survival.'" *Guill*, ¶ 66 (quoting *Loving v. Va.*, 388 U.S. 1, 12, 87 S. Ct. 1817, 1824 (1967)). "Marriage and procreation are fundamental to the very existence and survival of the race." *Skinner v. Okla. ex rel. Williamson*, 316 U.S. 535, 541, 62 S.

---

[2] *See also Maynard*, 125 U.S. at 211-12, 8 S. Ct. at 730 (quoting *Adams v. Palmer*, 51 Me. 480, 485 (Me. 1863)) (marriage is "a 'relation the most important . . . the first step from barbarism to incipient civilization, the purest tie of social life and the true basis of human progress'"); *Griswold v. Conn.*, 381 U.S. 479, 486, 85 S. Ct. 1678, 1682 (1965) ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association . . . . for as noble a purpose as any involved in our prior decisions."); *Reynolds v. U.S.*, 98 U.S. 145, 165 (1879) ("Upon [marriage] . . . society may be said to be built").

Ct. 1110, 1113 (1942). "[V]irtually every [U.S.] Supreme Court case recognizing as fundamental the right to marry indicates as the basis for the conclusion the institution's inextricable link to procreation, which necessarily and biologically involves participation (in ways either intimate or remote) by a man and a woman." *Conaway v. Deane*, 932 A.2d 571, 621 (Md. 2007). "All of the cases infer that the right to marry enjoys its fundamental status due to the male-female nature of the relationship and/or the attendant link to fostering procreation of our species." *Conaway*, 932 A.2d at 619 (citing the Supreme Court's holdings in *Loving*, *Zablocki*, *Turner*, and *Skinner*).

¶25    From procreation springs further societal protections provided exclusively by marriage. As noted above, courts have cited the raising of children to be one of the core functions which support constitutional protection of marriage. *See Meyer v. Neb.*, 262 U.S. at 399, 43 S. Ct. at 626; *see also Baker v. Nelson*, 191 N.W.2d 185, 186 (Minn. 1971), *appeal dismissed*, 409 U.S. 810, 93 S. Ct. 37 (1972) ("The institution of marriage as a union of man and woman, uniquely involving the procreation and *rearing of children within a family*, is as old as the book of Genesis.") (emphasis added). Married couples role-model and thereby teach procreative relationships and the procreative lifestyle to children of the marriage as they are raised, ensuring that marriage's human race-sustaining functions upon which the survival and stability of society depend are passed to and replicated by the next generation.

¶26    The replication, by children, of the procreative marital relationship as role-modeled by their married parents not only perpetuates the race-sustaining function by populating the race, but also builds extended families which share hereditary

12

characteristics of a common gene pool. Throughout history, this genetic commonality has provided an invaluable tool to enhance human survival. Common hereditary traits provide critical understanding of an extended family's physical and mental strengths, weaknesses, and susceptibility to disease and death. Even before the advent of modern science, this information was collectively shared among extended family members and served to alert and prepare them for eventualities related to the onset of disease and other life patterns, thus strengthening their health and livelihood. Modern medical technologies have only increased this capability, as research of an extended family's genetics now serves to predict, detect, and treat common, family-related diseases, further enhancing human survival.

¶27 Upon extended families are built people groups or ethnic groups of individual races, tribes, kindred, and nationalities based upon their broadly shared genetic characteristics. In addition to developing understanding about their mutually shared health risks, people groups throughout history have looked outward to their physical surroundings and, based upon their common genetics and collective experiences, have obtained the knowledge necessary for their people to adapt to and function well in the physical environment, thus enhancing their health and longevity. People groups around the world have been linked to make up the larger human race. While world customs and cultures vary greatly, these societies share the common foundational element of a woman and a man united in marriage. It is little wonder the Supreme Court has said that marriage is "fundamental to the very existence and survival of the race." *Zablocki*, 434 U.S. at 384 (citing *Skinner*, 316 U.S. at 541). One court well summed up these

13

principles: "[T]he State has a compelling interest in fostering the traditional institution of marriage (whether based on self-preservation, procreation, or in nurturing and keeping alive the concept of marriage and family as a basic fabric of our society), as old and as fundamental as our entire civilization, which institution is deeply rooted and long established in firm and rich societal values." *In re Estate of Cooper*, 564 N.Y.S.2d 684, 688 (N.Y. Surrog. Ct. 1990); *see also Conaway*, 932 A.2d at 630 ("In light of the fundamental nature of procreation, and the importance placed on it by the Supreme Court, safeguarding an environment most conducive to the stable propagation and continuance of the human race is a legitimate government interest.").

¶28    These principles demonstrate clearly that marriage is not merely a private act. It is also a public act which serves a public function critical to society, that of bringing together female and male to create and raise the future generation. Courts have recognized this, holding that the above-discussed critical societal functions are uniquely provided by marriage between a woman and man and cannot be replicated by other relationships.[3] "Because only relationships between opposite-sex couples can naturally produce children, it is reasonable for the state to afford unique legal recognition to that particular social unit in the form of opposite-sex marriage. The legislature could reasonably conclude that the institution of civil marriage as it has existed in the country from the beginning has successfully provided this desirable social structure and should be preserved." *In re J.B.*, 326 S.W.3d 654, 677 (Tex. App. Dallas 2010) (internal citations

---

[3] Because this case does not involve an equal protection challenge as between married and unmarried heterosexual couples, I do not here focus on or develop an analysis regarding the distinctions between them.

omitted). "Indisputably, the only sexual relationship capable of producing children is one between a man and a woman. The State could reasonably decide that by encouraging opposite-sex couples to marry, thereby assuming legal and financial obligations, the children born from such relationships will have better opportunities to be nurtured and raised by two parents within long-term, committed relationships, which society has traditionally viewed as advantageous for children. *Because same-sex couples cannot by themselves procreate, the State could also reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships.*" *Standhardt v. Super. Ct. of Ariz.*, 77 P.3d 451, 462-63, ¶ 38 (Ariz. App. Div. 1 2003) (emphasis added); *see also Citizens for Equal Protec. v. Bruning*, 455 F.3d 859, 868 (8th Cir. 2006) ("[Appellees'] argument disregards the expressed intent of traditional marriage laws—to encourage heterosexual couples to bear and raise children in committed marriage relationships.").[4] "[S]o far as heterosexuals are concerned, the evidence that on average married couples live longer, are healthier, earn more, have lower rates of substance abuse and mental illness, are less likely to commit suicide, and report higher levels of happiness—that marriage civilizes young males, confers economies of scale and of joint consumption, minimizes sexually transmitted disease, and provides a stable and nourishing framework

---

[4] While not all heterosexual couples have the ability or desire to procreate and raise children, the jurisprudence is premised upon the potential of producing children which lies within the marriage structure and the state's interest, as stated here, in "encourag[ing]" these outcomes. *Citizens for Equal Protec.*, 455 F.3d at 868. "The fundamental right to marriage and its ensuing benefits are conferred on opposite-sex couples not because of a distinction between whether various opposite-sex couples actually procreate, but rather because of the possibility of procreation." *Conaway*, 932 A.2d at 633.

15

for child rearing—refutes any claim that policies designed to promote marriage are irrational." *Irizarry v. Bd. of Educ. of Chicago*, 251 F.3d 604, 607 (7th Cir. 2001) (citations omitted). Modern medicine makes it technologically possible for some same-sex couples to artificially conceive and bear children. However, that fact does not diminish the truth that human life cannot be sustained without procreative marriage relationships, even in light of modern technology.

¶29 Consequently, the right to marry has not been held to mean there is a fundamental right to marry someone of the same gender. "[V]irtually every court to have considered the issue has held that same-sex marriage is not constitutionally protected as fundamental in either their state or the Nation as a whole." *Conaway*, 932 A.2d at 628 (citations omitted). "The idea that same-sex marriage is even possible is a relatively new one. Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex. . . . The right to marry is unquestionably a fundamental right. The right to marry someone of the same sex, however, is not 'deeply rooted'; it has not even been asserted until relatively recent times." *Hernandez v. Robles*, 855 N.E.2d 1, 8-9 (N.Y. 2006) (citations omitted).[5]

---

[5] In *Baker*, 191 N.W.2d 185, the Minnesota Supreme Court held that a state statute, interpreted by the Court as not authorizing same-sex marriages, did not violate due process or equal protection. The U.S. Supreme Court dismissed the subsequent appeal for "want of [a] substantial federal question." 409 U.S. at 810. The U.S. Supreme Court's action in *Baker* has been described as binding precedent. *Andersen v. King Co*., 138 P.3d 963, 999 (Wash. 2006) (citing to *Baker* and holding "the same-sex union as a constitutional right argument was so frivolous as to merit dismissal without further argument by the Supreme Court. A similar result is required today."); *Morrison v. Sadler*, 821 N.E.2d 15, 19 (Ind. App. 2005) (citing to *Baker* and stating: "There is binding United States Supreme Court precedent indicating that state bans on same-sex

¶30　Given this exclusive importance of marriage, the law developed to give it sanction, permanence, and a formal structure upon which to base legal entitlement and obligation. Although commonly referred to as a contractual relationship, the obligation of marriage is more than merely contractual. As the Supreme Court has explained, "when the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities." *Maynard*, 125 U.S. at 210-11, 8 S. Ct. at 729. "When the contracting parties have entered into the married state, they have not so much entered into a contract as into a new relation, the rights, duties and obligations of which rest, not upon their agreement, but upon the general law of the State, statutory or common, which defines and prescribes those rights, duties and obligations. They are of law, not of contract." *Adams*, 51 Me. at 483. As we have noted, "it is to the interest of the state that [marriage] be permanent." *Franklin*, 40 Mont. at 350, 106 P. at 354.

¶31　Upon this structure of permanence, and again in view of the exclusive importance of marriage, the state has built a system of exclusive benefits and protections on behalf of, and dependent upon, marriage. "[M]arital status often is a pre-condition to the receipt of government benefits (*e.g.*, Social Security benefits), property rights (*e.g.*, tenancy by

---

marriage do not violate the United States Constitution."); *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1305 (M.D. Fla. 2005) ("*Baker v. Nelson* is binding precedent upon this Court"); *but see In re Kandu*, 315 B.R. 123, 138 (W.D.Wash. 2004); *In re J.B.*, 326 S.W.3d 654, 672 (Tex. App. Dallas 2010).

the entirety, inheritance rights), and other, less tangible benefits (*e.g.*, legitimation of children born out of wedlock)." *Turner*, 482 U.S. at 96, 107 S. Ct. at 2265. "In terms of federal benefits, the Government Accounting Office (GAO) compiled in 1997, and updated in 2004, a list of federal rights, responsibilities, and privileges granted to married couples, but denied to same-sex couples. According to the study, there were 1,138 federal statutes providing such benefits." *Conaway*, 932 A.2d at 582 n. 6 (citations omitted). Plaintiffs provided the District Court with a list of over 340 Montana statutes that classify based on marital status and that would be impacted by the proposed relief sought.

¶32 While Plaintiffs do not claim the right to marry, they are nonetheless claiming constitutional entitlement to all of these same rights and benefits which are provided to married couples on the ground that they are "similarly situated in every material respect." However, this position ignores the historical and long-developed legal foundation and formal structure giving marriage an exclusive legal permanence, which does not exist for other relationships. More importantly, the above discussion, including the precedent addressing marriage and its unique attributes, demonstrates that Plaintiffs' claim to be "similarly situated" to married couples is without merit. This is not meant to disparage Plaintiffs or minimize the contributions they offer, but is simply a statement of the reality that marriage between a woman and man exclusively provides unique and transcendent societal protections vital to human survival which differentiate it and make it dissimilar from other relationships. These protections uniquely provided by marriage form a

18

legitimate and even compelling state interest, and thus a constitutional basis, for the State's exclusive treatment of marriage.

¶33    The above discussion of the law of marriage reflects the general state of the law before the Marriage Amendment was adopted by Montanans in 2004. Although some of the cited cases were decided after adoption of the Marriage Amendment, they were premised upon pre-2004 precedent, and marriage was considered to be a fundamental right with constitutionally protected status at the time of the Amendment's adoption. However, several years earlier, legal arguments attacking the exclusive status of marriage began to be offered, and considerable concern was generated over whether the law's exclusive treatment of marriage would remain, or whether courts would begin to overturn long-standing precedent favoring marriage. With all due respect, several courts indicated a willingness to uproot established legal precedent recognizing the uniqueness of marriage between a man and woman, and eliminate the law's exclusive treatment of marriage. *See e.g. Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993); *Baker v. State*, 744 A.2d 864 (Vt. 2000); *Goodridge v. Dept. of Pub. Health*, 798 N.E.2d 941 (Mass. 2003).

¶34    The response of the citizens of the country to these court decisions can only be described as a phenomenon of direct democracy. To counter this threat to established precedent favoring marriage, citizens of some 31 states acted to either reinstate the law's exclusive definition and treatment of marriage in some manner, or to ensure that courts could not eliminate such exclusive treatment, by amending their state constitutions to explicitly protect marriage. Montana was one of those states.

19

¶35     Building on the foundation of historical legal protections for marriage, Montana voters solidified the premise that marriage is between one man and one woman by placing the concept expressly into the Montana Constitution.  Mont. Const. art. XIII, § 7. The Voter Information Packet provided voters with the arguments for and against adoption of the Amendment.  Proponents stated that the "[t]he time-honored, vital institution of marriage is being threatened. . . .  Special interest groups are constantly seeking to gain special rights that infringe on the rights of the rest of society.  Such special rights cost all Montanans. . . .  Voting yes on CI-96 allows the people to give clear direction to judges on this important issue."

¶36     Directly related to this case, proponents discussed the issue of benefits which are attendant to marriage.  "If CI-96 fails, how will homosexual marriage one day affect your family? . . .  Small business employers in Montana may someday be required to provide expanded health coverage, retirement and fringe benefits to same-sex 'spouses' of employees.  The broad subjectivity of such un-funded mandates could hurt Montana's economy and jobs."  Opponents likewise also focused on benefits and obligations associated with same-sex couples:  "if CI-96 were to pass, the State could nullify the contractual agreements made between same-gender partners.  CI-96 would limit innovative and robust companies from treating their employees equitably."  As the District Court noted, both sides of the debate acknowledged "that the marriage amendment would have something to do with the benefits and obligations that relate to the status of being married."

20

¶37    Proponents and opponents alike focused on the issue of benefits because everyone understood the law:   that marriage is a concrete legal status upon which the State premises exclusive treatment and benefits, as demonstrated by the above-cited authority. It is more than a label, a societal choice, a union of two people, or an aspiration.  Indeed, marriage is an obligation given exclusive protections in the law because it provides exclusive protections to society.  Even before adoption of the Marriage Amendment, this was recognized in Montana statute.  *See e.g.* §§ 40-1-101, 40-1-103, 40-1-401, 40-2-101, 40-2-102, MCA.   Montana has long used marital status as an exclusive basis for provision and allotment of benefits and obligations.  *See e.g.* §§ 2-18-601, 19-17-405, 33-22-140, 39-51-2205, 39-71-723, 50-9-106, 72-2-112, 15-30-2114, 15-30-2366, MCA. Building on these statutory provisions and the prior holdings of our cases, Montana citizens enacted the Marriage Amendment to expressly "constitutionalize" these principles, thereby strengthening the law's exclusive treatment of marriage.  *See State v. Toomey*, 135 Mont. 35, 51-53, 335 P.2d 1051, 1059-60 (1958) ("[W]e must construe the amendment in the light of the conditions as they existed at the time of its adoption. *Rankin v. Love*, 125 Mont. 184, 187, 232 P.2d 998, 1000 (1951); *State ex rel. Bottomly v. District Court*, 73 Mont. 541, 547, 237 P. 525, 527 (1925). . . .  "It is only reasonable to assume that the people, in adopting the amendment to our Constitution, adopted it in light of the existing [state law] and the construction placed upon that law by this Court.").

¶38    When asked during oral argument what unique legal concreteness would remain to marriage if the requested relief was granted, Plaintiffs' counsel replied, "How people view it, how symbolic and how important and how solemn it is, is important.  Marriage is

meaningful." When asked again, "In what way? I'm trying to understand what concrete[ness] in the law is left?" Counsel responded, "The significance is that you're married." However, such a diminished concept of marriage would necessitate a dramatic rewriting of the law. Marriage has always been much more—a concrete legal status which the law recognized and favored with exclusive treatment, including benefits and obligations. In adopting the Marriage Amendment, Montana voters determined to permanently preserve this exclusive treatment for marriage by placing it in the Constitution. Thus, in one way, Plaintiffs are asking this Court to render the Marriage Amendment superfluous by holding that it added nothing to the law's previous exclusive classification of marriage.[6] But further, Plaintiffs are asking the Court to hold the Marriage Amendment actually had a reverse effect—that marriage has *less* legal protection now than before the Amendment was passed, because marriage can no longer serve as the basis for exclusive treatment by the State. Clearly, this is directly contrary to the "clear direction to judges" which the Marriage Amendment was designed to give.

¶39    "The Equal Protection Clause 'is not a license for courts to judge the wisdom, fairness, or logic of [the voters'] choices.'" *Citizens for Equal Protec.*, 455 F.3d at 867 (bracket in original) (quoting *F.C.C. v. Beach Commun., Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993)). Now that the marriage relationship has been given constitutionally-protected status, any change to the long-standing principles which govern this issue must come from the people through the democratic process, not from the

---

[6] In addition to the above-cited legal rulings, marriage was limited to a man and woman under prior statutory law. *See* §§ 40-1-401(1)(d), 40-1-103, MCA.

courts.[7] "The package of government benefits and restrictions that accompany the institution of formal marriage serve a variety of other purposes. *The legislature—or the people through the initiative process*—may rationally choose not to expand in wholesale fashion the groups entitled to those benefits." *Citizens for Equal Protec.*, 455 F.3d at 868 (emphasis added). "[A]s we have explained, there is no fundamental right to be free of the political barrier a validly enacted constitutional amendment erects." *Citizens for Equal Protec.*, 455 F.3d at 868.

¶40 I appreciate the deeply-held feelings and beliefs of the Plaintiffs and condemn any acts of cruelty they have suffered, some of which are referenced in their affidavits. Yet, given the long-standing legal protections and exclusive treatment of marriage, with its corresponding benefits and obligations, and the incorporation of those principles into the Montana Constitution by the citizens of Montana, Plaintiffs' equal protection claim must fail.

¶41 I concur.

/S/ JIM RICE


Justice Patricia O. Cotter dissents.

¶42 I dissent from the Court's Opinion, and concur with virtually all of Justice Nelson's well-written and comprehensive Dissent. I write separately to state that I would not liken the Court's approach here to cases sanctioning slavery and racial segregation.

---

[7] Several of the cases cited herein were followed by democratic initiatives to grant rights to same-sex couples.

Dissent, ¶ 51. Moreover, I do not agree that the Court is taking the approach it has adopted "to avoid a socially divisive issue." Dissent, ¶ 74. Although I disagree with the Court's analysis and resolution, I do not believe it is acting in bad faith.

¶43 Second, I decline to join the bulk of Part V of the Dissent, which challenges the constitutionality of the Marriage Amendment. Plaintiffs do not challenge the Marriage Amendment, and I agree that the relief Plaintiffs seek does not offend the Marriage Amendment in the slightest.

¶44 With the foregoing caveat, I therefore join Justice Nelson's Dissent through the first sentence of ¶ 179.

/S/ PATRICIA COTTER

Justice Michael E Wheat joins the Dissent of Justice Patricia O. Cotter.

/S/ MICHAEL E WHEAT

Justice James C. Nelson, dissenting.

## I.  INTRODUCTION

¶45   *[I]f we have learned anything from the significant evolution in the prevailing societal views and official policies toward members of minority races and toward women over the past half-century, it is that even the most familiar and generally accepted of social practices and traditions often mask an unfairness and inequality that frequently is not recognized or*

24

*appreciated by those not directly harmed by those practices or traditions.*[1]

¶46　There are some cases where we look back and can see that the court was clearly on the wrong side of history.  Among the most notorious are *Dred Scott v. Sandford*, 60 U.S. 393 (1857) (slaves of African descent are property, not citizens); *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138 (1896) (segregation of white and colored people in public facilities does not violate equal protection, provided the facilities are "equal"); *Muller v. Oregon*, 208 U.S. 412, 421-23, 28 S. Ct. 324, 326-27 (1908) (differential treatment of women in employment is justified because "woman has always been dependent upon man"); *Buck v. Bell*, 274 U.S. 200, 47 S. Ct. 584 (1927) (compulsory sterilization of feebleminded individuals "in order to prevent our being swamped with incompetence" does not violate due process or equal protection; "[t]hree generations of imbeciles are enough"); *People v. Hall*, 4 Cal. 399, 404-05 (Cal. 1854) (the Chinese, being "a race of people whom nature has marked as inferior" and who are "incapable of progress or intellectual development beyond a certain point," may be precluded from testifying against white persons); and *Scott v. State*, 39 Ga. 321, 323 (1869) (racial intermarriage is "unnatural" and "productive of deplorable results"; "the offspring of these unnatural connections are generally sickly and effeminate").  I venture to say that another case belonging on this list is *Bowers v. Hardwick*, 478 U.S. 186, 106 S. Ct. 2841 (1986) (the state may regulate private sexual conduct between consenting adults), which the Supreme Court overruled in *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472 (2003) (individual

---

[1] *In re Marriage Cases*, 183 P.3d 384, 451 (Cal. 2008).

25

decisions by two adults—married or unmarried—concerning the intimacies of their physical relationship are a form of "liberty" protected by the Fourteenth Amendment). As Justice Kennedy aptly stated in his opinion for the Court in *Lawrence*, "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." 539 U.S. at 579, 123 S. Ct. at 2484.

¶47    In the wake of the Hawaii Supreme Court's decision in *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), which held that denying same-sex couples the ability to marry must be justified under "strict scrutiny" principles, measures were proposed and adopted in as many as 30 states, including Montana, purporting to limit marriage to one man and one woman. Due to the success of these measures, it became "a constant theme of opponents of same-sex marriage that whenever it has been put before the voters it has lost." Erik Eckholm, *In Maine and Maryland, Victories at the Ballot Box for Same-Sex Marriage*, N.Y. Times (Nov. 7, 2012). That, however, is no longer true. In this most recent election of November 6, 2012, voters in Maine, Maryland, and Washington approved ballot measures authorizing same-sex couples to marry. And in Minnesota, voters defeated a ballot measure that would have amended the Minnesota Constitution to limit marriage to one man and one woman. It appears that a majority of voters in these states have seen through the scare tactics and propaganda which "family values" organizations and certain religious groups have used to persuade the electorate that allowing same-sex marriage will harm children, hurt businesses and the economy, intrude on religious freedoms, and undermine the institution of marriage itself. As discussed in greater detail later in this

26

Dissent, there is no *actual* evidence supporting any of the maledictions and stereotypes used in the campaigns against same-sex marriage.

¶48 Meanwhile, in Montana, the issue at hand is not about same-sex marriage. It is less dramatic, though by no means less important. It concerns the right of committed intimate same-sex couples to receive the same civil protections which the State makes available to committed intimate different-sex couples. Plaintiffs assert, and rightly so, that their government may not single out unpopular groups for disfavored treatment, as the State of Montana has done here. Shockingly, this Court refuses to uphold this most basic principle of constitutional law. While I have not always agreed with this Court's decisions—in fact, I have strenuously disagreed with my colleagues on occasion[2]—I have never disagreed more strongly with the Court as I do in this case. With due respect, I believe today's decision, like those mentioned above, wrongly deprives an abused minority of their civil rights.

¶49 This Dissent is lengthy. It is meant to be, for several reasons. First, I believe this is the most important civil rights case to come before this Court in decades. And it will

_____

[2] *See e.g. Western Tradition Partn. v. Atty. Gen.*, 2011 MT 328, ¶¶ 61-135, 363 Mont. 220, 271 P.3d 1 (dissent); *Musselshell Ranch Co. v. Seidel-Joukova*, 2011 MT 217, ¶¶ 36-86, 362 Mont. 1, 261 P.3d 570 (partial dissent); *Rohlfs v. Klemenhagen, LLC*, 2009 MT 440, ¶¶ 47-118, 354 Mont. 133, 227 P.3d 42 (dissent); *Gonzales v. City of Bozeman*, 2009 MT 277, ¶¶ 54-87, 352 Mont. 145, 217 P.3d 487 (dissent); *Kafka v. Mont. Dept. of Fish, Wildlife and Parks*, 2008 MT 460, ¶¶ 96-248, 348 Mont. 80, 201 P.3d 8 (dissent); *Nelson v. State*, 2008 MT 336, ¶¶ 64-78, 346 Mont. 206, 195 P.3d 293 (partial dissent); *Confederated Salish and Kootenai Tribes v. Clinch*, 2007 MT 63, ¶¶ 46-158, 336 Mont. 302, 158 P.3d 377 (dissent); *State v. Mizenko*, 2006 MT 11, ¶¶ 44-192, 330 Mont. 299, 127 P.3d 458 (dissent); *Goldstein v. Commn. on Prac. of the Sup. Ct.*, 2000 MT 8, ¶¶ 52-124, 297 Mont. 493, 995 P.2d 923 (dissent); *Durden v. Hydro Flame Corp.*, 1999 MT 186, ¶¶ 33-58, 295 Mont. 318, 983 P.2d 943 (dissent); *State v. Guillaume*, 1999 MT 29, ¶¶ 32-42, 293 Mont. 224, 975 P.2d 312 (dissent).

be my last opportunity, sitting as a member of this Court, to address the fundamental constitutional rights of gay, lesbian, and bisexual people and the discrimination which the State of Montana is perpetrating against these individuals. The issues here are significant and complex, and deserving of thorough consideration, analysis, and discussion.

¶50 Second, I am profoundly disappointed in this Court, as an institution, for rendering a decision that requires Plaintiffs, the same-sex couples here, to wage a litigation jihad against their own government to obtain the statutory rights, benefits, and protections to which they are constitutionally entitled. I have located no court decision in this country—state or federal—applying the declaratory judgment laws in the cabined and unworkable fashion that this Court does here.

¶51 Lastly, I am thoroughly disheartened that today's decision takes civil rights in this State backward to a time when court decisions supported and facilitated other equally pernicious forms of government-sanctioned discrimination, including slavery and racial segregation; women being viewed as little more than men's dependents, unable to vote or own property; the Chinese being deemed an "inferior" race; the compulsory sterilization of the "feebleminded"; and the criminalization of private sexual intimacy between two consenting adults. No other minority group has been treated in this fashion in this State in modern times. This, truly, is a shameful, black day for civil rights in Montana.

¶52 Yet, while gay, lesbian, and bisexual citizens may have lost this battle, the war is not over. If we have learned anything as an evolving species, it is that no government, no religion, no institution, and no political party can long oppress the inviolable dignity and

28

spirit of human beings in their fight for fairness in the courts, access to justice, and equal protection of the laws.

¶53 With these introductory remarks, I now proceed to my detailed discussion and analysis. In Part II (¶¶ 57-80), I provide a background and overview of the case and the issues. In Part III (¶¶ 81-113), I explain the declaratory judgment laws and address in detail the District Court's and this Court's erroneous analyses under those laws.

¶54 Next, in Part IV (¶¶ 114-168), I analyze Plaintiffs' constitutional claim. Given the evidence that gay, lesbian, and bisexual people are reviled and demonized in Montana and have suffered a history of invidious and prejudicial treatment, I conclude that sexual orientation is a suspect class under Montana's Equal Protection Clause, and thus that discrimination based on sexual orientation in the provision of statutory benefits, protections, and services must survive "strict scrutiny" review. I further conclude that treating Plaintiffs differently based on sexual orientation is an affront to and violation of their inviolable right to human dignity, also protected by Montana's Constitution.

¶55 As a final matter, in Part V (¶¶ 169-206), I am compelled to address the so-called Marriage Amendment to Montana's Constitution (Mont. Const. art. XIII, § 7). Plaintiffs do not ask to be "married," and granting them the relief they seek does not offend that provision in the slightest. Yet, the State relies on the Marriage Amendment as support for its position, and the State's argument before this Court is bolstered by an outpouring of attacks on the same-sex couples by no less than 128 Montana protestant churches and the Montana Catholic Bishops, all appearing through the Montana Catholic Conference as amicus curiae, along with other "family values" organizations, also appearing as amici

29

curiae. The Marriage Amendment is the conduit through which the State and its amici claim that it may deprive Plaintiffs—who, because of this provision, cannot marry—of the statutory benefits and protections which the State grants to married couples. That the State and its amici have injected the Marriage Amendment into this case at all, however, demonstrates, in spades, what that provision is *really* about: the constitutionalization of religious doctrine. Indeed, what the State and its amici seek to do here is conflate *sectarian* canons regarding marriage with *secular* laws governing the provision of benefits and protections to committed couples. In my view, this approach violates several constitutional provisions, not the least of which is the clause in Montana's Declaration of Rights prohibiting the State from establishing religion. Emblematic of the religiously grounded discrimination defended by the State and its amici is the blatant mendacity underlying the Marriage Amendment initiative—a fourberie reminiscent of some of the worst propaganda campaigns perpetrated in modern times.

¶56    In the last section of this Dissent, Part VI (¶¶ 207-212), I set forth my conclusions and provide a short epilogue.

## II. BACKGROUND AND OVERVIEW

¶57    Plaintiffs here are twelve lesbian, gay, or bisexual individuals who are in six committed, intimate, same-sex relationships. As of the filing of their affidavits in the District Court on December 10, 2010, plaintiffs Donaldson and Guggenheim had been in a relationship for 27 years; Leslie and Haugland for 12 years; Stallings and Wagner for 21 years; Gibson and Boettcher for 11 years; Long and Parker for 8 years; and Owens and Williams for 18 years. With their life partners, Plaintiffs have established families

30

which provide them with long-term mutual emotional and economic support and a stable environment for raising children. Plaintiffs are employed in, or have retired from, a variety of professions including teaching, coaching, counseling, engineering, music, art, and medicine. They are active in their children's schools, in their churches, in their professions, and in their communities. One has served in the Montana Legislature. It is undisputed that Plaintiffs are productive members of society and have, in fact, successfully raised a number of children. Some Plaintiffs are now grandparents.

¶58 Plaintiffs desire to protect their family relationships in the same way their heterosexual neighbors, coworkers, and fellow community members are able to do under Montana law. Plaintiffs have taken some steps in this regard. For example, they have entered into joint tenancy arrangements on their houses and bank accounts and have executed powers of attorney, healthcare directives, and wills in favor of their partners. Plaintiffs point out, however, that such private legal arrangements can be expensive and, thus, are not available to many couples. Plaintiffs also express concerns about whether these arrangements will be honored—especially in the event of a medical emergency. Some Plaintiffs describe (in their affidavits) past incidents when healthcare personnel refused to speak with them about their partner's condition. Another Plaintiff (Leslie) describes how she and her former partner, Erika, took many of the legally available steps to protect their relationship. Yet, after Erika died in a work-related accident on Christmas Day 1996, which was their eighth anniversary, Leslie found herself "powerless and degraded" and treated like a "legal stranger" when she attempted to exercise the responsibilities of a partner. She was denied access to Erika's remains; she was denied a

31

copy of the death certificate by the sheriff because she was a "stranger in blood"; she was refused paid bereavement leave by her employer (the same employer for whom Erika had been working when she was killed) and thus had to go back to work only a week after Erika's death; she had no rights under the intestacy laws with regard to Erika's property; she had no legal means to prevent Erika's family from entering their home, going through their belongings, and taking Erika's possessions, many of which the two had shared as domestic partners; and, to add insult to injury, she was required to pay inheritance taxes on the proceeds from Erika's half of their condominium, which Leslie was forced to sell.

¶59    The underlying issue, as the District Court stated in its Order, is that "individuals such as Plaintiffs are denied a variety of benefits and protections that are statutorily available to heterosexual spouses." The District Court identified some of these statutes and noted some of the "real life scenarios" in which these laws have affected Plaintiffs. For example, Montana's intestacy laws and workers' compensation laws provide certain protections to the surviving spouse of a different-sex relationship, but not to the surviving partner of a same-sex relationship. Likewise, bereavement leave is made available to a different-sex spouse but not to a same-sex partner. Furthermore, Plaintiffs are unable under Montana's tax laws to file joint returns or to take the spousal exemption for nonworking spouses if filing separately. Montana law permits the different-sex spouse of a terminally ill person to withhold life-sustaining treatment, but does not afford this right to the same-sex partner of a terminally ill person. Similarly, the different-sex spouse of a person who has become mentally incompetent has priority to become guardian, but a same-sex partner does not have this same right.

32

¶60 If not for the fact that each couple consists of two members of the *same* sex, Plaintiffs' relationships could qualify as "marriage" under Montana law. Title 40, chapter 1, MCA. As noted, however, Plaintiffs do not ask to be granted the status of "married." For purposes of this case, Plaintiffs only seek a determination that they are entitled, as a matter of constitutional law, to obtain the same rights and benefits—along with the same mutual responsibilities and obligations—which the State of Montana has chosen to grant to different-sex married couples. The premise underlying this claim is that "marriage" does not include an exclusive right to any particular rights and benefits conferred by the government, and that "marriage" connotes something other than just the receipt of such rights and benefits. *See e.g. In re Marriage Cases*, 183 P.3d 384, 426-27, 434-35, 444-46 (Cal. 2008) ("the constitutional right to marry clearly does not obligate the state to afford specific tax or other governmental benefits on the basis of a couple's family relationship"; even if all of the personal and dignity interests which have traditionally informed the right to marry have been given to same-sex couples through the Domestic Partner Act, there is still "a considerable and undeniable symbolic importance" to the designation of "marriage"); *Kerrigan v. Commr. of Pub. Health*, 957 A.2d 407, 417-18 (Conn. 2008) ("[m]arriage . . . is not merely shorthand for a discrete set of legal rights and responsibilities"; "[a]lthough marriage and civil unions do embody the same legal rights under our law, they are by no means 'equal'[;] . . . the former is an institution of transcendent historical, cultural and social significance, whereas the latter most surely is not"); *Perry v. Brown*, 671 F.3d 1052, 1077-79 (9th Cir. 2012) (discussing "the extraordinary significance of the official designation of 'marriage' " apart from the rights,

33

protections, and benefits conferred by the government). Therefore, Plaintiffs argue, when the State chooses to make benefits and protections available to persons in committed intimate relationships, the State must do so evenhandedly, without discriminating on the basis of the sexual orientation of the persons in those relationships. In a sense, Plaintiffs are merely demanding "separate but equal" treatment by the State—the minimal floor of equal protection rights under *Plessy*.

¶61  The Attorney General does not deny that the State *could* provide such protections to committed intimate same-sex couples. As a matter of fact, the Attorney General acknowledges in his appellate brief that "the Legislature could choose to provide benefits similar to spousal benefits to unmarried couples" and that "the Legislature could create a different status conferring similar benefits outside of marriage for civil unions or domestic partners." The Attorney General, speaking through an Assistant Attorney General, made similar statements during oral argument.

¶62  One may wonder, then, why we do not simply grant Plaintiffs the declaratory relief they seek. While I certainly do not condone the "separate but equal" doctrine of *Plessy*—which the Supreme Court overruled in *Brown v. Board of Ed.*, 347 U.S. 483, 74 S. Ct. 686 (1954)—Plaintiffs have made clear that, for purposes of this lawsuit, they do not seek the status of marriage. They merely seek "equal opportunity" to obtain the same benefits and protections which the State, in its discretion, has chosen to make available to different-sex couples. It is surely beyond cavil that Plaintiffs are entitled, at the very least, to the equal protection of these laws—even if that protection is effected through a regime that does not include marriage, as the Attorney General suggests. *See Alaska Civ.*

34

*Liberties Union v. State*, 122 P.3d 781, 793-94 (Alaska 2005) (restricting public benefits programs to different-sex married couples violates the rights of employees with same-sex partners to "equal rights, opportunities, and protection under the law"); *Lewis v. Harris*, 908 A.2d 196, 220-21 (N.J. 2006) (as a matter of equal protection, "committed same-sex couples must be afforded on equal terms the same rights and benefits enjoyed by married opposite-sex couples"); *Baker v. State*, 744 A.2d 864, 886 (Vt. 1999) (the State has "a constitutional obligation to extend to [same-sex couples] the common benefit, protection, and security that Vermont law provides opposite-sex married couples").

¶63    It appears from the District Court record, the arguments on appeal, and the Court's Opinion that the hindrance in recognizing and declaring these rights boils down to a simple refusal by those in power to make the constitutionally sound—albeit politically unpopular—decision. For starters, rather than concede the elementary premise of this lawsuit—that it is a denial of equal protection to make statutory protections available to different-sex couples, who may obtain them by getting married, but to categorically deny them to same-sex couples, who are not able to get married—the Attorney General instead attempts to justify and *prolong* this institutionalized discrimination being perpetrated by the State of Montana against a discrete minority of its citizens.[3] Frankly, the State's

---

[3] In contrast, *see e.g. Perry v. Brown*, 265 P.3d 1002, 1008 (Cal. 2011): "The answer filed by the [California] Attorney General also declined to defend the initiative, but went further and affirmatively took the position that Proposition 8 [which amended the California Constitution to prohibit same-sex marriage] is unconstitutional." *See also e.g.* Ltr. from Eric H. Holder Jr., U.S. Atty. Gen., to John A. Boehner, Speaker, U.S. H.R., at 2 (Feb. 23, 2011) (Dkt. 42 in the District Court record): "[T]he President [of the United States] and I have concluded that classifications based on sexual orientation

arguments in this regard are inconsistent and difficult to follow. On one hand, the State concedes that the Legislature could provide committed intimate same-sex couples with similar benefits as are afforded to different-sex married couples. Yet, on the other hand, the State suggests that any benefits provided to different-sex married couples cannot also be provided to same-sex couples due to the Marriage Amendment. This reasoning is clearly a non sequitur for reasons discussed in greater detail in the Marriage Amendment section below. *See* ¶¶ 174-179, *infra*. For the time being, it suffices to point out that the Marriage Amendment merely states: "Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state." And, as noted, Plaintiffs are not asking that their relationships be recognized as "marriage." Furthermore, the Marriage Amendment does not require the State to grant married couples tax benefits, or the right to make medical decisions for a spouse, or the right to death benefits under the workers' compensation laws, etc. Nor does it say that these sorts of benefits and protections, if the State chooses to grant them, may not also be offered to unmarried persons. The State concedes that the Legislature could enact a civil-union or domestic-partnership scheme.

¶64    Perhaps for these reasons, the State ultimately takes the position that Plaintiffs' constitutional claim should not be decided at all. The reason: a ruling in Plaintiffs' favor could result in the invalidation of "innumerable" unspecified statutes. Yet, surely the fact that Plaintiffs are being discriminated against in "innumerable" ways is reason to *hasten* a decision on the merits of their claim, not delay it. Regrettably, however, a majority of

warrant heightened scrutiny and that, as applied to same-sex couples legally married under state law, Section 3 of [the Defense of Marriage Act] is unconstitutional."

this Court defers to the Attorney General's approach. Instead of requiring the State to demonstrate the constitutionality of its practices, the Court punts. The Court implies that Plaintiffs are to blame—that their failure to "specifically identify" and "specifically analyze" the "specific statutes" that are discriminatory somehow precludes us from declaring Plaintiffs' rights. Opinion, ¶¶ 9, 11, 13. How the Court expects Plaintiffs to present their claim is not entirely clear from the Court's opaque analysis. But a careful inspection reveals the Court's rationale to be entirely disingenuous in any event.

¶65   First of all, Plaintiffs *have* identified numerous statutes which grant benefits and protections to different-sex spouses but not to same-sex partners. Indeed, after observing in its Order that "Plaintiffs are denied a variety of benefits and protections that are statutorily available to heterosexual spouses," the District Court lists a slew of those statutes. Furthermore, Plaintiffs attached a laundry list of the discriminatory statutes to their motion to alter or amend the judgment. That list is attached as Appendix 1 to this Dissent. If what the Court needs is a specific statute to analyze, the Court can simply pick one of the numerous statutes identified in the District Court's Order or in Plaintiffs' list, and assess its validity in light of the parties' arguments. The constitutional principles of the Court's analysis could then be extrapolated and applied to other statutes.

¶66   Secondly, if the Court is suggesting that Plaintiffs may not obtain a declaratory ruling until they have specifically identified *every single* discriminatory statute, it appears entirely likely that the extensive list of statutes attached to Plaintiffs' motion to alter or amend the judgment is, in fact, a listing of *every single* discriminatory statute. If that is what the Court needs, then the Court need look no further than Plaintiffs' motion, which

37

is contained in the District Court record. More importantly, however, the Court has cited no authority whatsoever for requiring Plaintiffs to identify all of the discriminatory statutes. In fact, as I discuss in further detail below, the Uniform Declaratory Judgments Act enables Plaintiffs to obtain a declaration of their rights in a single lawsuit, without necessarily identifying each and every discriminatory statute.

¶67 Thirdly, if the Court is suggesting that Plaintiffs must challenge each statute on an individual basis, the Court has cited no authority for this approach either. Indeed, one purpose of the Uniform Declaratory Judgments Act is to *avoid* such seriatim litigation. As Plaintiffs reminded the District Court in their motion to alter or amend the judgment, they sought declaratory relief "in part to avoid this type of expensive and protracted litigation that would drain judicial resources while prolonging the harm experienced by Plaintiffs and their families." *Cf. McGillivray v. State*, 1999 MT 3, ¶¶ 9-11, 293 Mont. 19, 972 P.2d 804 (concluding that declaratory relief was the only "reasonable remedy" where, absent such relief, only those plaintiffs who had "the financial resources and personal fortitude to endure four different court proceedings" would be able to exercise their claimed constitutional right, while those plaintiffs "who will not or cannot afford this extensive litigation would be denied their right"). Indeed, forcing Plaintiffs to challenge each of the "innumerable" statutes in piecemeal fashion is not only manifestly unfair to them, it is an enormous waste of resources, given that the underlying legal question is the same with respect to each statute at issue. Montana taxpayers, who will have to foot the State's legal bills for defending each of these "innumerable" lawsuits, should be appalled by the Court's and the Attorney General's approach here.

¶68    I think it is worth noting that the Court's and the Attorney General's approach is completely out of step with other courts around the country—federal and state.  For example, Section 3 of the Defense of Marriage Act (DOMA), 1 U.S.C. § 7, defines "marriage" as a legal union between one man and one woman, and defines "spouse" as a person of the opposite sex who is a husband or a wife.  Although these definitions have "varying impact on more than a thousand federal laws," the Second Circuit Court of Appeals did not require the plaintiff to specifically identify those laws.  *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012).  To the contrary, the court proceeded to analyze her equal protection claim and concluded that "homosexuals compose a class that is subject to heightened scrutiny," that the class is "quasi-suspect" and thus subject to "intermediate scrutiny," and that "DOMA's classification of same-sex spouses was not substantially related to an important government interest."  *Windsor*, 699 F.3d at 185, 188.  Similarly, despite DOMA's "ramifying application throughout the U.S. Code" and its "effects on the numerous federal programs at issue," the First Circuit Court of Appeals did not require the plaintiffs to identify the "economic and other benefits" impacted by DOMA. *Massachusetts v. U.S. Dept. of Health and Human Servs.*, 682 F.3d 1, 5, 13 (1st Cir. 2012).  The court simply analyzed the constitutionality of excluding same-sex couples and concluded that "Congress' denial of federal benefits to same-sex couples lawfully married in Massachusetts has not been adequately supported by any permissible federal interest." *Massachusetts*, 682 F.3d at 16.

¶69    In New Jersey, different-sex married couples are entitled to "a vast array of economic and social benefits and privileges." *Lewis*, 908 A.2d at 206.  While same-sex

couples enjoyed various rights under New Jersey's Domestic Partnership Act, they were still denied "many benefits and privileges" accorded to married couples. *Lewis*, 908 A.2d at 215. In other words, the Domestic Partnership Act "failed to bridge the inequality gap between committed same-sex couples and married opposite-sex couples." *Lewis*, 908 A.2d at 215. The New Jersey Supreme Court noted a number of the rights afforded to married couples but denied to same-sex couples. The court did *not* require the plaintiffs, however, to go back to the trial court and re-file their constitutional challenge to this scheme—like this Court does in the present case—as "specific" challenges to "specific" statutes. Rather, the court quite sensibly and logically explained that the constitutional question is "whether there is a public need to deny committed same-sex partners the benefits and privileges available to heterosexual couples." *Lewis*, 908 A.2d at 217. Ultimately, the court held that "denying to committed same-sex couples the financial and social benefits and privileges given to their married heterosexual counterparts bears no substantial relationship to a legitimate governmental purpose." *Lewis*, 908 A.2d at 220.

¶70    The fact that there were "hundreds" of statutes relating to marriage and to marital benefits did not prevent the Supreme Judicial Court of Massachusetts from ascertaining whether the exclusion of same-sex couples from those benefits violated the state constitution. *Goodridge v. Dept. of Pub. Health*, 798 N.E.2d 941, 955 (Mass. 2003). The court noted some of the statutory benefits in its opinion, but saw no need "to be comprehensive." *Goodridge*, 798 N.E.2d at 955. The Hawaii Supreme Court also saw no such need. In considering the same-sex couples' constitutional challenge, the court observed that "a multiplicity of rights and benefits" are contingent upon the status of

40

marriage, but the court found it "unnecessary . . . to engage in an encyclopedic recitation of all of them." *Baehr v. Lewin*, 852 P.2d 44, 59 (Haw. 1993).

¶71 The Vermont Supreme Court likewise had no difficulty analyzing the legality of excluding same-sex couples from the "broad array of legal benefits and protections incident to the marital relation, including access to a spouse's medical, life, and disability insurance, hospital visitation and other medical decisionmaking privileges, spousal support, intestate succession, homestead protections, and many other statutory protections." *Baker*, 744 A.2d at 870. The court did not require the plaintiffs to specifically identify and specifically analyze the specific statutes. Rather, the court addressed the question common to each: "whether the exclusion of same-sex couples from the benefits and protections incident to marriage under Vermont law" is unconstitutional. *Baker*, 744 A.2d at 880. The court ultimately found "a constitutional obligation to extend to plaintiffs the common benefit, protection, and security that Vermont law provides opposite-sex married couples." *Baker*, 744 A.2d at 886.

¶72 I could continue, but I think the point is clear. In refusing to issue a declaratory ruling as to Plaintiffs' constitutional rights, and in forcing them to instead litigate each statutory protection individually, this Court sets itself up as the only court in the country to follow such an approach. In so doing, the Court commits grievous error.

¶73 The instant case is no different than the cases cited above. "Marriage" in Montana is presently defined as "a personal relationship between a man and a woman arising out of a civil contract." Section 40-1-103, MCA. Marriage between two persons of the same sex is prohibited. Section 40-1-401(1)(d), MCA; Mont. Const. art. XIII, § 7. Hence, by

41

definition, a person cannot be the "spouse" of someone who is the same sex. *Black's Law Dictionary* 1533 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009) (*spouse*: "a married person"). The State grants a broad array of legal benefits and protections to "spouses." As but one example, § 37-19-904(2)(c), MCA, grants the surviving "spouse" the right to control the disposition of the remains of a deceased person. Same-sex couples are excluded from the operation of these statutes because, by definition, they cannot be "spouses" and because they are not encompassed within the scope of the statutes in some *other* way. *See e.g.* § 45-5-206, MCA (for purposes of partner or family member assault, "partners" means "spouses, former spouses, persons who have a child in common, and persons who have been or are currently in a dating or ongoing intimate relationship with a person of the *opposite* sex" (emphasis added)). Plaintiffs' claim here is the same as the challengers' claims in the above cases: excluding same-sex couples from the opportunity to obtain the protections of these laws is unconstitutional.

¶74 As detailed in the Declaratory Judgment section below, there is simply no basis in law or in reason for requiring Plaintiffs to present their constitutional claim within the context of a challenge to a specific spousal benefit, or for requiring them to pursue independent challenges to each benefit, or for requiring them to identify all of the discriminatory laws. The notion that they must "specifically identify" and "specifically analyze" each of the "innumerable" statutes is, in reality, nothing more than a straw-man argument that the Attorney General has invented, and this Court has adopted, to avoid a socially divisive issue. I cannot believe that if the statutes discriminated on the basis of race, national origin, or religious affiliation, rather than sexual orientation, the Court

42

would concoct such an implausible procedural technicality as the Court does here to evade a legitimately presented constitutional question and deny the plaintiffs relief.

¶75    For all of these reasons, the Court's contention that it cannot issue a ruling on Plaintiffs' constitutional rights is devoid of any genuine or well-grounded underpinning. And so is the Court's suggestion that Plaintiffs still need "to develop an argument as to . . . the level of constitutional scrutiny that should be applied to [the discriminatory] laws by the courts." Opinion, ¶ 13. Plaintiffs devote entire sections of their briefs to this exact question, arguing that sexual orientation is a suspect class and that the denial of statutory benefits and obligations based on sexual orientation should be subject to heightened scrutiny. It is not clear whether the Court has overlooked these sections of Plaintiffs' briefs, or simply chosen to ignore them, but the argument is there. Perhaps the Court's view is that the level of scrutiny varies from statute to statute depending on "the nature of the State's interest." Opinion, ¶ 13. That, however, would be quite the novel approach to constitutional law. Indeed, I am aware of no precedent, from any court in this country, holding that the level of scrutiny—rational basis, middle tier, or strict—is determined not by the *classification* or the *constitutional right* at issue, but by "the nature of the State's interest" in discriminating against the class or infringing the right. Such an approach turns equal protection and due process analysis on its head.

¶76    If the reader is baffled by what the Court is requiring of Plaintiffs, he or she is not alone. As a purely factual matter, there is no dispute that the State, by statute, makes certain benefits and obligations available to different-sex couples but denies same-sex couples access to those same benefits and obligations. The legal question common to

43

every challenge Plaintiffs might lodge against these statutes is whether, under our Constitution, the State may categorically exclude homosexuals and bisexuals in committed intimate same-sex relationships from the opportunity to obtain the same statutory protections made available to heterosexuals and bisexuals in committed intimate different-sex relationships. There is no persuasive, let alone legitimate, reason why we cannot issue a ruling on this question. Even assuming, for the sake of argument, that "the nature of the State's interest" in excluding same-sex couples varies from statute to statute, this does not preclude us from declaring what Plaintiffs' rights are under traditional constitutional principles. We can rule—and I would rule—that sexual orientation is a suspect class and, therefore, that the State's interest in denying same-sex couples the opportunity to obtain the statutory protections offered to different-sex couples must be "compelling." Such a ruling is permitted by the Uniform Declaratory Judgments Act, and it would adequately resolve this dispute. At that point, the legislative and executive branches could take whatever steps are necessary to honor Plaintiffs' civil rights—as legislative and executive officers are constitutionally sworn to do (Mont. Const. art. III, § 3)—in accordance with our decision.

¶77 The Court tells Plaintiffs that they may amend their complaint and pursue further proceedings in the District Court. Opinion, ¶ 13. While this at least has the virtue of rescuing their claims from the District Court's outright dismissal, I cannot agree that this remedy is adequate. To the contrary, refusing to declare Plaintiffs' constitutional rights *forthwith*, and sending them back to the District Court for unnecessary *re*-litigation of a constitutional question they have squarely presented to us in the instant appeal, is itself an

infringement of those rights. It must not be forgotten that "[t]he rights here asserted are, like all such rights, present rights; they are not merely hopes to some future enjoyment of some formalistic constitutional promise. The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled." *Watson v. City of Memphis*, 373 U.S. 526, 533, 83 S. Ct. 1314, 1318 (1963) (rejecting the City's request for further delay in meeting its constitutional obligation under the Fourteenth Amendment to desegregate its public parks and other municipal recreational facilities). Likewise, under Montana law, the courts of this State (including the Montana Supreme Court) are courts of justice. Section 3-1-101, MCA. "Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person[.] . . . Right and justice shall be administered without sale, denial, or delay." Mont. Const. art. II, § 16. This fundamental constitutional right is not simply access to courts. It is access to *justice*—defined in Montana's organic law to mean a speedy remedy, to every person, for every injury of person, without delay.

¶78     Thus, as a matter of federal constitutional law and Montana constitutional law, Plaintiffs are entitled to a *prompt* determination of their constitutional rights vis-à-vis the State of Montana's admitted practice of making benefits and protections available to different-sex couples while categorically denying them to same-sex couples. Plaintiffs are also entitled to *prompt* rectification for any violations of these rights. *Watson*, 373 U.S. at 533, 83 S. Ct. at 1318 ("any deprivation of constitutional rights calls for prompt rectification"); Mont. Const. art. II, § 16 ("speedy remedy" shall be afforded for every injury). "It is axiomatic that 'justice delayed is justice denied.' " *State ex rel. Carlin v.*

45

*Fifth Jud. Dist. Ct.*, 118 Mont. 127, 135, 164 P.2d 155, 159 (1945); *cf. Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S. Ct. 2166, 2178 (1988) ("Perpetual litigation of any issue . . . delays, and therefore threatens to deny, justice."); *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 58, 310 Mont. 123, 54 P.3d 1 (Nelson, Trieweiler, Leaphart, & Cotter, JJ., specially concurring) ("Constitutional rights that cannot be enforced are illusory. It is as if those rights cease to exist as legal rights."). Evading and delaying a decision on the merits of Plaintiffs' constitutional claims, and requiring them to file seriatim challenges to "innumerable" statutes—each with the same, common legal issue—denies Plaintiffs access to justice just as clearly and as surely as if we had simply padlocked the courthouse doors. No class of litigants should be burdened with the emotional, financial, and time-related costs of this approach. No class of litigants should be treated in this draconian fashion. Our decision today makes a mockery of this Court's supposed commitment to access-to-justice principles. *See In re the Estab. of an Access to Just. Commn.*, No. AF 11-0765 (Mont. May 22, 2012).

¶79    In light of the foregoing, I believe that rather than affirmatively *protect* Plaintiffs' civil rights as they are sworn to do, the Attorney General, the Legislature, and now, sadly, a majority of this Court have instead denied these persons justice and wrongly prolonged the State's discriminatory practices. In requiring Plaintiffs to jump through procedural hoops that we have *never* imposed on any other minority group, and in thus delaying the vindication of their constitutional rights, the Court conveys that gay, lesbian, and bisexual Montanans cannot expect to receive fairness, justice, respect, and equal treatment from Montana's courts. As I said at the outset, this is a black day for civil rights in Montana.

46

¶80    I now turn to a detailed discussion of the law supporting my conclusion that declaratory relief is appropriate here.

## III.  DECLARATORY JUDGMENT

¶81    *Procedure should be the "handmaid of justice," a means to an end.  Instead . . . procedure tends to become rigid, stereotyped, and over-technical, an end in itself, often seemingly oblivious to the practical needs of those to whose ills it is designed to minister.  Litigants thus often become pawns in a game, the social cost of which is excessive and the result of which is frequently unnecessarily cumbersome and socially undesirable.  Substantive rights often become the incidents of procedural fencing.*[4]

### A.  Legal Principles

¶82    The National Conference of Commissioners on Uniform State Laws approved the Uniform Declaratory Judgments Act in 1922.  The Act has been adopted, substantially as drafted, in most states including Montana.  *See* Unif. Declaratory Judms. Act, tbl. of jxns. and historical notes, 12 U.L.A. 331 (2008 & Supp. 2012); Mont. Code Ann., Annotations 2012, at 1030; Title 27, chapter 8, MCA.  The Act states that it is to be "so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees."  Section 27-8-103, MCA.  Thus, it is appropriate to consider decisions from other jurisdictions when applying the Act.  *See e.g. Beahringer v. Page*, 789 N.E.2d 1216, 1223 (Ill. 2003) ("In interpreting the Illinois

---

[4] *Allstate Ins. Co. v. Hayes*, 499 N.W.2d 743, 746 (Mich. 1993) (ellipsis in original) (quoting Edwin Borchard, *Declaratory Judgments* xiii (2d ed. 1941)).

declaratory judgment statute, Illinois courts may look to the decisions of other states in interpreting the Uniform Declaratory Judgments Act.").

¶83    The purpose of the Uniform Declaratory Judgments Act "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Section 27-8-102, MCA. The Act relieves litigants of the common-law rule that no declaration of rights may be judicially adjudged unless a right has been violated. *Boyds Civic Assn. v. Montgomery Co. Council*, 526 A.2d 598, 602 (Md. 1987). In other words, the Act renders disputes concerning legal rights and duties justiciable without proof of a wrong committed by one party against another. *Hirschfield v. Bd. of Co. Commrs.*, 944 P.2d 1139, 1142 (Wyo. 1997); *see also Beahringer*, 789 N.E.2d at 1223 ("The declaratory judgment procedure allows the court to take hold of a controversy one step sooner than normally—that is, after the dispute has arisen, but before steps are taken which give rise to claims for damages or other relief. The parties to the dispute can then learn the consequences of their action before acting." (internal quotation marks omitted)).

¶84    Thus, we have recognized that declaratory relief serves "to liquidate uncertainties and controversies which might result in future litigation." *In re Dewar*, 169 Mont. 437, 444, 548 P.2d 149, 154 (1976); *accord Forty-Second Legis. Assembly v. Lennon*, 156 Mont. 416, 421, 481 P.2d 330, 332 (1971) ("to eliminate or reduce a multiplicity of future litigation"); *Beahringer*, 789 N.E.2d at 1223 (" 'to afford security and relief against uncertainty so as to avoid potential litigation' "). Through declaratory relief, " 'parties between whom an actual controversy exists or between whom litigation is inevitable are enabled to have the issues speedily determined where their determination would be

48

delayed to the possible injury of the one or the other if they were compelled to await the course of ordinary judicial proceedings.' " *Automation Sys., Inc. v. Intel Corp.*, 501 F. Supp. 345, 347 (S.D. Iowa 1980) (quoting Anthony William Deller, *Walker on Patents* vol. 8, § 617, 65 (2d ed. 1973)). In this respect, "declaratory procedure operates prospectively, and not merely for the redress of past wrongs. It serves to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission of wrongs; in short, the remedy is to be used in the interests of preventive justice, to declare rights rather than execute them." *Babb v. Super. Ct.*, 479 P.2d 379, 383 (Cal. 1971) (alteration and internal quotation marks omitted).

¶85 To that end, the Uniform Declaratory Judgments Act confers on courts the "power to declare rights, status, and other legal relations *whether or not further relief is or could be claimed*." Section 27-8-201, MCA (emphasis added). The declaration "may be either affirmative or negative in form and effect," and it has "the force and effect of a final judgment or decree." Section 27-8-201, MCA. The Act specifically provides that

> [a]ny person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Section 27-8-202, MCA. The Act further provides, however, that this enumeration "does not limit or restrict the exercise of the general powers conferred in 27-8-201 in any proceeding where declaratory relief is sought in which a judgment or decree will terminate the controversy or remove an uncertainty." Section 27-8-205, MCA. The Act

49

"is to be liberally construed and administered," § 27-8-102, MCA, and "[n]o action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for," § 27-8-201, MCA.

¶86 Lastly, it is well settled that declaratory procedure is appropriate to determine a constitutional question or to test a constitutional right. *See e.g. MEA-MFT v. McCulloch*, 2012 MT 211, 366 Mont. 266, ___ P.3d ___; *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, 325 Mont. 148, 104 P.3d 445; *McGillivray v. State*, 1999 MT 3, 293 Mont. 19, 972 P.2d 804; *McDonald v. State*, 220 Mont. 519, 722 P.2d 598 (1986); *Bd. of Regents v. Judge*, 168 Mont. 433, 543 P.2d 1323 (1975). As the Washington Supreme Court has stated, "[d]eclaratory procedure is peculiarly well suited to the judicial determination of controversies concerning constitutional rights and . . . the constitutionality of legislative action or inaction." *Seattle Sch. Dist. v. State*, 585 P.2d 71, 80 (Wash. 1978).

## B.  The District Court's Decision

¶87 Given these principles, the District Court clearly had power "to declare [Plaintiffs' constitutional] rights, status, and other legal relations"—*whether or not further relief was or could be claimed*—in order to "terminate the controversy" or "remove an uncertainty." Sections 27-8-201, -205, MCA. The District Court did not deny that it has this power; in fact, Plaintiffs reminded the District Court that it has this power in their motion to alter or amend the judgment. The District Court, rather, simply failed to exercise it.

¶88 At this juncture it is necessary to describe Plaintiffs' Prayer for Relief, which is attached as Appendix 2 to this Dissent. It consists of nine numbered paragraphs. The first five paragraphs seek *declaratory* relief—specifically, a "declaration" that the State's

50

categorical exclusion of same-sex couples from the opportunity to obtain the protections and obligations which the State makes available to different-sex couples violates five separate rights in the Montana Constitution. The next two paragraphs seek *injunctive* relief: that the State be enjoined "from continuing to deny Plaintiffs and their families access to a legal status and statutory structure that confers the protections and obligations the State provides to different-sex couples who marry," and that the State be required "to offer same-sex couples and their families a legal status and statutory structure that confers the protections and obligations that the State provides to different-sex couples who marry, but not the status or designation of marriage." The final two paragraphs seek costs, attorney's fees, and such other relief as the court deems just and proper.

¶89 Curiously, while five of the nine paragraphs in the Prayer for Relief seek *declaratory* relief, the District Court focused exclusively on the question of *injunctive* relief. The court stated that "[t]he relief sought by Plaintiffs is contained in paragraph 7 of their prayer for relief." Paragraph 7 requests an order requiring the State to offer same-sex couples and their families "a legal status and statutory structure that confers the protections and obligations that the State provides to different-sex couples who marry, but not the status or designation of marriage." The District Court interpreted this to mean that "Plaintiffs seek an order of this Court requiring the legislature to adopt a civil union or domestic partnership statutory scheme."

¶90 The District Court questioned whether the issuance of such an order would be an appropriate exercise of the court's power. The District Court acknowledged that it has previously been willing to exercise its judicial power when it found "a specific statute

51

applying to gay people" unconstitutional. *See Gryczan v. State*, No. BDV-93-1869 (Mont. 1st Jud. Dist. Feb. 16, 1996), *aff'd*, 283 Mont. 433, 942 P.2d 112 (1997). However, the District Court distinguished the present case from *Gryczan* on the ground that "what Plaintiffs want here is not a declaration of the unconstitutionality of a specific statute or set of statutes, but rather a direction to the legislature to enact a statutory arrangement." The District Court opined that directing the Legislature to take such action "would launch this Court into a roiling maelstrom of policy issues without a constitutional compass." The District Court also felt that it could not issue such an order without knowing "*all* of the statutes that would be affected" (emphasis added).

¶91 The District Court further acknowledged that it has previously declared a statutory scheme unconstitutional and allowed the Legislature broad discretion to correct the unconstitutional portions of the statutes. *See Columbia Falls Elem. Sch. Dist. v. State*, No. BDV-02-0528 (Mont. 1st Jud. Dist. Apr. 15, 2004), *aff'd*, 2005 MT 69, 326 Mont. 304, 109 P.3d 257. But the District Court viewed *Columbia Falls* as distinguishable from the present case in that the court was dealing with "a discreet school funding formula" and "knew exactly what statutes would be affected" in the *Columbia Falls* case, whereas the present case involves "a not yet entirely specified array of statutes that deal with many different topics and were enacted over a variety of years."

¶92 The District Court thus reached "the jurisprudential decision that Plaintiffs' requested relief constitutes an impermissible sojourn into the powers of the legislative branch." Citing "the constitutional separation of powers" (Mont. Const. art. III, § 1), the District Court granted the Attorney General's motion to dismiss. The District Court

posited that the proper way to address Plaintiffs' concerns would be through "specific suits directed at specific, identifiable statutes."

¶93     With regard to the issue of *injunctive* relief, I do not fault Plaintiffs for including requests for such relief in their complaint. It was their prerogative to do so. *See* Title 27, chapter 19, MCA. Likewise, however, I do not fault the District Court for declining to order *injunctive* relief at this stage. The District Court noted several factors which, in the court's view, weighed against the issuance of a judicial order requiring the Legislature to enact the "statutory structure" requested by Plaintiffs. I cannot conclude that the District Court abused its discretion in this regard. *See Krutzfeldt Ranch, LLC v. Pinnacle Bank*, 2012 MT 15, ¶ 13, 363 Mont. 366, 272 P.3d 635 ("the denial of a temporary or permanent injunction is reviewed for 'manifest abuse of discretion' ").

¶94     That being said, *none* of the factors identified by the District Court regarding Plaintiffs' request for *injunctive* relief excuse or justify that court's complete and utter failure to grant Plaintiffs' request for *declaratory* relief. It bears repeating that the District Court had "power to declare rights, status, and other legal relations *whether or not further relief is or could be claimed.*" Section 27-8-201, MCA (emphasis added). Indeed, " '[a] declaratory judgment or decree is one which simply declares the rights of the parties or expresses the opinion of the court on a question of law, *without ordering anything to be done*; its distinctive characteristic being that the declaration stands by itself, and no executory process follows as of course . . . .' " *Black v. Siler*, 392 P.2d 572, 574 (Ariz. 1964) (emphasis added) (quoting *Clein v. Kaplan*, 40 S.E.2d 133, 137 (Ga. 1946)). The District Court had the power to issue a declaration if for no other reason than

to "remove an uncertainty" regarding Plaintiffs' rights. Section 27-8-205, MCA. Again, the Uniform Declaratory Judgments Act "is to be liberally construed and administered," § 27-8-102, MCA, and "[n]o action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for," § 27-8-201, MCA. Thus, the fact that the District Court felt precluded from granting Plaintiffs' requests for *injunctive* relief was not a valid legal basis for ignoring their requests for *declaratory* relief. These are distinct forms of relief, and a court's ability to grant the latter does not depend in any way whatsoever on its ability to grant the former. Section 27-8-201, MCA.

¶95 There is likewise no merit to the proposition that declaratory relief cannot be granted without first identifying "all" of the statutes that would be affected by the ruling. First of all, as a factual matter, Plaintiffs provided the District Court with a list, appearing to be exhaustive, of the Montana statutes that confer benefits and protections on married couples—benefits and protections that are unavailable to Plaintiffs because they cannot marry. *See* Appendix 1 to this Dissent. The District Court thus had what it claimed it needed: a list of "all of the statutes that would be affected" by the court's ruling. Yet, rather than address Plaintiffs' requests for declaratory relief in light of this list—which Plaintiffs had provided at the District Court's behest—the District Court inexplicably took no action at all and thus caused their motion to alter or amend the judgment to be denied by operation of law. *See* M. R. Civ. P. 59(g) (2009).

¶96 Secondly, this same proposition—that declaratory relief cannot be granted without first identifying "all" of the statutes that would be affected by the ruling—was asserted, and rejected, in *Spates v. Montgomery Co.*, 590 A.2d 1074, 1076 (Md. Spec. App. 1991).

54

There, the government argued that "by failing to identify particular statutes he regards as unconstitutional, Spates has not presented a justiciable issue." *Spates*, 590 A.2d at 1077. The Maryland Court of Special Appeals agreed that Spates' complaint was "poorly drawn and seriously lacking in specifics." *Spates*, 590 A.2d at 1077. Yet, the court observed that Spates' "basic point" was that the government's failure to tax personal property placed an unfair, disproportionate, and non-uniform tax burden on the owners of real property. *Spates*, 590 A.2d at 1077. From this, the court reasoned that

> the failure to identify particular sections of the Tax-Property article of the Code is really not telling in this case. Spates has challenged the system of taxation authorized by law, which includes those sections defining terms, imposing the property tax, determining the kinds of property to be taxed, establishing the method of assessment, and providing for the collection of the tax. Given the nature of his attack, it would, as he contends, be well-nigh impossible, and quite unnecessary in our view, to pick through the entire Tax Code and identify only those specific statutes or parts of statutes that directly support the system he challenges.

*Spates*, 590 A.2d at 1077.

¶97 Plaintiffs' challenge in the present case is not directed at Montana's system of taxation; it is directed at Montana's system of statutory benefits and protections accorded to married couples. Nevertheless, *Spates*' reasoning is pertinent here. Indeed, the fact that the Legislature has spread the benefits and protections throughout the Code, rather than collecting them all in a single title and chapter, cannot immunize the system from challenge and review.

¶98 The one feature common to each of the benefits and protections is that they are granted to "spouses," or on the basis of "marriage" to a "husband" or "wife." Under current Montana law, only heterosexuals and bisexuals in different-sex relationships can

get "married" and thus become "spouses," "husbands," and "wives"; homosexuals and bisexuals in same-sex relationships are not allowed to marry. Mont. Const. art. XIII, § 7; §§ 40-1-103, -401(1)(d), MCA; *Black's Law Dictionary* 810, 1533, 1735 (*spouse*: "a married person"; *husband*: "[a] married man"; *wife*: "[a] married woman"). As a result, same-sex couples are not encompassed within these benefits and protections. Plaintiffs challenge this scheme as unconstitutional—i.e., the fact that the State systematically denies them "the opportunity" to obtain the benefits and protections made available to different-sex couples. Again, Plaintiffs do not ask to be married; they would be satisfied if "the opportunity" to obtain the benefits and protections were provided through some sort of alternative method distinct from "marriage." Whether this claim implicates one statute or a hundred, it is quite unnecessary for Plaintiffs to identify them all in this lawsuit in order to obtain a declaratory ruling. Paragraphs 1 through 5 of the Prayer for Relief seek only a "declaration" that this disparate treatment—*the existence of which no one disputes*—violates the Montana Constitution. The District Court and this Court, in turn, may decree that it is unconstitutional to deny same-sex couples the opportunity to obtain the civil protections made available to different-sex couples, absent a compelling state interest. Once that is done, the Legislature can identify the problem statutes and amend them. Indeed, the Legislature did just that in 2009 when it passed House Bill 37, titled "An Act Gender Neutralizing and Conforming Titles 10 through 90 of the Montana Code Annotated to Current Bill Drafting Standards . . . ." This single piece of legislation, the text of which spans 967 pages of the 2009 Session Laws, simultaneously amended 2,876 statutes. Surely if the Legislature can identify several thousand statutes needing to

56

be "gender neutralized," the Legislature can identify a few hundred statutes needing to be "sexual-orientation neutralized."

¶99 We have said that "[t]he decision to dismiss a complaint for declaratory relief is within the sound discretion of the district court." *Renville v. Farmers Ins. Exch.*, 2003 MT 103, ¶ 9, 315 Mont. 295, 69 P.3d 217. We have also held, however, that the "[f]ailure of a district court to exercise discretion is itself an abuse of discretion." *Clark Fork Coalition v. Mont. Dept. of Envtl. Quality*, 2008 MT 407, ¶ 43, 347 Mont. 197, 197 P.3d 482; *cf. Spates*, 590 A.2d at 1076 ("Having failed to find a legitimate reason not to declare the rights of the parties, it was incumbent upon the court to do so."). That is what happened here when the District Court dismissed Plaintiffs' complaint based on their requested *injunctive* relief, without addressing their requested *declaratory* relief. In so doing, the District Court wrongly conflated these two forms of relief. The District Court failed to recognize that one of the purposes of the Uniform Declaratory Judgments Act is "[t]o enable public duties and powers to be established without the cumbersome and technical prerequisites of mandamus, certiorari, injunction, prohibition, or habeas corpus." Edwin Borchard, *Declaratory Judgments* 288 (2d ed. 1941). The District Court overlooked the fact that while a motion to dismiss may be used in a declaratory judgment proceeding "to challenge the legal availability or appropriateness of *the remedy*," a motion to dismiss should "seldom, if ever, . . . be sustained or the complaint dismissed without *a declaration* one way or the other of *the rights* of the parties." *Spates*, 590 A.2d at 1076 (emphases added, brackets and internal quotation marks omitted); *cf. Steffel v. Thompson*, 415 U.S. 452, 468-69, 94 S. Ct. 1209, 1220 (1974) (a federal court has "the

57

duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction" (internal quotation marks omitted)); James Wm. Moore, *Moore's Federal Practice* vol. 2, § 12.34[1][b], 12-81 (3d ed., Matthew Bender 2012) ("Consistently with their obligation to construe plaintiffs' allegations liberally, courts will not dismiss for failure to state a claim merely because the complaint requests inappropriate relief.").

¶100   I am thus in complete agreement with Plaintiffs' statement, in their motion to alter or amend the judgment, that "dismissal of the entire action based solely on one request for injunctive relief reflects a manifest error of law as there are five other requests for declaratory judgment upon which this Court may properly rule."   The District Court erred, as a matter of law, in its treatment of Plaintiffs' request for declaratory relief, and the District Court's judgment must therefore be reversed to that extent.

## C.  This Court's "Justiciability" Rationale

¶101   Like the District Court, this Court also lumps Plaintiffs' requests for *injunctive* relief and *declaratory* relief into a single analysis.  Opinion, ¶ 9.  Doing so is error for the reasons just discussed.  The Court does appear, however, to reject Plaintiffs' claims using a somewhat different rationale.   Specifically, the Court asserts that this case is not "justiciable" because a ruling in Plaintiffs' favor "would not terminate the uncertainty or controversy giving rise to this proceeding" and because Plaintiffs are asking this Court to "determine speculative matters," "declare social status," "give advisory opinions," or "give abstract opinions."  Opinion, ¶ 9.  In all respects, the Court is mistaken.

¶102 First of all, a declaratory judgment is itself "remedial." Section 27-8-102, MCA. A declaratory judgment or decree is one which simply declares the rights of the parties or expresses the opinion of the court on a question of law, *without ordering anything to be done*; the declaration stands by itself, and no executory process follows as of course. *Black*, 392 P.2d at 574; *Clein*, 40 S.E.2d at 137; § 27-8-201, MCA. The Uniform Declaratory Judgments Act permits courts "to settle and to afford relief from uncertainty and insecurity." Section 27-8-102, MCA. A declaratory judgment is appropriate if for no other reason than to "remove an uncertainty." Section 27-8-205, MCA.

¶103 The Court's contention that a declaratory judgment would not terminate the uncertainty or controversy giving rise to this proceeding is simply untrue. There is no dispute that the State offers a variety of benefits and protections to committed intimate couples, but only different-sex couples have the opportunity to obtain them. This regime gives preferential treatment to heterosexuals and bisexuals committed to a person of the opposite sex, and disfavors homosexuals and bisexuals committed to a person of the same sex. Plaintiffs' requests for declaratory relief raise one legal question: Is it constitutionally permissible for the State to deny same-sex couples the opportunity to obtain the benefits and protections made available to different-sex couples? In other words, is it constitutionally permissible for Montana's government to treat Plaintiffs differently based on their sexual orientation? That is the "uncertainty or controversy" in this case. We may resolve it—and, for the reasons detailed in the Constitutional Analysis section below, I would resolve it—by holding that sexual orientation is a suspect class and that any disparate treatment between committed intimate same-sex couples and

59

different-sex married couples is subject to "strict scrutiny" review. Such a ruling would answer and resolve Plaintiffs' requests for declaratory relief.

¶104 Secondly, there is no merit to the Court's suggestion that Plaintiffs have asked us to determine speculative matters, declare social status, or give an abstract opinion. This dismissive portrayal of Plaintiffs' complaint is insulting and disrespectful. There is nothing "speculative" about the discrimination Plaintiffs have experienced—some of it private, some of it state-imposed—as described in their affidavits. The State itself does not deny that Plaintiffs have suffered economic and emotional harm due to their sexual orientation and that Plaintiffs' relationships are treated differently than their different-sex counterparts under the law. Plaintiffs do not ask or need this Court to declare their "social status." Plaintiffs are acutely aware of their social status. They ask this Court, rather, to declare and uphold their constitutional rights. There is nothing "speculative" or "abstract" about this claim.

¶105 Lastly, we have previously defined nonjusticiable advisory opinions as "opinions issued by the court in response to a request from some other branch of government, such as the legislative or executive, asking for information concerning matters of law." *In re Secret Grand Jury Inquiry*, 170 Mont. 354, 357, 553 P.2d 987, 990 (1976). That clearly is not the case here. More recently, we have stated that an advisory opinion is "one advising what the law would be upon a hypothetical state of facts or upon an abstract proposition." *Plan Helena, Inc. v. Helena Regl. Airport Auth. Bd.*, 2010 MT 26, ¶ 12, 355 Mont. 142, 226 P.3d 567. That too is not the case here. The underlying state of facts is not "hypothetical," nor is the proposition "abstract." Plaintiffs are being denied access

to statutory benefits and protections which the State, in its discretion, has chosen to make available to different-sex couples.

¶106　In *Secret Grand Jury Inquiry*, this Court articulated what constitutes a "justiciable controversy" for purposes of obtaining a declaratory judgment:

> First, a justiciable controversy requires that parties have existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument invoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the effect of a final judgment in law or decree in equity upon the rights, status or legal relationships of one or more of the real parties in interest, or lacking these qualities be of such an overriding public moment as to constitute the legal equivalent of all of them.

170 Mont. at 357, 553 P.2d at 990.

¶107　We have repeated this test in numerous cases,[5] and recently applied the test in *Chipman v. N.W. Healthcare Corp.*, 2012 MT 242, ¶¶ 19-23, 366 Mont. 450, 288 P.3d 193. Here, the rights Plaintiffs invoke (Article II, Sections 3, 4, 10, and 17 of the Montana Constitution) are obviously not theoretical. They are "existing and genuine" constitutional rights. Second, a judgment on whether the State may make statutory benefits and protections available to different-sex couples, but categorically deny them to

---

[5] *See Lee v. State*, 195 Mont. 1, 6, 635 P.2d 1282, 1284-85 (1981); *Brisendine v. Dept. of Commerce*, 253 Mont. 361, 364, 833 P.2d 1019, 1021 (1992); *Gryczan v. State*, 283 Mont. 433, 442, 942 P.2d 112, 117 (1997); *Northfield Ins. Co. v. Mont. Assn. of Counties*, 2000 MT 256, ¶ 12, 301 Mont. 472, 10 P.3d 813; *Powder River County v. State*, 2002 MT 259, ¶ 102, 312 Mont. 198, 60 P.3d 357; *Montana-Dakota Utils. Co. v. City of Billings*, 2003 MT 332, ¶ 9, 318 Mont. 407, 80 P.3d 1247; *Advocs. for Educ., Inc. v. Mont. Dept. of Nat. Resources & Conserv.*, 2004 MT 230, ¶ 12, 322 Mont. 429, 97 P.3d 553; *Skinner v. Allstate Ins. Co.*, 2005 MT 323, ¶ 15, 329 Mont. 511, 127 P.3d 359; *Miller v. State Farm Mut. Auto. Ins. Co.*, 2007 MT 85, ¶ 8, 337 Mont. 67, 155 P.3d 1278.

same-sex couples, "will effectively operate to settle the issues at hand." *Chipman*, ¶ 22. I am not persuaded that it is necessary to litigate "the nature of the State's interest" with respect to each individual statute. Opinion, ¶ 13. But even assuming, for the sake of argument, that *the nature of the State's interest* in excluding same-sex couples varies from statute to statute, the present action can definitively settle *the nature of Plaintiffs' constitutional rights*—rights that are the same regardless of the statute at issue. There is no indication, therefore, that a declaration here would be "purely political, administrative, philosophical or academic." *Chipman*, ¶ 22. Finally, in considering "the main thrust" of this lawsuit, *Chipman*, ¶ 23, this Court has been asked to determine the constitutional relationship of the parties. In particular, we must determine whether the Constitution requires that when the State offers legal benefits and protections to persons in committed intimate relationships, it must do so evenhandedly, without discriminating on the basis of sexual orientation. This controversy directly involves the rights, status, and legal relationships of the parties. *Chipman*, ¶ 23; *see also Plan Helena*, ¶ 9 (the controversy must be "definite and concrete, touching legal relations of parties having adverse legal interests" (internal quotation marks omitted)). Accordingly, it is a justiciable controversy under the foregoing three-part test.

### D. Summary

¶108 In sum, the Court errs in holding that this case is nonjusticiable. In adopting its statute-by-statute approach, the Court not only fails to follow Montana's own statutory commands, but also sets itself apart as the *non*-uniform black sheep in the otherwise *Uniform* Declaratory Judgments Act states.

¶109 Courts have "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Section 27-8-201, MCA. This power "is to be liberally construed and administered" to permit courts "to settle and to afford relief from uncertainty and insecurity." Section 27-8-102, -205, MCA. Through a declaratory judgment proceeding, "a multiplicity of suits can be avoided, while an adequate, expedient, and inexpensive remedy can be afforded for litigants in a single action." *Thomas v. Cilbe, Inc.*, 104 So. 2d 397, 403 (Fla. App. 1958).

¶110 Here, the declaratory issue is whether the Montana Constitution prohibits the State from excluding same-sex partners from the opportunity to obtain the benefits and protections that the State makes available to different-sex partners. There is no need to identify "all" of the potentially offending statutes in order to issue a ruling on this legal question, nor is there a need to pursue each statutory challenge separately. It is sufficient to declare the constitutional standard applicable to Plaintiffs' claim—an issue which Plaintiffs have raised and briefed. And for the reasons discussed below, I would hold that sexual orientation is a suspect class under Article II, Section 4 of the Montana Constitution and that discrimination based on sexual orientation in the provision of statutory benefits and protections is subject to "strict scrutiny" review. I would reverse the District Court's judgment and direct it to enter such an order. I dissent from this Court's failure and refusal to do so.

¶111 As for the injunctions Plaintiffs request, I do not believe it is necessary to order such relief at this point. It is sufficient to declare Plaintiffs' constitutional rights so as to remove the apparent uncertainty concerning those rights. Sections 27-8-201, -205, MCA.

Rather than proceed to direct the State how to remedy the problem, it is prudent to do what was done in the *Columbia Falls* and *Snetsinger* cases and permit the legislative and executive branches to address and resolve the matter in the first instance, in accordance with our constitutional interpretation, as those officers are sworn to do (Mont. Const. art. III, § 3). *See* Borchard, *Declaratory Judgments* 279-80 ("The declaratory action proceeds on the assumption that a mild remedy will often satisfy, that responsible defendants, like government officials or large corporations, do not need more than a declaration of the law to obey it and that a coercive procedure under such circumstances is an expensive and often unnecessary luxury."). Indeed, this is exactly what happened following our decision in *Snetsinger*, where we concluded that the Montana University System's policy of treating unmarried same-sex couples differently than unmarried different-sex couples in the provision of health benefits violated the Montana Constitution. Within three months, the Board of Regents had approved—unanimously, no less—a new insurance policy that would allow University System employees to obtain health coverage for gay and lesbian partners. *See Regents Approve Same-Sex Insurance Policy*, Missoulian (Mar. 18, 2005).

¶112 Plaintiffs here contend that entering a declaratory judgment regarding their constitutional rights "would serve the courts' primary function of adjudicating citizens' rights under the Constitution, while allowing the coordinate branches of government a reasonable opportunity to bring the State's conduct into compliance with the Constitution." I agree and, thus, would affirm the District Court's denial of injunctive relief, with the understanding that Plaintiffs may again pursue such relief if it becomes

64

necessary in the future to do so. *See e.g. Baker v. State*, 744 A.2d 864, 886, 887 (Vt. 1999) ("We hold only that plaintiffs are entitled under Chapter I, Article 7, of the Vermont Constitution to obtain the same benefits and protections afforded by Vermont law to married opposite-sex couples. We do not purport to infringe upon the prerogatives of the Legislature to craft an appropriate means of addressing this constitutional mandate . . . . In the event that the benefits and protections in question are not statutorily granted, plaintiffs may petition this Court to order the remedy they originally sought.").

¶113 Having detailed my reasons for disagreeing with the District Court's and this Court's procedural dispositions of the case, I now provide the legal analysis underlying my conclusions that sexual orientation is a suspect class and, thus, that treating same-sex couples differently than different-sex couples is subject to strict scrutiny review.

## IV. CONSTITUTIONAL ANALYSIS

¶114    *[I]n view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution . . . neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law.*[6]

¶115 Plaintiffs contend that the State's exclusion of same-sex couples from the opportunity to obtain the benefits and protections which the State makes available to different-sex couples violates five fundamental constitutional rights: to pursue safety, health, and happiness (Mont. Const. art. II, § 3), to equal protection of the laws (§ 4), to individual dignity (§ 4), to individual privacy (§ 10), and to due process of law (§ 17).

---

[6] *Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S. Ct. 1138, 1146 (1896) (Harlan, J., dissenting).

Because I conclude that the Equal Protection Clause (which happens to be Plaintiffs' primary argument) is sufficient to resolve this case, I focus my analysis there and do not address Plaintiffs' arguments under Article II, Sections 3, 10, or 17.  At the conclusion of my equal protection discussion, however, I briefly discuss Article II, Section 4's Dignity Clause and the additional support it provides for Plaintiffs' claim.

## A. Religious, Moral, and Political Beliefs

¶116 At the outset, it is important to emphasize two preliminary points made by various courts which have addressed these issues.

¶117 First, although the question whether the State may exclude same-sex couples from the benefits and protections that it provides to different-sex married couples "arouses deeply-felt religious, moral, and political beliefs[, o]ur constitutional responsibility to consider the legal merits of issues properly before us provides no exception for the controversial case." *Baker v. State*, 744 A.2d 864, 867 (Vt. 1999).  Courts have a duty to uphold the constitutional rights of all parties, regardless of how unpopular they or their cause may be.  *See e.g. Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997) (upholding the constitutional right of homosexuals to engage in private, consensual, noncommercial sexual conduct with other adults free of governmental interference or regulation); *Texas v. Johnson*, 491 U.S. 397, 109 S. Ct. 2533 (1989) (upholding Johnson's First Amendment right to burn an American flag); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827 (1969) (upholding a Ku Klux Klan leader's First Amendment right to threaten "revengeance" if the "suppression" of the white race continues); *Varnum v. Brien*, 763 N.W.2d 862, 875 (Iowa 2009) (a statute inconsistent with the Constitution "must be

66

declared void, even though it may be supported by strong and deep-seated traditional beliefs and popular opinion"); *see also State v. Finley*, 276 Mont. 126, 135, 915 P.2d 208, 214 (1996) (this Court has the "obligation" to protect individual rights); *Washington v. Seattle Sch. Dist.*, 458 U.S. 457, 486, 102 S. Ct. 3187, 3203 (1982) (the Judiciary has a "special role in safeguarding the interests of those groups that are relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process" (internal quotation marks omitted)); *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 535 (1886) ("It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.").

¶118   Second, and along these same lines, the proper resolution of this case "does not turn on the religious or moral debate over intimate same-sex relationships, but rather on the statutory and constitutional basis for the exclusion of same-sex couples from the secular benefits and protections offered married couples." *Baker*, 744 A.2d at 867.  As aptly stated by the United States Supreme Court,

> for centuries there have been powerful voices to condemn homosexual conduct as immoral.  The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family.  For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives.  These considerations do not answer the question before us, however.  The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of [its] law[s].  Our obligation is to define the liberty of all, not to mandate our own moral code.

*Lawrence v. Texas*, 539 U.S. 558, 571, 123 S. Ct. 2472, 2480 (2003) (internal quotation marks omitted).  Speaking to this same subject, this Court has likewise observed that

> it is not the function of this or of any court to interpret the law on the basis of what may be morally acceptable or unacceptable to society at any given time. . . . Our Constitution does not protect morality; it does, however, guarantee to all persons, whether in the majority or in a minority, those certain basic freedoms and rights which are set forth in the Declaration of Rights . . . . Regardless that majoritarian morality may be expressed in the public-policy pronouncements of the legislature, it remains the obligation of the courts—and of this Court in particular—to scrupulously support, protect and defend those rights and liberties guaranteed to all persons under our Constitution.

*Gryczan*, 283 Mont. at 454-55, 942 P.2d at 125; *see also Alaska Civ. Liberties Union v. State*, 122 P.3d 781, 783 (Alaska 2005) ("Irrelevant to our analysis must be personal, moral, or religious beliefs—held deeply by many—about whether persons should enter into intimate same-sex relationships or whether same-sex domestic partners should be permitted to marry.").

¶119 The upshot of these principles is that fundamental rights are not subject to filtering through the sieve of majoritarian morality or religious doctrine. Indeed, "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack." *Lawrence*, 539 U.S. at 577-78, 123 S. Ct. at 2483 (internal quotation marks omitted); *see Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817 (1967) (invaliding antimiscegenation laws). The purpose of the federal Bill of Rights, like Montana's Declaration of Rights,

> was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights [including equal

68

protection of the laws] may not be submitted to vote; they depend on the outcome of no elections.

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185-86 (1943). Our responsibility "is to protect constitutional rights of individuals . . . even when the rights have not yet been broadly accepted, were at one time unimagined, or challenge a deeply ingrained practice or law viewed to be impervious to the passage of time." *Varnum*, 763 N.W.2d at 875.

## B. Equal Protection Principles

¶120 The United States Constitution and the Montana Constitution both command that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV; Mont. Const. art. II, § 4. Although the basic principles underlying these two provisions are the same, this Court has held that Article II, Section 4 provides greater individual protection than the Fourteenth Amendment. *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 15, 325 Mont. 148, 104 P.3d 445.

¶121 "The guaranty of equal protection of the laws is a pledge of the protection of equal laws." *Romer v. Evans*, 517 U.S. 620, 634, 116 S. Ct. 1620, 1628 (1996) (internal quotation marks omitted). It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985); *accord Snetsinger*, ¶ 15.

> "[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited

69

upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation."

*Eisenstadt v. Baird*, 405 U.S. 438, 454, 92 S. Ct. 1029, 1038-39 (1972) (quoting *Ry. Express Agency, Inc. v. New York*, 336 U.S. 106, 112-13, 69 S. Ct. 463, 466-67 (1949) (Jackson, J., concurring)). The Equal Protection guaranty "requires the democratic majority to accept for themselves and their loved ones what they impose on you and me." *Cruzan v. Dir., Missouri Dept. of Health*, 497 U.S. 261, 300-01, 110 S. Ct. 2841, 2863 (1990) (Scalia, J., concurring).

¶122 Of course, the "promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer*, 517 U.S. at 631, 116 S. Ct. at 1627. The general rule, therefore, is that if a law neither burdens a constitutional right nor targets a suspect or quasi-suspect class, then the courts will uphold the legislative classification so long as it bears a rational relationship to some legitimate governmental objective. However, if the classification disadvantages a suspect or quasi-suspect class or impinges upon the exercise of a constitutional right, then the classification is subject to heightened scrutiny. *See Romer*, 517 U.S. at 631, 116 S. Ct. at 1627; *Cleburne*, 473 U.S. at 440-41, 105 S. Ct. at 3254-55; *Snetsinger*, ¶¶ 17-19.

### C. Framework

¶123 "Proper equal protection analysis involves identifying the classes involved, determining whether they are similarly situated and then using the appropriate level of scrutiny to determine if the statute is constitutional." *Bustell v. AIG Claims Serv., Inc.*,

2004 MT 362, ¶ 20, 324 Mont. 478, 105 P.3d 286; *accord Reesor v. Montana State Fund*, 2004 MT 370, ¶¶ 10, 13, 15, 325 Mont. 1, 103 P.3d 1019. While we have stated the "similarly situated" requirement in numerous cases, *see e.g. Snetsinger*, ¶ 16; *State v. Egdorf*, 2003 MT 264, ¶ 15, 317 Mont. 436, 77 P.3d 517; *Powell v. State Compen. Ins. Fund*, 2000 MT 321, ¶ 22, 302 Mont. 518, 15 P.3d 877, we have not fleshed out the meaning of this term. Federal caselaw provides some guidance on this point.

¶124 The federal framework for analyzing equal protection claims is the same as the Montana framework. The first step is to identify the State's classification of groups. *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). To accomplish this, a plaintiff can show that the law is applied in a discriminatory manner or imposes different burdens on different classes of people. *Freeman*, 68 F.3d at 1187. Once the plaintiff establishes a governmental classification, it is necessary to identify a "similarly situated" class against which the plaintiff's class can be compared. *Freeman*, 68 F.3d at 1187. This is necessary because "[d]iscrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances." *Atty. Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982). "The goal of identifying a similarly situated class . . . is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group." *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989). Although the formula for determining whether two groups are "similarly situated" for equal protection purposes "is not always susceptible to precise demarcation," *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 9 (1st Cir. 2007), the question is essentially whether the plaintiff's group is "roughly equivalent" to

71

the control group, *Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir. 2004), in "all relevant respects" other than the factor constituting the alleged discrimination, *Aguilar*, 883 F.2d at 706; *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331 (1992). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners." *Tapalian*, 377 F.3d at 6 (internal quotation marks omitted). Lastly, if it is demonstrated that a cognizable class is treated differently, the court analyzes whether the distinction made between the groups is justified under the appropriate level of scrutiny. *United States v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir. 1995).

## D. Classification and "Similarly Situated" Analysis

¶125 As discussed, the State grants various benefits and obligations to married persons, which is accomplished through the use of such terms as "husband," "wife," "spouse," or "married" in the various statutes.[7] The State contends, therefore, that the statutes create "a marital classification." In the State's view, "[t]he different classes involved here are married couples, who by definition are capable of receiving spousal benefits, and

---

[7] *See e.g.* § 15-61-102(3), MCA (" 'Dependent' means the spouse of the employee or account holder . . . ."); § 19-6-505(2), MCA ("Upon the retired member's death, the retirement benefit must be paid to the member's surviving spouse, if there is one."); § 27-1-515, MCA ("The rights of personal relations forbid . . . the abduction or enticement of a wife from the wife's husband or a husband from the husband's wife . . . ."); § 39-71-116(4), MCA (" 'Beneficiary' means . . . a surviving spouse living with or legally entitled to be supported by the deceased at the time of injury . . . ."); § 40-2-102, MCA ("Insofar as each is able, the husband and wife shall support each other out of their property and labor."); § 40-2-108, MCA ("A married person may be a personal representative, guardian, conservator, or trustee and may personally be bound and may bind the estate the person represents without any act or assent on the part of the person's spouse."); § 50-9-106(2), MCA ("The authority to consent or to withhold consent under subsection (1) may be exercised by the following individuals, in order of priority: (a) the spouse of the individual . . . ."); § 72-2-412, MCA ("A decedent's surviving spouse is entitled to a homestead allowance of $20,000.").

unmarried couples, who by definition are not capable of receiving spousal benefits." The State further argues that married couples and unmarried couples are not similarly situated because married couples are formally recognized under the law and unmarried couples are not. Thus, the State concludes that Plaintiffs' equal protection claim must fail. One of the State's amici (Montana Family Foundation) similarly argues that Plaintiffs' claim fails because "all unmarried couples are treated alike under Montana law."

¶126 These arguments are incorrect—both in identifying the pertinent classification and in applying the "similarly situated" concept. It is true that the statutes, on their face, classify based on marital status. But, as we have recognized, it is sometimes necessary to look beyond the face of a classification in order to ascertain the true distinction being drawn. In *Bankers Life & Cas. Co. v. Peterson*, 263 Mont. 156, 866 P.2d 241 (1993), for example, this Court did not treat "normal pregnancy and childbirth" as a classification between pregnant persons and non-pregnant persons—the approach the State argues here. Rather, we recognized that distinctions based on pregnancy are, in reality, sex-linked classifications. "[A]ny classification which relies on pregnancy as the determinative criterion is a distinction based on sex" because "it is the capacity to become pregnant which primarily differentiates the female from the male." *Bankers Life*, 263 Mont. at 160, 866 P.2d at 243 (internal quotation marks omitted).

¶127 Likewise here, only different-sex couples have the capacity under current Montana law to get "married" and thereby become "spouses," "husbands," and "wives." Same-sex couples are not permitted to marry and are thus categorically excluded from the statutory benefits and obligations granted to spouses, husbands, and wives. Mont. Const. art. XIII,

73

§ 7; §§ 40-1-103, -401(1)(d), MCA; *Black's Law Dictionary* 810, 1533, 1735 (*spouse*: a married person; *husband*: a married man; *wife*: a married woman). Different-sex couples may obtain all of the benefits and obligations—by getting married. Same-sex couples may not obtain any of the benefits and obligations—because they cannot get married. Thus, while the classification may appear on its face to be marital status, the statutory definition of "spouse" is "[i]nherent" in this classification. *Snetsinger*, ¶ 20. And because marital status, by definition, is available only to different-sex couples, the pertinent classification is sexual orientation. *Snetsinger*, ¶ 27 (holding that sexual orientation, not marital status, is "the defining difference" where "unmarried opposite-sex couples are able to avail themselves of health benefits under the University System's policy while unmarried same-sex couples are denied the health benefits").

¶128 Indeed, if the State limited marriage to Caucasians, and then granted an array of statutory benefits to such married couples, it would be ludicrous to argue—as the State does here—that "married couples qualify for spousal benefits not because they are [Caucasian] but because they are spouses." This statement is simply wrong. Being Caucasian is, in fact, a prerequisite to qualifying for the benefits in this example, just as being heterosexual (or bisexual and committed to someone of the opposite sex) is a prerequisite to qualifying for the benefits in the present case. By granting benefits in a seemingly benign fashion to "spouses," but then defining "spouses" to include only Caucasians, the relevant classification is race, not marital status. If the State limited the meaning of "spouse" to Catholics, the classification would be religious affiliation. And

by defining "spouse" to mean a member of a different-sex couple, the statutory scheme creates a classification based on sexual orientation.

¶129 It is perplexing that the State is even making the contrary argument, given the multitude of courts that have already rejected it. In *Tanner v. Oregon Health Sci. U.*, 971 P.2d 435 (Or. App. 1998), for example, the governmental defendant argued that the benefits at issue were "available to all on equal terms" because "[a]ll married employees—heterosexual and homosexual alike—are permitted to acquire insurance benefits for their spouses." 971 P.2d at 447-48 (emphasis omitted). As the Oregon Court of Appeals observed, such reasoning "misses the point": "Homosexual couples may not marry. Accordingly, the benefits are not made available on equal terms. They are made available on terms that, for gay and lesbian couples, are a legal impossibility." *Tanner*, 971 P.2d at 448. Similarly, the governmental defendants in *Alaska Civ. Liberties Union* argued that their programs differentiated on the basis of marital status, not sexual orientation. The Alaska Supreme Court, however, concluded otherwise:

> We agree with the plaintiffs that the proper comparison is between same-sex couples and opposite-sex couples, whether or not they are married. The municipality correctly observes that no unmarried employees, whether they are members of same-sex or opposite-sex couples, can obtain the disputed benefits for their domestic partners. But this does not mean that these programs treat same-sex and opposite-sex couples the same. Unmarried public employees in opposite-sex domestic relationships have the opportunity to obtain these benefits, because employees are not prevented by law from marrying their opposite-sex domestic partners. In comparison, public employees in committed same-sex relationships are absolutely denied any opportunity to obtain these benefits, because these employees are barred by law from marrying their same-sex partners in Alaska or having any marriage performed elsewhere recognized in Alaska. Same-sex unmarried couples therefore have no way of obtaining these benefits, whereas opposite-sex unmarried couples may become eligible for

75

them by marrying. The programs consequently treat same-sex couples differently from opposite-sex couples.

*Alaska Civ. Liberties Union*, 122 P.3d at 788; *accord Collins v. Brewer*, 727 F. Supp. 2d 797, 803 (D. Ariz. 2010), *aff'd sub nom. Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011); *Kerrigan v. Commr. of Pub. Health*, 957 A.2d 407, 431 n. 24 (Conn. 2008); *Varnum*, 763 N.W.2d at 883-84; *Conaway v. Deane*, 932 A.2d 571, 605-06 (Md. 2007); *Lewis v. Harris*, 908 A.2d 196, 215 (N.J. 2006); *Hernandez v. Robles*, 855 N.E.2d 1, 11 (N.Y. 2006); *Baker*, 744 A.2d at 880; *cf. Lawrence*, 539 U.S. at 583, 123 S. Ct. at 2486-87 (O'Connor, J., concurring in the judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than conduct. It is instead directed toward gay persons as a class.").

¶130 One of the fallacies in the State's approach is that it denies the most fundamental and defining aspect of same-sex relationships. The State contends that "[l]aws granting spousal benefits do not discriminate against gays and lesbians any more than they discriminate against . . . other couples that may desire spousal benefits but do not qualify as spouses." In other words, the State asserts, Plaintiffs "are situated no differently than unmarried different-sex partners." Yet, as discussed above, different-sex partners may get married. And the State's implication that Plaintiffs may do the same—albeit, to someone of the opposite sex—is absurd. As the California Supreme Court explained:

> By limiting marriage to opposite-sex couples, the marriage statutes, realistically viewed, operate clearly and directly to impose different treatment on gay individuals because of their sexual orientation. By definition, gay individuals are persons who are sexually attracted to persons

of the same sex and thus, if inclined to enter into a marriage relationship, would choose to marry a person of their own sex or gender. A statute that limits marriage to a union of persons of opposite sexes, thereby placing marriage outside the reach of couples of the same sex, unquestionably imposes different treatment on the basis of sexual orientation. *In our view, it is sophistic to suggest that this conclusion is avoidable by reason of the circumstance that the marriage statutes permit a gay man or a lesbian to marry someone of the opposite sex, because making such a choice would require the negation of the person's sexual orientation.* Just as a statute that restricted marriage only to couples of the same sex would discriminate against heterosexual persons on the basis of their heterosexual orientation, the current California statutes realistically must be viewed as discriminating against gay persons on the basis of their homosexual orientation.

*In re Marriage Cases*, 183 P.3d 384, 440-41 (Cal. 2008) (emphasis added, footnote omitted). It should be noted that people have a constitutionally protected right under the "liberty" component of the Fourteenth Amendment's Due Process Clause and under the "privacy" provision of the Montana Constitution to choose a personal intimate relationship with someone of the same sex. *Lawrence*, 539 U.S. at 567, 123 S. Ct. at 2478; *Gryczan*, 283 Mont. at 455-56, 942 P.2d at 125-26. It is not the State's prerogative to prohibit such relationships. Nor, however, may the State seek to accomplish the same result through coercive measures—such as by denying homosexuals and bisexuals the equal protection of the State's secular laws when these individuals choose a partner of the same sex, rather than one of the opposite sex.

¶131 Another fallacy in the State's argument is the mistaken perception that "similarly situated" means "similar in the possession of the classifying trait." When the government creates a particular classification, there of course will be some who fall within that class and some who fall outside of it. It is incorrect to say, however, as the State does here, that these two groups are not "similarly situated" *because of the classification itself.*

77

Such circular reasoning would effectively immunize every classification against equal protection challenge. The Iowa Supreme Court discussed this point in *Varnum*:

> In considering whether two classes are similarly situated, a court cannot simply look at the trait used by the legislature to define a classification under a statute and conclude a person without that trait is not similarly situated to persons with the trait. The equal protection clause does not merely ensure the challenged statute applies equally to all people in the legislative classification. "Similarly situated" cannot mean simply "similar in the possession of the classifying trait." All members of any class are similarly situated in this respect and consequently, any classification whatsoever would be reasonable by this test. In the same way, the similarly situated requirement cannot possibly be interpreted to require plaintiffs to be identical in every way to people treated more favorably by the law. No two people or groups of people are the same in every way, and nearly every equal protection claim could be run aground onto the shoals of a threshold analysis if the two groups needed to be a mirror image of one another. Such a threshold analysis would hollow out the constitution's promise of equal protection.

763 N.W.2d at 882-83 (citations, brackets, and some internal quotation marks omitted).

¶132 Having discussed the fallacies of the State's approach, I turn to a proper "similarly situated" analysis. Again, whether two classes are similarly situated depends on whether they are roughly equivalent in all relevant respects *besides* the classifying trait adopted by the State. *Tapalian*, 377 F.3d at 6; *Aguilar*, 883 F.2d at 706. The inquiry is not whether persons are similarly situated for *all* purposes, but whether they are similarly situated for purposes of the law challenged. *Kerrigan*, 957 A.2d at 422; *accord Varnum*, 763 N.W.2d at 883 ("the equal protection guarantee requires that laws treat all those who are similarly situated *with respect to the purposes of the law* alike" (emphasis in original)).

¶133 In *Snetsinger*, ¶ 27, this Court concluded that unmarried different-sex couples and unmarried same-sex couples, "although similarly situated in all respects other than sexual

orientation," were not being treated "equally and fairly" because the former group had the ability to obtain the health benefits provided by the Montana University System and the latter group did not. That conclusion is on point here: unmarried different-sex couples are able to obtain the various benefits provided by the State, while unmarried same-sex couples are not able to obtain those benefits. Although the Court in *Snetsinger* did not discuss its conclusion on the "similarly situated" requirement in much detail, a number of other courts have provided persuasive analyses on this point.

¶134 The Iowa Supreme Court, for example, concluded in *Varnum* that "for purposes of Iowa's marriage laws, which are designed to bring a sense of order to the legal relationships of committed couples and their families in myriad ways," the plaintiffs (six same-sex couples) "are similarly situated compared to heterosexual persons" "in every important respect, but for their sexual orientation." 763 N.W.2d at 883-84.

> Plaintiffs are in committed and loving relationships, many raising families, just like heterosexual couples. Moreover, official recognition of their status provides an institutional basis for defining their fundamental relational rights and responsibilities, just as it does for heterosexual couples. Society benefits, for example, from providing same-sex couples a stable framework within which to raise their children and the power to make health care and end-of-life decisions for loved ones, just as it does when that framework is provided for opposite-sex couples.

*Varnum*, 763 N.W.2d at 883.

¶135 The Connecticut Supreme Court likewise determined that the plaintiffs there (eight same-sex couples) "share the same interest in a committed and loving relationship as heterosexual persons who wish to marry, and they share the same interest in having a family and raising their children in a loving and supportive environment." *Kerrigan*, 957

79

A.2d at 424. The court noted that the plaintiffs met the same statutory eligibility requirements applicable to persons who seek to marry, including restrictions related to public safety, such as age and consanguinity. *Kerrigan*, 957 A.2d at 424.

¶136 Addressing this question, the California Supreme Court observed that

> [b]oth groups at issue consist of pairs of individuals who wish to enter into a formal, legally binding and officially recognized, long-term family relationship that affords the same rights and privileges and imposes the same obligations and responsibilities. Under these circumstances, there is no question but that these two categories of individuals are sufficiently similar . . . .

*Marriage Cases*, 183 P.3d at 435 n. 54 (internal quotation marks omitted).

¶137 In *Baker*, the principal purpose the government advanced in support of excluding same-sex couples from the legal benefits of marriage was the interest in " 'furthering the link between procreation and child rearing.' " 744 A.2d at 881. The Vermont Supreme Court agreed that "the State has a legitimate and long-standing interest in promoting a permanent commitment between couples for the security of their children" and that "the State's interest has been advanced by extending formal public sanction and protection to the union, or marriage, of those couples considered capable of having children." *Baker*, 744 A.2d at 881. The court further observed, however, "that a significant number of children today are actually being raised by same-sex parents, and that increasing numbers of children are being conceived by such parents through a variety of assisted-reproductive techniques." *Baker*, 744 A.2d at 881. The court reasoned, therefore,

> to the extent that the state's purpose in licensing civil marriage was, and is, to legitimize children and provide for their security, the statutes plainly exclude many same-sex couples who are no different from opposite-sex couples with respect to these objectives. If anything, the exclusion of

80

same-sex couples from the legal protections incident to marriage exposes *their* children to the precise risks that the State argues the marriage laws are designed to secure against. In short, the marital exclusion treats persons who are *similarly* situated for purposes of the law, *differently.*

*Baker*, 744 A.2d at 882 (emphases in original).

¶138 *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010), involved a constitutional challenge to Proposition 8, which amended California's Constitution to restrict marriage to one man and one woman. The federal district court held a bench trial during which it heard lay and expert testimony on various issues, including whether same-sex couples are inferior to or materially distinct from different-sex couples. The federal district court's decision is discussed in greater detail below in the Marriage Amendment section. *See* ¶¶ 183-189, *infra.* For purposes of the present discussion, it is sufficient to note the following testimony and factual findings made by the court:

- "Gay and lesbian sexual orientations are 'normal variation[s] and are considered to be aspects of well-adjusted behavior.' "

- "Homosexuality is not considered a mental disorder. . . . [M]ajor professional mental health associations have all gone on record affirming that homosexuality is a normal expression of sexuality and that it is not in any way a form of pathology."

- " 'Courts and legal scholars have concluded that sexual orientation is not related to an individual's ability to contribute to society or perform in the workplace.' "

- "Same-sex couples are identical to opposite-sex couples in the characteristics relevant to the ability to form successful marital unions. Like opposite-sex couples, same-sex couples have happy, satisfying relationships and form deep emotional bonds and strong commitments to their partners. Standardized measures of relationship satisfaction, relationship adjustment and love do not differ depending on whether a couple is same-sex or opposite-sex."

- "Same-sex couples receive the same tangible and intangible benefits from marriage that opposite-sex couples receive," including "greater commitment to

the relationship, more acceptance from extended family, less worry over legal problems, [and] greater access to health benefits and benefits for their children."

- "The sexual orientation of an individual does not determine whether that individual can be a good parent. Children raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted. The research supporting this conclusion is accepted beyond serious debate in the field of developmental psychology."

- "The evidence shows that, by every available metric, opposite-sex couples are not better than their same-sex counterparts; instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal."

*Perry*, 704 F. Supp. 2d at 967, 969, 980, 1002.

¶139   These findings are consistent with the record in the present case. Plaintiffs filed the affidavit of Dr. Letitia Anne Peplau, a psychologist, who states: "Research clearly establishes that same-sex couples closely resemble heterosexual couples both in terms of the quality of their relationship and the processes that affect their relationships." The State does not deny this. Plaintiffs also filed the affidavit of Dr. Suzanne D. Dixon, a behavioral and developmental pediatrician, who states: "Children raised by same-sex parents are just as likely to be psychologically, emotionally, socially and sexually well adjusted as those raised by heterosexual parents. Being parented by gay, lesbian or bisexual parents has no adverse impact on the behavior and development of children." The State does not deny this either. In fact, the State does not deny that Plaintiffs are similarly situated to different-sex couples in every respect other than the ability to obtain the secular benefits and obligations at issue here by getting married.

¶140   I agree with the Iowa Supreme Court that the benefits and responsibilities granted by the State to married persons "are designed to bring a sense of order to the legal

relationships of committed couples and their families in myriad ways"—for example, by providing a stable framework within which to raise children and the power to make healthcare decisions for loved ones. *Varnum* 763 N.W.2d at 883-84. Plaintiffs indicate in their affidavits that they share the same interest as different-sex couples in protecting their relationships, their families, and their children. Except for the fact that one partner is the same sex as the other, Plaintiffs' committed intimate relationships are materially indistinguishable from different-sex committed intimate relationships.

¶141 Based on these undisputed facts and the foregoing discussion, I conclude and would hold that the pertinent classification here is sexual orientation. I further conclude and would hold that Plaintiffs are similarly situated to, but treated differently than, different-sex couples vis-à-vis the benefits and responsibilities afforded by the State to married persons. I now turn to the question of the appropriate level of scrutiny.

### E. Level of Scrutiny

¶142 As noted above, if a law neither burdens a constitutional right nor targets a suspect or quasi-suspect class, then the courts will uphold the legislative classification so long as it bears a rational relationship to some legitimate governmental objective. But if the law disadvantages a suspect or quasi-suspect class or impinges upon the exercise of a constitutional right, then the classification is subject to heightened scrutiny. *See Romer*, 517 U.S. at 631, 116 S. Ct. at 1627; *Cleburne*, 473 U.S. at 440-41, 105 S. Ct. at 3254-55; *Snetsinger*, ¶¶ 17-19.

¶143 In *Snetsinger*, this Court concluded that the Montana University System's policy of allowing unmarried different-sex couples to avail themselves of the health benefits

83

offered under the University System's group health insurance plan, while denying unmarried same-sex couples the ability to obtain these same benefits, failed even the most deferential standard of review: "there is no justification for treating the two groups differently, nor is the University System's policy rationally related to a legitimate governmental interest." *Snetsinger*, ¶ 27.

¶144 In the present case, Plaintiffs likewise argue that the State's exclusion of same-sex couples from the opportunity to obtain the benefits and protections which the State makes available to different-sex couples fails rational basis review. Plaintiffs further argue, however, that "sexual orientation should be considered a suspect classification under Montana law" and that discrimination on the basis of sexual orientation is therefore subject to "strict scrutiny." For purposes of resolving Plaintiffs' request for declaratory relief, and for the reasons which follow, I agree that sexual orientation is a suspect class and that treating same-sex couples differently than different-sex couples is thus subject to strict scrutiny review.

¶145 Courts have identified four factors or indicia as bearing on whether a class is suspect or quasi-suspect (thus warranting a more exacting constitutional analysis of the legislative classification than that provided by rational basis review). They are (1) whether the class has historically been subjected to discrimination; (2) whether the characteristics that distinguish the class indicate a typical class member's ability to perform or contribute to society; (3) whether the distinguishing characteristic is immutable or beyond the class members' control; and (4) whether the class is a minority or politically powerless. *See In re C.H.*, 210 Mont. 184, 198, 683 P.2d 931, 938 (1984)

(citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S. Ct. 1278, 1294 (1973)); *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012); *Marriage Cases*, 183 P.3d at 442-43; *Kerrigan*, 957 A.2d at 426; *Varnum*, 763 N.W.2d at 886-88; *Conaway*, 932 A.2d at 606-07; *Andersen v. King County*, 138 P.3d 963, 974 (Wash. 2006). The third and fourth factors (immutability and lack of political power), however, "are not strictly necessary factors to identify a suspect class." *Windsor*, 699 F.3d at 181. Indeed, as to immutability, the California Supreme Court has pointed out that, under California law, "a person's religion is a suspect classification for equal protection purposes, and one's religion, of course, is not immutable but is a matter over which an individual has control." *Marriage Cases*, 183 P.3d at 442 (citations omitted). Likewise, as to lack of political power, the California Supreme Court has pointed out that "if a group's *current* political powerlessness were a prerequisite to a characteristic's being considered a constitutionally suspect basis for differential treatment, it would be impossible to justify the numerous decisions that continue to treat sex, race, and religion as suspect classifications." *Marriage Cases*, 183 P.3d at 443 (emphasis in original); *see also Kerrigan*, 957 A.2d at 426 (characterizing history of discrimination and ability to perform or contribute to society as "required" factors, and immutability and political powerlessness as "other considerations that, in a given case, may be relevant" (citations omitted)).

¶146  In the present case, the parties' disagreement centers primarily on the first and fourth factors—history of discrimination and lack of political power. In considering the four factors, therefore, I shall focus primarily on these two.

85

## 1.  History of Discrimination

¶147   As the Second Circuit Court of Appeals recently observed, "[i]t is easy to conclude that homosexuals have suffered a history of discrimination."  *Windsor*, 699 F.3d at 182.  Indeed, as I discussed in my *Snetsinger* concurrence, "[i]t is overwhelmingly clear that gays and lesbians have been historically subject to unequal treatment and invidious discrimination."  *Snetsinger*, ¶¶ 45-53 (Nelson, J., specially concurring); *accord Varnum* 763 N.W.2d at 889-90; *Kerrigan*, 957 A.2d at 432-34.  "Outside of racial and religious minorities, we can think of no group which has suffered such pernicious and sustained hostility, and such immediate and severe opprobrium, as homosexuals." *Marriage Cases*, 183 P.3d at 442 (bracketed material and internal quotation marks omitted).   "Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal."  *Windsor*, 699 F.3d at 182.  In point of fact, although this Court held 15 years ago that homosexuals have the right under Montana's Constitution to engage in private, consensual, noncommercial sexual conduct with other adults free of governmental interference or regulation, *Gryczan*, 283 Mont. 433, 942 P.2d 112, the Legislature has repeatedly refused in multiple subsequent legislative sessions to repeal the statutory criminalization of "sexual contact or sexual intercourse between two persons of the same sex," §§ 45-2-101(21), 45-5-505, MCA; Aff. of Christine Kaufmann at 4 & Attachment A (detailing the failed efforts to repeal this statutory language).

¶148   Plaintiffs filed the affidavit of Dr. George Chauncey, a professor of history at Yale University.  Dr. Chauncey states that, in his professional opinion, "gay and lesbian people

have been subject to widespread and significant discrimination and hostility in the United States, including the State of Montana." He notes that among the most conspicuous legacies of this discrimination are "the numerous state statutes and constitutional amendments that brand gays and lesbians as second-class citizens by denying them the right to marry the person they love" and "the federal Defense of Marriage Act that prohibits the federal government from recognizing such marriages legally entered into in states where they are allowed." Dr. Chauncey provides a detailed historical record of anti-gay discrimination and the roots of such discrimination. Aff. of George Chauncey, Ph.D., at 3-22. His discussion is extensive, spanning 20 single-spaced pages, and it is not possible to recite every example of anti-gay discrimination and violence he describes. I shall attempt, however, to highlight the main points of his discussion.

¶149 Dr. Chauncey explains that through much of the twentieth century, in particular, gay men and lesbians have suffered under the weight of medical theories that treated their desires as a disorder, penal laws that condemned their consensual adult sexual behavior as a crime, and federal and state civil statutes, regulations, and policies that discriminated against them on the basis of their sexual orientation. Beginning in the 1930s and 1940s, many states prohibited gay people from being served in restaurants and bars. In the 1950s, the federal government banned the employment of homosexuals and insisted that its private contractors ferret out and dismiss their gay employees. Across the century, many municipalities periodically launched police campaigns to suppress gay meeting places and sought to purge gay civil servants from government employment. Many clergy condemned homosexuality as sinful. Leading physicians and medical researchers

87

claimed that homosexuality was a pathological condition or disease. Government leaders and the media justified anti-gay discrimination and the suppression of gay meeting places by fostering stereotypes of homosexuals as child molesters. These stereotypes have had enduring consequences and continue to inspire public fears and hostility, especially concerning gay teachers and parents. In the 1990s, following Anita Bryant's lead, activists opposed to gay rights frequently fomented voter fear of gay people by reviving demonic stereotypes of homosexuals as perverts who threatened the nation's children and moral character. Such tactics have been invoked in Montana. In 1995, the Montana Senate included homosexual acts in a bill requiring the registration of sexual and violent offenders. Senator Al Bishop, a supporter of the bill, stated on the Senate floor that homosexual sex is "even worse than a violent sexual act." During a 2003 debate over keeping Montana's criminal sodomy law on the books—despite this Court's decision in *Gryczan*—a member of the Coalition for Community Responsibility asserted that "[g]ay men think they are doing children a favor by sodomizing them." During the 2005 legislative session, Senator Dan McGee of Laurel stated, "I'll never be able to support bills which try to overturn centuries of moral ideology. Homosexuality is wrong." In 2010, opponents of the Missoula ordinance prohibiting discrimination based on sexual orientation and gender identity stated that passage of the ordinance would result in "unacceptable loss of safety and privacy for women and children." Numerous bills have been proposed to add sexual orientation to Montana's antidiscrimination laws and to Montana's hate-crimes law, but all have failed. (Christine Kauffman details the repeated defeat of such legislation in Attachment A to her affidavit, at pages 3 to 7.) Earlier this

year, the Hamilton School Board voted to *remove* sexual orientation from a proposed anti-bullying policy and *not* to include sexual orientation in the district's equal-education and equal-employment policies. *See* David Erickson, *Sexual Orientation Not Included in Hamilton Schools' Anti-Bullying Policy*, Ravalli Republic (Mar. 30, 2012).

¶150 Dr. Chauncey notes that gay people continue to face discrimination from highly regarded institutions. For example, the Boy Scouts of America, a federally chartered organization, insists that "homosexual conduct is not morally straight" and refuses to allow gay men into the organization. *Boy Scouts of America v. Dale*, 530 U.S. 640, 651, 120 S. Ct. 2446, 2453 (2000). Gay people also continue to face violence motivated by anti-gay bias. In 1984, three teens attacked 23-year-old Charlie Howard due to his sexual orientation and threw him off a bridge into the Kenduskeag Stream in Maine, where he drowned. In 1998, Matthew Shepard, a college student in Wyoming, was bound, tied to a fence, beaten with a pistol, and left to die because he was gay. In 2008, Lawrence Fobes King, a 15-year-old student in California, died two days after he was shot in school by a fellow student because of his sexual orientation. The FBI reported 1,260 hate crimes based on perceived sexual orientation in 1998 and 1,297 in 2008.

¶151 In its Order, the District Court observed that "there appears little doubt that Plaintiffs have been subject to private prejudice, discrimination, and even violence in Montana." Indeed, Plaintiffs describe various ways in which they have been harassed because of their sexual orientation. One plaintiff, for example, was labeled a "lesbian baby-killer" on a neo-Nazi website, and "wanted dead or alive" posters of her were hung in downtown Bozeman, causing her to fear for her physical safety. Another plaintiff,

89

who grew up in Great Falls and worked at the Cascade County Regional Youth Services Center for several years, describes an incident when a Cascade County Commissioner confronted her and told her that gay people are dangerous and should not be allowed to work with youth. Plaintiffs describe demeaning instances where employers, healthcare workers, and others refused to recognize or honor their same-sex relationships.

¶152 The State concedes that "gays and lesbians have been subject to *private* prejudice, discrimination, and violence in Montana" (emphasis added). But the State contends that Plaintiffs "have yet to identify a single instance of any targeted State action against them that they ask the Court to review and invalidate." This contention is simply bizarre. The question at hand is whether gays and lesbians have suffered a history of discrimination. Clearly they have. The State's suggestion that all of the prejudice and discrimination has been purely "private" is utterly ridiculous. Indeed, the State's position flies in the face of the substantial evidence presented in the District Court, none of which the State refuted. Perhaps the most obvious evidence of "public" discrimination against gays and lesbians is the codification of disparate treatment in at least three Montana statutes (§§ 40-1-103, 40-1-401(1)(d), and 45-2-101(21), MCA), not to mention the Montana Constitution itself (Mont. Const. art. XIII, § 7). The State implies that there was not "any expressed animus underlying the approval of CI-96." (CI-96 refers to Constitutional Amendment 96, the 2004 ballot measure which added the Marriage Amendment to Montana's Constitution.) But as discussed in the Marriage Amendment section below, that provision demonstrably was motivated by animus toward gays and lesbians. The State fails to provide any

90

evidence or sensible argument to refute Plaintiffs' overwhelming showing that homosexuals as a group have historically endured persecution and discrimination.

## 2. Relation to Ability

¶153 "There are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual's ability to contribute to society, at least in some respect. But homosexuality is not one of them. The aversion homosexuals experience has nothing to do with aptitude or performance." *Windsor*, 699 F.3d at 182-83; *accord Marriage Cases*, 183 P.3d at 442 ("sexual orientation is a characteristic . . . that bears no relation to a person's ability to perform or contribute to society"); *Kerrigan*, 957 A.2d at 435 ("homosexuality bears no relation at all to an individual's ability to contribute fully to society"; "an individual's homosexual orientation implies no impairment in judgment, stability, reliability or general social or vocational capabilities" (brackets and internal quotation marks omitted)); *Varnum* 763 N.W.2d at 891 ("sexual orientation is broadly recognized in Iowa to be irrelevant to a person's ability to contribute to society"). The State does not contend otherwise.

¶154 A classification which bears no relationship to a person's ability to contribute to society "is likely based on irrelevant stereotypes and prejudice." *Varnum*, 763 N.W.2d at 890. A classification unrelated to a person's ability to perform or contribute to society typically reflects prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others—or reflects outmoded notions of the relative capabilities of persons with the characteristic. *Varnum*, 763 N.W.2d at 890; *Cleburne*, 473 U.S. at 440-41, 105 S. Ct. at 3254-55. Such is the case here.

91

### 3. Immutability

¶155   Although often couched in terms of "immutability," the Second Circuit explained in *Windsor* that the question under this factor is whether there are obvious, immutable, *or* distinguishing characteristics that define a discrete group.  699 F.3d at 183.  For instance, classifications based on alienage, illegitimacy, and national origin are all subject to heightened scrutiny, even though these characteristics do not declare themselves, and often may be disclosed or suppressed as a matter of preference, and even though alienage and illegitimacy are actually subject to change.  "What seems to matter is whether the characteristic of the class [invites] discrimination when it is manifest."  *Windsor*, 699 F.3d at 183.  Here, the characteristic that distinguishes gays and lesbians from others and qualifies them for recognition as a distinct and discrete group is the characteristic that historically has resulted in their social and legal ostracism:  their attraction to persons of the same sex.  *Kerrigan*, 957 A.2d at 436; *accord Windsor*, 699 F.3d at 184 ("sexual orientation is a sufficiently distinguishing characteristic to identify the discrete minority class of homosexuals"); *Perry*, 704 F. Supp. 2d at 964 ("[s]exual orientation is fundamental to a person's identity and is a distinguishing characteristic that defines gays and lesbians as a discrete group").

¶156   To the extent that "immutability" has any significance to the analysis, this prong of the inquiry is satisfied when the identifying trait is so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change it.  *Kerrigan*, 957 A.2d at 438; *Varnum*, 763 N.W.2d at 893; *Watkins v. U.S. Army*, 875 F.2d 699, 726 (9th Cir. 1989) (en banc) (Norris, J., concurring in the judgment).  In this

regard, the federal district court in *Perry* found, based on the evidence presented, that "[i]ndividuals do not generally choose their sexual orientation. No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation." 704 F. Supp. 2d at 966. The court noted that sexual orientation is "an enduring pattern of sexual, affectional or romantic desires for and attractions to men, women or both sexes" and that "[t]he vast majority of people are consistent in self-identification, behavior and attraction throughout their adult lives. *Perry*, 704 F. Supp. 2d at 964. Accordingly, I agree with the California Supreme Court that "[b]ecause a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment." *Marriage Cases*, 183 P.3d at 442; *accord Varnum*, 763 N.W.2d at 893 ("Accordingly, because sexual orientation is central to personal identity and may be altered if at all only at the expense of significant damage to the individual's sense of self, classifications based on sexual orientation are no less entitled to consideration as a suspect or quasi-suspect class than any other group that has been deemed to exhibit an immutable characteristic." (brackets and internal quotation marks omitted)).

### 4. Political Power

¶157 The last factor is premised on the notion that "[w]ithout political power, minorities may be unable to protect themselves from discrimination at the hands of the majoritarian political process." *Windsor*, 699 F.3d at 184. As noted, the Judiciary has a "special role in safeguarding the interests of those groups that are relegated to such a position of

93

political powerlessness as to command extraordinary protection from the majoritarian political process." *Washington v. Seattle Sch. Dist.*, 458 U.S. 457, 486, 102 S. Ct. 3187, 3203 (1982) (internal quotation marks omitted).

¶158   While the State's central argument on this point is devoted to the proposition that gays and lesbians have achieved some recent political successes,

> [t]he question is not whether homosexuals have achieved political successes over the years; they clearly have.  The question is whether they have the strength to politically protect themselves from wrongful discrimination.   When the Supreme Court ruled that sex-based classifications were subject to heightened scrutiny in 1973, the Court acknowledged that women had already achieved major political victories.  *See Frontiero*, 411 U.S. at 685, 93 S.Ct. 1764.  The Nineteenth Amendment had been ratified in 1920, and Title VII had already outlawed sex-based employment.  *See* 78 Stat. 253.  The Court was persuaded nevertheless that women still lacked adequate political power, in part because they were "vastly underrepresented in this Nation's decisionmaking councils," including the presidency, the Supreme Court, and the legislature. *Frontiero*, 411 U.S. at 686 n. 17, 93 S.Ct. 1764.

*Windsor*, 699 F.3d at 184 (citing *Frontiero v. Richardson*, 411 U.S. 677, 93 S. Ct. 1764 (1973)); *see also Varnum*, 763 N.W.2d at 894 (neither "absolute political powerlessness" nor "current political powerlessness" is a prerequisite to heightened scrutiny"); *Kerrigan*, 957 A.2d at 444 (explaining that the term "political powerlessness" is a "misnomer"; the political powerlessness aspect of the suspectness inquiry "does not require a showing that the group seeking recognition as a protected class is, in fact, without political power"; the question, rather, is "whether the group lacks sufficient political strength to bring a prompt end to the prejudice and discrimination through traditional political means").

¶159   The Court of Appeals observed in *Windsor* that there are parallels between the status of women at the time of *Frontiero* and homosexuals today:  their position has

improved markedly in recent decades, but they still face pervasive, although at times more subtle, discrimination in the political arena. 699 F.3d at 184. The court noted that the seemingly small number of acknowledged homosexuals in positions of power and authority "is attributable either to a hostility that excludes them or to a hostility that keeps their sexual preference private—which, for our purposes, amounts to much the same thing." *Windsor*, 699 F.3d at 184-85. The court further noted that these same considerations can also be expected "to suppress some degree of political activity by inhibiting the kind of open association that advances political agendas." *Windsor*, 699 F.3d at 185; *see also Rowland v. Mad River Local School Dist.*, 470 U.S. 1009, 1014, 105 S. Ct. 1373, 1377 (1985) (Brennan & Marshall, JJ., dissenting from denial of certiorari) ("Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena."). Thus, the court concluded that "homosexuals are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public." *Windsor*, 699 F.3d at 185.

¶160 The Connecticut Supreme Court likewise had "little difficulty in concluding that gay persons are entitled to heightened constitutional protection despite some recent political progress." *Kerrigan*, 957 A.2d at 444. The court cited several considerations in this regard. First, the discrimination that gay persons have suffered has been so pervasive and severe—even though their sexual orientation has no bearing at all on their ability to contribute to or perform in society—that it is highly unlikely that legislative enactments alone will suffice to eliminate that discrimination. *Kerrigan*, 957 A.2d at 444. Second,

95

insofar as gay persons play a role in the political process, it is apparent that their numbers reflect their status as a small and insular minority. *Kerrigan*, 957 A.2d at 446. Third, although the state legislature eventually enacted a gay-rights law, its enactment was preceded by nearly a decade of numerous failed attempts at passage, and the legislation contained "an unprecedented proviso" expressing the legislature's position that it does not condone homosexuality. *Kerrigan*, 957 A.2d at 448-50. Fourth, while the enactment of remedial legislation aimed at protecting a class from discrimination may indicate that the subject group possesses some political power, it also supports the conclusion that the subject group is in need of heightened constitutional protection. *Kerrigan*, 957 A.2d at 450-51; *accord Hernandez v. Robles*, 855 N.E.2d 1, 28-29 (N.Y. 2006) (Kaye, C.J., & Ciparick, J., dissenting) (the passage of civil rights measures "acknowledge[s]—rather than mark[s] the end of—a history of purposeful discrimination"). Fifth, the awareness of public hatred and the fear of violence that often accompanies it undermine efforts to develop an effective gay political identity; gay persons are disinclined to risk retaliation by open identification with the movement, and potential allies from outside the gay and lesbian community may think twice about allying their fortunes with such a despised population. *Kerrigan*, 957 A.2d at 452. Sixth, gay persons lack the political power that African-Americans and women possess today; yet, political gains by African-Americans and women have not been found to obviate the need for heightened judicial scrutiny of legislation that draws distinctions on the basis of race or gender. *Kerrigan*, 957 A.2d at 453. Given all of these factors (and the detailed analysis accompanying them), the court held that "gay persons cannot be deprived of heightened judicial protection merely

96

because of their relatively limited political influence." *Kerrigan*, 957 A.2d at 453-54; *see also Varnum*, 763 N.W.2d at 895 ("gay and lesbian people are not so politically powerful as to overcome the unfair and severe prejudice that history suggests produces discrimination based on sexual orientation").

¶161 In the present case, Dr. Chauncey provided his professional opinion that "gay and lesbian people do not currently possess a meaningful degree of political power in the United States or in the State of Montana." He cites various examples reflecting the persistence of anti-gay discrimination over the last decade. The State has not refuted Dr. Chauncey's opinion or any of the evidence underlying it. I also note that the entire underpinning of the Marriage Amendment, discussed in further detail below, was based on attacking and demeaning homosexuals and homosexuality. Accordingly, in light of Dr. Chauncey's unrefuted report, the detailed discussions in the *Windsor* and *Kerrigan* opinions, and the circumstances underlying the passage of the Marriage Amendment, I conclude that gays and lesbians are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public.

### 5. Summary

¶162 Based on the foregoing analysis under each of the factors, I conclude and would hold that sexual orientation is a suspect class under Article II, Section 4 of the Montana Constitution. Correspondingly, I would also hold that discrimination based on sexual orientation in the provision of statutory benefits and protections is subject to "strict scrutiny" review. *See Snetsinger*, ¶ 17 ("Strict scrutiny applies if a suspect class or fundamental right is affected."). Under the strict-scrutiny standard, the State has the

97

burden of showing that the law or policy is narrowly tailored to serve a compelling governmental interest.[8] *Snetsinger*, ¶ 17. I would reverse the District Court's judgment and direct it to enter a declaratory order encompassing these holdings. But for reasons discussed in the Declaratory Judgment section above, I would not order injunctive relief at this time and instead would permit the legislative and executive branches to implement our constitutional interpretation in the first instance.

### F. Human Dignity

¶163 As just discussed, Plaintiffs are entitled to a declaratory ruling that gay, lesbian, and bisexual persons are a suspect class in Montana and the State's disparate treatment of same-sex couples is subject to "strict scrutiny" review under the Equal Protection Clause of Article II, Section 4. This approach is sufficient to resolve this case in their favor.

¶164 That said, however, it is equally important to acknowledge the more fundamental human issue in this case. In addition to guaranteeing "the equal protection of the laws," Article II, Section 4 also provides that "[t]he dignity of the human being is inviolable." I addressed this provision of Montana's Constitution at length in *Baxter v. State*, 2009 MT 449, ¶¶ 74-94, 354 Mont. 234, 224 P.3d 1211 (Nelson, J., specially concurring). In the interests of brevity, given that this is already a lengthy dissent, I am not going to repeat my entire analysis and discussion of the Dignity Clause here.

---

[8] The State has put forth one purported objective for the exclusion of same-sex couples from the statutory benefits and obligations provided to married couples: "that an option short of marriage would detract from or dilute the uniqueness of the marital bond." For reasons discussed in the Marriage Amendment section below, I conclude that this asserted justification is without merit. *See* ¶¶ 174-178, 186-187, 204-205, *infra*.

¶165 Suffice it to say that, as I stated in *Baxter*, human dignity is perhaps the most fundamental right in the Declaration of Rights. Indeed, it is the *only* right in Montana's Constitution that is "inviolable"—meaning that it is absolute. No individual may be stripped of his or her human dignity by the government or by a private organization. *Baxter*, ¶ 83 (Nelson, J., specially concurring).

¶166 Human dignity may be defined in many ways. But, at bottom, it encompasses a fundament truth: every individual person is intrinsically valuable and has inherent worth because we are sentient beings with the capacity of independent, autonomous, rational, and responsible thought and action. *Baxter*, ¶ 84 (Nelson, J., specially concurring). Demonizing, demeaning, degrading, and stereotyping people because of their sexual orientation is simply an attempt to strip those so condemned of their worth, their value, and hence their dignity. Indeed, naming it for what it is, discrimination based on sexual orientation is bigotry. And, whether rationalized on the basis of majoritarian morality, partisan ideology, or religious tenets, homophobic discrimination is still bigotry. *Kulstad v. Maniaci*, 2009 MT 326, ¶ 103, 352 Mont. 513, 220 P.3d 595 (Nelson, J., concurring).

¶167 Without belaboring the point, the State's treatment of the committed couples here based on their sexual orientation is a frontal assault on their dignity as autonomous, rational, independent human beings. The State's public censure effectively conveys to these citizens the message that, as a class, they are inferior, immoral, corrupt, perverted, and sinful—that they are not worthy of sharing in the advantages that the State provides to their "normal," family-oriented, God-fearing, and morally superior heterosexual counterparts. "[T]he failure to provide equal benefits and protections in Montana law to

99

same-sex couples [is] a failure to respect the core humanity of gay and lesbian couples by denying that they can create, for themselves, the same sort of committed, loving relationships which heterosexual couples can create." Matthew O. Clifford and Thomas P. Huff, *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause with Possible Applications*, 61 Mont. L. Rev. 301, 335 n. 137 (2000). I can think of no better way to attack the right of inviolable human dignity of each of the Plaintiffs in this case. I conclude and would hold that the State's discriminatory refusal to provide the benefits and protections at issue here to the committed intimate same-sex couples violates the Dignity Clause of Article II, Section 4.

¶168 Having concluded my analysis under the Equal Protection and Dignity Clauses, I now turn to the Marriage Amendment.

## V. THE MARRIAGE AMENDMENT

¶169      *Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State.*[9]

### A. Constitutional Language

¶170 The Montana Constitution is divided into 14 articles, each addressing a different facet of government. Article I contains the Compact with the United States. Article II is

---

[9] Letter to the Danbury, Conn., Baptist Assn. (Jan. 1, 1802), in *Works of Thomas Jefferson* vol. 8, 113.

the Declaration of Rights—which we have described as "a compact of overlapping and redundant rights and guarantees," *Armstrong v. State*, 296 Mont. 361, 389, 989 P.2d 364, 383 (1999), each of which is "fundamental," *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 25, 349 Mont. 475, 204 P.3d 693. They include the rights to privacy, due process, human dignity, religion, and equal protection of the laws, to name but a few. Article III enumerates general governmental provisions, such as separation of powers, the oath of office, and the powers of initiative and referendum. Article IV concerns suffrage and elections. Articles V, VI, and VII set forth the powers of the Legislature, the Executive, and the Judiciary, respectively. Article VIII concerns revenue and finance; Article IX the environment and natural resources; Article X education and public lands; Article XI local government; Article XII departments and institutions; and Article XIV constitutional revision and amendment.

¶171 That leaves Article XIII, which is titled "General Provisions." Section 1 concerns the chartering of nonmunicipal corporations. Section 2 directs the Legislature to provide for an office of consumer counsel. Section 3 (repealed in 1986) required the Legislature to create a salary commission. Section 4 directs the Legislature to adopt a code of ethics. Section 5 requires the Legislature to enact liberal homestead and exemption laws. And Section 6 prohibits perpetuities except for charitable purposes.

¶172 Last among these general provisions is Section 7, the Marriage Amendment, which was added in 2004. It states, in its entirety: "Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state." Mont. Const. art. XIII, § 7. I note that this is the *only* provision in the Montana Constitution that

purports to affirmatively strip an entire class of citizens of an elemental civil right accorded, presumptively and without thought or hesitation, to all other Montanans.

## B. Irrelevance of the Marriage Amendment

¶173   The State and several of its amici drape themselves in the mantel of the Marriage Amendment as an underpinning for their arguments.  They argue that granting committed intimate same-sex couples any of the statutory benefits and protections which are accorded to different-sex married couples—while still denying same-sex couples the right to marry—may violate the Marriage Amendment.  I say "may" because, as noted earlier, the Attorney General's position is difficult to reconcile.  On one hand, he seems to contend that the Marriage Amendment precludes Plaintiffs' claims, yet, on the other hand, he concedes that the Legislature could provide same-sex couples with similar protections as are granted to different-sex married couples, by means of a civil-union or domestic-partnership scheme, if it chose to do so.  *See* ¶ 63, *supra*.  Regardless of the State's actual position on this matter, however, there is no question where the State's amici stand:  They believe that the Marriage Amendment precludes Plaintiffs' claims. *See* Amicus Curiae Br. of Mont. Catholic Conf. and Other Christian Churches at 5 ("This lawsuit is, in effect, an attempt to change the Constitutional and statutory definition of marriage."); Br. of Amicus Curiae Mont. Family Found. at 3 ("Th[e] constitutional definition of marriage is, in reality, what Appellants challenge . . . ."); Br. of Amici Curiae Sen. President, Sen. Majority Leader, Speaker of the H.R., and H. Majority Leader of the State of Montana at 7-13 (analogizing the issue here, concerning same-sex couples, to the "moral dilemma" in the mid-1800s of whether slavery was "right" or

"wrong," and arguing that this Court should not "exalt the desires of the minority" over the will of the majority expressed through Montana's Marriage Amendment). Needless to say, I disagree entirely with this view of the Marriage Amendment's scope.

¶174 First of all, Plaintiffs do not seek the status of "marriage." They seek only the opportunity to obtain the protections which the State of Montana has made available to different-sex couples—such as decision-making authority during medical emergencies and end-of-life situations, a financial safety net under the tax code, and legal rights in the event of a spouse's injury, death, or intestacy. In the most basic terms, these committed intimate same-sex couples—some of whom have been together for decades—merely ask that they not be treated as "legal strangers" to each other. It is difficult to comprehend how granting them this basic civil right infringes upon or undermines the institution of marriage, or threatens the rights of different-sex couples.

¶175 Indeed, the same sort of paranoid arguments were once held out as obvious and incontrovertible reasons to deny the constitutional rights of different-race couples. *See e.g. Perez v. Sharp*, 198 P.2d 17, 23 (Cal. 1948) ("[R]espondent has sought to justify the statute by contending that the prohibition of intermarriage between Caucasians and members of the specified races prevents the Caucasian race from being contaminated by races whose members are by nature physically and mentally inferior to Caucasians."); *Scott v. State*, 39 Ga. 321, 323 (1869) ("The amalgamation of the races is not only unnatural, but is always productive of deplorable results. Our daily observation shows us, that the offspring of these unnatural connections are generally sickly and effeminate, and that they are inferior in physical development and strength, to the fullblood of either

103

race. It is sometimes urged that such marriages should be encouraged, for the purpose of elevating the inferior race. The reply is, that such connections never elevate the inferior race to the position of the superior, but they bring down the superior to that of the inferior. They are productive of evil, and evil only, without any corresponding good."); *State v. Gibson*, 36 Ind. 389, 405 (1871) (requiring separation of the races " 'is not prejudice, nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts' " (quoting *W. Chester & Phila. R.R. Co. v. Miles*, 55 Pa. 209, 214 (1867)); *Loving v. Virginia*, 388 U.S. 1, 3, 87 S. Ct. 1817, 1819 (1967) (" 'Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for [interracial] marriages. The fact that he separated the races shows that he did not intend for the races to mix.' " (quoting the trial judge's decision)). As we now recognize, these supposedly self-evident propositions are, in fact, utterly groundless. Upholding the rights of different-race couples did not impinge on the institution of marriage or deprive it of its vitality, and neither will upholding the rights of the same-sex couples here, who do not even ask to be "married" in the first place.

¶176 Secondly, "[t]hat the Marriage Amendment effectively prevents same-sex couples from marrying does not automatically permit the government to treat them differently in other ways." *Alaska Civ. Liberties Union v. State*, 122 P.3d 781, 786-87 (Alaska 2005). Indeed, the plain language of the Marriage Amendment neither requires the State to confer any specific benefits or obligations on married persons, nor prohibits the State

from granting the same protections to unmarried persons that it grants to married persons. This fact is reflected throughout the Montana Code. For example, the right of a spouse to be appointed as guardian of an incapacitated person is not *exclusive* to the spouse. The right is also shared by "a relative or friend who has demonstrated a sincere, longstanding interest in the welfare of the incapacitated person." Section 72-5-312, MCA. Likewise, the partner-or-family-member-assault statute protects not only spouses, but also "persons who have been or are currently in a dating or ongoing intimate relationship with a person of the opposite sex." Section 45-5-206, MCA. Other examples exist, but the point is that these illustrations demonstrate, unequivocally, that there is no merit to the premise that the Marriage Amendment bars the State from granting unmarried persons the same rights and protections that the State grants to married persons. Neither the State nor any of its amici cite any authority for such a proposition.

¶177   In fact, the State's reasoning on this point is entirely circular. The State offers the following syllogism: *Premise 1* – "Marriage is defined by [§ 40-1-103, MCA] as 'a personal relationship between a man and a woman arising out of a civil contract to which the consent of the parties is essential' "; *Premise 2* – This definition "has been incorporated into the Montana Constitution by [the Marriage Amendment]"; *Conclusion* – "Spousal benefits, therefore, flow from the now-constitutional status of marriage." All that *Premise 1* and *Premise 2* establish, however, is that the "personal relationship" recognized by the State must, under the Montana Constitution, consist of one man and one woman. The third (unstated) premise of the State's syllogism is that this "personal relationship" includes the right to "spousal benefits." Yet, neither the

Marriage Amendment nor § 40-1-103, MCA, says anything about spousal benefits, and the State concedes elsewhere in its brief that there is "no constitutional or judicially enforceable mandate for the Legislature to provide or fund spousal benefits." *See In re Marriage Cases*, 183 P.3d 384, 426 (Cal. 2008) ("the constitutional right to marry clearly does not obligate the state to afford specific tax or other governmental benefits on the basis of a couple's family relationship"). So, if the Legislature is not mandated to provide or fund spousal benefits, then obviously such benefits are not implicit in the "personal relationship" identified in § 40-1-103, MCA. Indeed, to hold otherwise could give rise to innumerable Takings and Due Process claims every time the Legislature reduced or eliminated a spousal benefit. As Plaintiffs point out, and as the State tacitly admits, the Legislature's conferral of such benefits is entirely "discretionary." Apparently the point the State is attempting to make is that when the State *does* choose to grant a benefit to married persons, the benefit cannot be granted to anyone else (i.e., to unmarried persons). But that is clearly not true, given the various statutes, noted above, which grant the same benefits to non-spouses as they do spouses.

¶178 Notably, the California Supreme Court concluded that Proposition 8, which amended California's Constitution to restrict marriage to one man and one woman, did not also "have the effect of abrogating the constitutional right of same-sex couples to enter into an officially recognized family relationship with a designation other than marriage." *Strauss v. Horton*, 207 P.3d 48, 77 (Cal. 2009). The court noted that

> an alternative, much more sweeping initiative measure—proposing the addition of a new constitutional section that would have provided not only that "[o]nly marriage between one man and one woman is valid or

106

recognized in California," but also that "[n]either the Legislature nor any court, government institution, government agency, initiative statute, local government, or government official shall . . . bestow statutory rights, incidents, or employee benefits of marriage on unmarried individuals"— was circulated for signature at the same time as Proposition 8, but did not obtain sufficient signatures to qualify for the ballot.

*Strauss*, 207 P.3d at 76 n. 8 (brackets and ellipsis in original). In Nebraska, voters did pass a more sweeping measure of this sort in November 2000. As a result, Nebraska's Constitution now states: "Only marriage between a man and a woman shall be valid or recognized in Nebraska. *The uniting of two persons of the same sex in a civil union, domestic partnership, or other similar same-sex relationship shall not be valid or recognized in Nebraska.*" Neb. Const. art. I, § 29 (emphasis added). If the additional language contained in Nebraska's Marriage Amendment and in the failed alternative to California's Proposition 8 were part of Montana's Marriage Amendment, the State's and its amici's arguments here might have traction. But that is not the case, and it is not the prerogative of the State, its amici, or this Court to insert such language. Section 1-2-101, MCA; *Jud. Stands. Commn. v. Not Afraid*, 2010 MT 285, ¶ 15, 358 Mont. 532, 245 P.3d 1116. By its plain terms, Montana's Marriage Amendment applies to "marriage." It says nothing about civil unions, domestic partnerships, or other similar same-sex relationships. It does not say that the government cannot bestow statutory rights, incidents, or employee benefits of marriage on unmarried individuals. As the State concedes, the Legislature could enact a civil-union or domestic-partnership scheme if it chose to do so.

¶179 Accordingly, there was no need for the Attorney General to inject the Marriage Amendment into this case, nor was there any legal basis for the religious and "family

values" organizations to file numerous amicus briefs supporting the Attorney General's arguments in that respect. Nevertheless, the Marriage Amendment has been put at issue, and it is thus necessary to address this aspect of the State's approach. For the reasons which follow, and based on my examination of the provision for what it actually is and does, I conclude *the Marriage Amendment itself* cannot withstand constitutional scrutiny.

## C. Basis of the Marriage Amendment

¶180 The entire underpinning of the Marriage Amendment is based on attacking and demeaning homosexuals and homosexuality. This is abundantly clear from the 2004 Voter Information Pamphlet provided to voters by the Montana Secretary of State and contained in the record of this case. In their argument for the Marriage Amendment (referred to as Constitutional Initiative 96 or CI-96), Proponents rail against "homosexual activists" who, Proponents claim, are seeking out "activist judges" to force Montanans to become part of "a vast, untested social experiment." Proponents assert that "homosexual activists" are "threatening" not only "the time-honored, vital institution of marriage," but also "the freedom to teach our children as we wish." Proponents warn parents that if CI-96 fails, "[e]very public school in Montana would be required *to teach your children that same-sex marriage and homosexuality are perfectly normal*" (emphasis in original). Proponents use similar scare tactics in an attempt to rally "small business employers," asserting that they "*may someday be required to provide expanded health coverage, retirement and fringe benefits to same-sex 'spouses' of employees*" (emphasis in original), which allegedly "could hurt Montana's economy and jobs." Proponents also warn churchgoers that if CI-96 does not pass, "[y]our church will be legally pressured to

108

perform same-sex weddings" and may lose its "tax exemptions" if it refuses to perform such ceremonies. Finally, Proponents argue that CI-96 is necessary for childrearing:

> Natural marriage is extremely important for future generations. Men and women are distinctly different. Each gender brings vitally important, and unique, elements to a child's development. *Saying that children don't necessarily need fathers or mothers is saying that one gender or the other is unnecessary.* A loving and compassionate society always aids motherless and fatherless families. Compassionate societies never intentionally create families without mothers or fathers, which is exactly what same-sex homes do. [Emphasis in original.]

¶181 Notably, in their rebuttal to the opponents' argument against CI-96, Proponents state that the initiative "doesn't limit the ability of homosexuals to enter into contractual agreements to protect their assets," "doesn't stop employers from giving same-sex couples the same benefits as their married employees (if they so choose)," and "doesn't stop churches from recognizing same-sex relationships." Proponents categorically *deny* that the Marriage Amendment "limits the rights of homosexuals." They state that the Marriage Amendment accomplishes one thing: "It simply stops the legalization of homosexual marriage," which Proponents claim has never been a "right" of same-sex couples in the first place. Proponents make it clear that their goal is to preserve "the historical definition of marriage." Proponents present no argument that the Marriage Amendment will go further and prohibit state government from granting same-sex couples legal protections similar to those possessed by married persons. Proponents did not incorporate into Montana's Marriage Amendment the language used in Article I, Section 29 of the Nebraska Constitution, which had been approved by Nebraska electors several years earlier (in November 2000).

109

¶182  In any event, the important point here is that there is no factual or legal basis whatsoever for any of Proponents' assertions in support of CI-96.  Indeed, the Voter Information Pamphlet offers no actual reasoning, statistics, or evidence to support the fears it mongers.  Yet, the fabricated threats posed by homosexuals to marriage, family, children, business, religion, and the economy were the so-called "official" justifications for the Marriage Amendment.  It is clear that the promoters of the Marriage Amendment were playing to a populist paranoia grounded in something other than actual evidence.

¶183  In this regard, some useful insights may be gleaned from the strikingly similar campaign four years later (in 2008) in support of Proposition 8 in California.  Essentially identical to Montana's Marriage Amendment, Proposition 8 (now Article I, Section 7.5 of the California Constitution) states in its entirety:  "Only marriage between a man and a woman is valid or recognized in California."  Following its approval by a slim majority of California voters (52.3 percent), Proposition 8 was challenged in federal court.  In January 2010, the United States District Court for the Northern District of California held a 12-day bench trial, during which it heard testimony from 8 lay witnesses and 11 expert witnesses.  The federal district court then entered extensive findings of fact and conclusions of law, ultimately deciding that Proposition 8 is unconstitutional under both the Due Process Clause and the Equal Protection Clause.  *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012).  Because the proponents of Proposition 8 "vigorously" defended the constitutionality of California's Marriage Amendment, *Perry*, 704 F. Supp. 2d at 931, and because a substantial evidentiary record was created concerning the alleged need for

a prohibition against same-sex marriage, the *Perry* case provides valuable context and insights for my discussion of Montana's Marriage Amendment. I shall detail, therefore, the pertinent parts of the *Perry* decision here.

¶184 For starters, the federal district court found that the proponents of Proposition 8 relied "on fears that children exposed to the concept of same-sex marriage may become gay or lesbian" and "on stereotypes to show that same-sex relationships are inferior to opposite-sex relationships." *Perry*, 704 F. Supp. 2d at 988, 990. Indeed, the proponents admitted as much:

> "[P]assing Proposition 8 would depend on our ability to convince voters that same-sex marriage had broader implications for Californians and was not only about the two individuals involved in a committed gay relationship." "We strongly believed that a campaign in favor of traditional marriage would not be enough to prevail." "We probed long and hard in countless focus groups and surveys to explore reactions to a variety of consequences our issue experts identified" and they decided to create campaign messaging focusing on "how this new 'fundamental right' would be inculcated in young children through public schools." "[T]here were limits to the degree of tolerance Californians would afford the gay community. They would entertain allowing gay marriage, but not if doing so had significant implications for the rest of society." "The Prop 8 victory proves something that readers of Politics magazine know very well: campaigns matter."

*Perry*, 704 F. Supp. 2d at 988 (brackets in original) (quoting Frank Schubert & Jeff Flint, *Passing Prop 8*, Politics, Feb. 2009, at 45-47).

¶185 Similar to the ballot argument for Montana's Marriage Amendment, the ballot argument in support of Proposition 8 summarized the initiative as follows:

> Proposition 8 is simple and straightforward. * * * Proposition 8 is about preserving marriage; it's not an attack on the gay lifestyle. * * * It protects our children from being taught in public schools that "same-sex marriage" is the same as traditional marriage. * * * While death, divorce, or other

circumstances may prevent the ideal, the best situation for a child is to be raised by a married mother and father. * * * If the gay marriage ruling [of the California Supreme Court] is not overturned, TEACHERS COULD BE REQUIRED to teach young children there is no difference between gay marriage and traditional marriage.

We should not accept a court decision that may result in public schools teaching our own kids that gay marriage is ok. * * * [W]hile gays have the right to their private lives, they do not have the right to redefine marriage for everyone else.

*Perry*, 704 F. Supp. 2d at 930 (brackets and asterisks in original, internal quotation marks omitted) (quoting California Voter Information Guide, California General Election, Tuesday, November 4, 2008).  In a mailing leaflet, the Proposition 8 proponents accused the California Supreme Court of being "activist" when it decreed earlier that year that gays and lesbians have the same fundamental right as heterosexuals to marry.  *See Perry*, 704 F. Supp. 2d at 988-89; *Marriage Cases*, 183 P.3d at 433-34 ("[W]e conclude that the right to marry . . . guarantees same-sex couples the same substantive constitutional rights as opposite-sex couples to choose one's life partner and enter with that person into a committed, officially recognized, and protected family relationship that enjoys all of the constitutionally based incidents of marriage.").  The Proposition 8 proponents argued that " '[i]f traditional marriage goes by the wayside, then in every public school, children will be indoctrinated with a message that is absolutely contrary to the values that their family is attempting to teach them at home.' "  *Perry*, 704 F. Supp. 2d at 990.  They suggested to voters that " 'the fact that gay people are being asked to be recognized and have their relationships recognized is an imposition on other people, as opposed to an extension of fundamental civil rights to gay and lesbian people.' "  *Perry*, 704 F. Supp. 2d at 989.

112

Like the proponents of Montana's Marriage Amendment, the Proposition 8 proponents "focused on protecting children and the concern that people of faith and religious groups would somehow be harmed by the recognition of gay marriage." *Perry*, 704 F. Supp. 2d at 990. "The campaign conveyed a message that gay people and relationships are inferior, that homosexuality is undesirable and that children need to be protected from exposure to gay people and their relationships." *Perry*, 704 F. Supp. 2d at 990.

¶186 Based on the evidence regarding the campaign to pass Proposition 8, the federal district court concluded that "the most likely explanation for its passage [was] a desire to advance the belief that opposite-sex couples are morally superior to same-sex couples." *Perry*, 704 F. Supp. 2d at 1002-03. The court further observed, however, that none of the evidence supported the proponents' premise that opposite-sex relationships are materially distinct from same-sex relationships. To the contrary, "the evidence thoroughly rebutted [that premise]: rather than being different, same-sex and opposite-sex unions are, for all purposes relevant to California law, exactly the same." *Perry*, 704 F. Supp. 2d at 1001. Furthermore, and contrary to the unsubstantiated fears asserted by the State's amici in the present case, the federal district court found that "[p]ermitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages." *Perry*, 704 F. Supp. 2d at 972. In regard to these findings, the court pointed to extensive expert testimony and other evidence in the record, plus various admissions by the Proposition 8 proponents, highlights of which I shall note here:

- "Gay and lesbian sexual orientations are 'normal variation[s] and are considered to be aspects of well-adjusted behavior.' "

- "Homosexuality is not considered a mental disorder. The American Psychiatric Association, the American Psychological Association and other major professional mental health associations have all gone on record affirming that homosexuality is a normal expression of sexuality and that it is not in any way a form of pathology."

- " 'Courts and legal scholars have concluded that sexual orientation is not related to an individual's ability to contribute to society or perform in the workplace.' "

- "Proponents admit that same-sex sexual orientation does not result in any impairment in judgment or general social and vocational capabilities."

- "Proponents admit that gay and lesbian individuals, including plaintiffs, have formed lasting, committed and caring relationships with persons of the same sex and same-sex couples share their lives and participate in their communities together."

- The American Psychoanalytic Association has stated that " 'gay men and lesbians possess the same potential and desire for sustained loving and lasting relationships as heterosexuals.' "

- "Research that has compared the quality of same-sex and opposite-sex relationships and the processes that affect those relationships consistently shows 'great similarity across couples, both same-sex and heterosexual.' "

- "Same-sex couples have more similarities than differences with opposite-sex couples, and any differences are marginal."

- "Married same-sex couples in Massachusetts have reported various benefits from marriage including greater commitment to the relationship, more acceptance from extended family, less worry over legal problems, greater access to health benefits and benefits for their children."

- "Proponents admit that gay and lesbian individuals raise children together."

- " '[S]ocial science has shown that the concerns often raised about children of lesbian and gay parents—concerns that are generally grounded in prejudice against and stereotypes about gay people—are unfounded.' "

- "Studies have demonstrated 'very conclusively that children who are raised by gay and lesbian parents are just as likely to be well-adjusted as children raised by heterosexual parents.' These results are 'completely consistent with our broader understanding of the factors that affect children's adjustment.' "

- "Sociological and psychological peer-reviewed studies conclude that permitting gay and lesbian individuals to marry does not cause any problems for children."

- "Children do not need to be raised by a male parent and a female parent to be well-adjusted, and having both a male and a female parent does not increase the likelihood that a child will be well-adjusted."

- "The genetic relationship between a parent and a child is not related to a child's adjustment outcomes."

- "Allowing same-sex couples to marry will have 'no impact' on the stability of marriage."

- "When racial restrictions on marriage across color lines were abolished, there was alarm and many people worried that the institution of marriage would be degraded and devalued. But 'there has been no evidence that the institution of marriage has become less popular because * * * people can marry whoever they want.' "

- "Data from Massachusetts on the 'annual rates for marriage and for divorce' for 'the four years prior to same-sex marriage being legal and the four years after' show 'that the rates of marriage and divorce are no different after [same-sex] marriage was permitted than they were before.' "

- "The viability of civilization or social order does not depend upon marriage as an exclusively heterosexual institution."

*Perry*, 704 F. Supp. 2d at 961, 967-69, 972-73, 980-81.

¶187 In sum, like the CI-96 campaign, the Proposition 8 campaign "relied heavily on negative stereotypes about gays and lesbians." *Perry*, 704 F. Supp. 2d at 1003. But when asked to demonstrate the validity of their arguments in court, the proponents failed to produce any *actual* evidence substantiating the notion that same-sex marriage harms children, is inferior to different-sex marriage, or threatens the stability of different-sex

115

marriage. More to the point, the challengers did produce substantial evidence—including deposition testimony by two of the proponents' own witnesses—*refuting* each of these propositions. In the end, it became apparent to the federal district court that "*moral and religious views* form the *only* basis for a belief that same-sex couples are different from opposite-sex couples." *Perry*, 704 F. Supp. 2d at 1001 (emphases added).

¶188 One such underlying moral and religious view is that men and women must adhere to specific gender roles in a marriage: the husband "is the bread winner" and the wife "stays at home." *Perry*, 704 F. Supp. 2d at 958-59, 975, 998. That is no longer the law in California or Montana, however. *See* Cal. Fam. Code § 720; § 40-2-101, MCA.

> "[T]he primacy of the husband as the legal and economic representative of the couple, and the protector and provider for his wife, was seen as absolutely essential to what marriage was" in the nineteenth century. Gender restrictions were slowly removed from marriage, but "because there were such alarms about it and such resistance to change in this what had been seen as quite an essential characteristic of marriage, it took a very very long time before this trajectory of the removal of the state from prescribing these rigid spousal roles was complete." The removal of gender inequality in marriage is now complete "to no apparent damage to the institution. And, in fact, I think to the benefit of the institution."

*Perry*, 704 F. Supp. 2d at 960 (brackets in original) (quoting trial testimony).

¶189 Another underlying moral and religious view is that gay and lesbian relationships are sinful. *Perry*, 704 F. Supp. 2d at 985-86. In this regard, one witness pointed out that

> [t]he religious arguments that were mobilized in the 1950s to argue against interracial marriage and integration as against God's will are mirrored by arguments that have been mobilized in the Proposition 8 campaign and many of the campaigns since Anita Bryant's 'Save Our Children' campaign, which argue that homosexuality itself or gay people or the recognition of their equality is against God's will.

116

*Perry*, 704 F. Supp. 2d at 985.[10]   And this leads me to the crux of the matter:  that Montana's Marriage Amendment is an unconstitutional attempt to enforce a sectarian belief (held by some[11]) through Montana's secular law.

¶190   Indeed, the Marriage Amendment is undisputedly grounded in religious doctrine. That much is apparent not only from the federal district court's findings, but particularly from the fulminations of numerous religious organizations in the present case, led by the Montana Catholic Conference, against the prospect that gay, lesbian, and bisexual Montanans might enjoy some measure of legal protection for their relationships.  If homosexuality and same-sex relationships were not a religious issue, it is highly doubtful that any of these amici would be so actively involved in this case.[12]

---

[10] *See also e.g.* Alan Sears & Craig Osten, *The Homosexual Agenda: Exposing the Principal Threat to Religious Freedom Today* (Broadman & Holman 2003).  It is disturbing that the same sort of propaganda was used to demonize various disliked groups in pre-World War II Germany.  Some examples of this are provided at the *German Propaganda Archive*, http://www.calvin.edu/academic/cas/gpa, including *The German National Catechism*, *The Jewish World Plague*, and *Ten Responses to Jewish Lackeys*. *See also Persecution of Homosexuals in Nazi Germany and the Holocaust*, http://en.wikipedia.org/wiki/Persecution_of_homosexuals_in_Nazi_Germany_and_the_H olocaust (which is a thorough and authoritatively supported article on the subject); Jewish Virtual Library, *Nazi Persecution of the Mentally and Physically Disabled*, http://www.jewishvirtuallibrary.org/jsource/Holocaust/disabled.html.  (Each Internet site mentioned in this Dissent was last accessed December 14, 2012.)

[11] As amici curiae Montana Religious Leaders make clear, religious organizations are not in unanimous agreement concerning the rights of same-sex couples.  *Compare* Amicus Curiae Br. of Mont. Catholic Conf. and Other Christian Churches (opposing Plaintiffs' claim), *with* Br. of Amici Curiae "Montana Religious Leaders" (supporting Plaintiffs' claim because, "like all Montanans, gay and lesbian Montanans deserve to be treated with dignity and afforded equal rights and protections under the law").

[12] As a former member of the Catholic Church, I find it somewhat incongruous that while the Montana Catholic Conference leads the charge here against the same-sex couples, the Church is an institution that is itself burdened with a history of marginalizing women and facilitating the sexual abuse of children.  The literature on this subject is

117

¶191   Before proceeding, I should note that what follows is not an attack on religion, and I make no pretense of being a theologian.   That the Marriage Amendment embodies a biblical abhorrence of homosexuality is, in my view, apparent from the testimony and evidence in the *Perry* case, discussed above, and from a casual reading of the Bible's teachings against homosexuality, discussed below.

¶192   While the historical Jesus, notably, had absolutely nothing to say on the subject, there are passing references to homosexuality in *Romans* 1:26-27, I *Corinthians* 6:9-10,

---

prodigious, and I make no attempt to cite all of it here.  The following resources confirm my observations in this regard:  The City University of New York, John Jay College of Criminal Justice, *The Nature and Scope of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States 1950-2002* (Feb. 2004), http://www.bishop-accountability.org/reports/2004_02_27_JohnJay_revised/2004_02_27_John_Jay_Main_Report_Optimized.pdf; Sam Harris, *The Moral Landscape: How Science Can Determine Human Values*, 199-201 n. 14 (Free Press 2010); *Catholic Sex Abuse Cases*, http://en.wikipedia.org/wiki/Catholic_sex_abuse_cases (a thoroughly annotated article on the subject); Sandra M. Schneiders, *The Effects of Women's Experience on Their Spirituality*, http://www.spiritualitytoday.org/spir2day/833521schneiders.html; Judith Levitt, *Women as Priests*, N.Y. Times (Sep. 29, 2012); Rachel Donadio, *Pope Rebukes Priests Who Advocate Ordaining Women and Ending Celibacy*, N.Y. Times (Apr. 5, 2012); *Doctrinal Assessment of the Leadership Conference of Women Religious*, http://www.usccb.org/loader.cfm?csModule=security/getfile&pageid=55544.

In a similar vein, while officially condemning homosexuality, the Boy Scouts of America, a federally chartered organization, incongruously maintained a different approach in dealing with pedophile adult scout leaders and volunteers.  For decades, the organization maintained secret "perversion files," failed to report incidents of child sexual abuse to legal authorities, covered up sexual abuse reports, handled sexual abuse claims "in house" via face-saving measures, and facilitated the sexual abuse of children by allowing pedophiles excluded from the scouting program in one state to reenter the program in a different state (not unlike the approach of the Catholic Church, as noted above.  *See* Petula Dvorak, *In Boy Scouts' "Perversion Files," Vivid Details on the Child Molesters among Us*, Washington Post (Oct. 26, 2012); Paul Duggan, *Boy Scout "Perversion Files" Released*, Washington Post (Oct. 18, 2012); Bob Rogers, *Montana and Wyoming Men Identified in Boy Scouts' "Perversion File,"* Billings Gazette (Oct. 18, 2012); PRWeb, *Monumental Boy Scouts Child Sex Abuse Report Released*, http://www.prweb.com/releases/prwebboy-scouts/child-sex-abuse/prweb10134925.htm (Nov. 15, 2012).

I *Timothy* 1:10, and *Jude* 1:7 (New King James Version). The primary condemnations of homosexuality, however, are taken from the Genesis story of Sodom and Gomorrah, and from the rules set out in Leviticus. In the former, God sends two angles in the form of men to the home of Lot to warn him of God's impending punishment of the townspeople. The Sodomites surround Lot's house demanding to "know" (i.e., have carnal knowledge of) the two men. Lot declines and, instead, offers up his two daughters to the mob. But when that ploy fails, the angels strike the townsmen blind. Lot, his wife Sarah, and his two daughters then flee the city. Along the way, Sarah is turned into a pillar of salt. Lot eventually takes up residence in a cave with his two daughters, where he gets drunk and impregnates them both. *Genesis* 19:1-36. Many believe this story reflects God's condemnation of homosexuality, and they thus equate "Sodomite" with "homosexual." I note, though, that in *Ezekiel* 16:49-50, the sins of Sodom are identified as pride, gluttony, sloth, greed, arrogance, and failure to help the poor.

¶193 The references to homosexuality in Leviticus are part of the so-called "Holiness Code." *See* Luther Seminary, *Leviticus 17-27 – The Holiness Code*, http://www.enterthebible.org/resourcelink.aspx?rid=377. Leviticus explicitly condemns homosexuality: "You shall not lie with a male as with a woman. It is an abomination." *Leviticus*, 18:22; *see also Leviticus*, 20:13 ("If a man lies with a male as he lies with a woman, both of them have committed an abomination. They shall surely be put to death. Their blood shall be upon them."). It should also be noted, however, that Leviticus sets forth a number of other rules that presumably made sense to a primitive nomadic culture thousands of years ago but that modern society would certainly question, if not outright

119

ignore. Indeed, it seems absurd to consider an amendment to Montana's Constitution authorizing the possession of slaves (*Leviticus* 25:44), or requiring the burning of animals as a sacrifice to God (*Leviticus* 1:2-17), or prohibiting intercourse with menstruating women (*Leviticus* 15:19-24), or prohibiting the consumption of shellfish (*Leviticus* 11:10-12), or prohibiting a blind or lame person from approaching the altar of God (*Leviticus*, 21:18-20), or prohibiting the trimming of one's hair, especially at the temples (*Leviticus* 19:27), or prohibiting any contact with or consumption of dead pigs (*Leviticus* 11:7-8), or prohibiting the planting of two different crops in the same field (*Leviticus* 19:19), or prohibiting the wearing of mixed linen and wool (*Leviticus* 19:19), or requiring the stoning of those who blaspheme (*Leviticus* 24:10-16).

¶194 As already stated, this is not meant to disparage or trivialize biblical teachings. In terms of sectarian doctrine and ritual, people have the right to believe and practice whatever they choose. That is the very essence of the constitutional protection of the "free exercise" of religion. U.S. Const. amend. I; Mont. Const. art. II, § 5; *Thomas v. Rev. Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 713, 101 S. Ct. 1425, 1430 (1981) ("[T]he Free Exercise Clause . . . gives special protection to the exercise of religion."); *St. John's Lutheran Church v. State Compen. Ins. Fund*, 252 Mont. 516, 523, 830 P.2d 1271, 1276 (1992) ("The right to freely exercise one's religious beliefs without the interference of the state is one of the most cherished and protected liberties in our society."). The issue, rather, is whether religious followers "may use the power of the State to enforce [their] views on the whole society" through operation of the State's secular laws. *Lawrence v. Texas*, 539 U.S. 558, 571, 123 S. Ct. 2472, 2480 (2003). Clearly they may not do so in

120

light of the First Amendment. *Everson v. Bd. of Educ.*, 330 U.S. 1, 15, 67 S. Ct. 504, 511 (1947) ("Neither a state nor the Federal Government . . . can pass laws which aid one religion, aid all religions, or prefer one religion over another."); *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 226, 83 S. Ct. 1560, 1573-74 (1963) ("While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs. . . . In the relationship between man and religion, the State is firmly committed to a position of neutrality." (emphasis omitted)); *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S. Ct. 2105, 2111 (1971) (legislation "must have a secular legislative purpose," and "its principal or primary effect must be one that neither advances nor inhibits religion"); *cf. Thomas*, 450 U.S. at 717-18, 101 S. Ct. at 1432 (the state may neither condition receipt of an important benefit upon conduct proscribed by a religious faith, nor deny such a benefit because of conduct mandated by religious belief). "In the words of [Thomas] Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' " *Everson*, 330 U.S. at 16, 67 S. Ct. at 512.

¶195 My focus here, however, is not on federal law. My analysis instead focuses solely on Montana's Constitution because it, unlike its federal counterpart, is burdened with the Marriage Amendment.

### D. Constitutionality of the Marriage Amendment

¶196 The Montana Constitution makes it clear that the right and power of government originates with the people, and they may amend the Constitution whenever they deem it

121

necessary. Mont. Const. art. II, §§ 1, 2. Yet, one will search in vain for a provision in the Constitution authorizing the people to amend that document so as to effect some social policy or majoritarian ideology that is, itself, contrary to constitutional principles. Quite simply, "while the people may amend the Constitution, they may not violate it in the process." *Reichert v. State*, 2012 MT 111, ¶ 68, 365 Mont. 92, 278 P.3d 455.

¶197 By way of example, the people could not enact additional "General Provisions" in Article XIII that would prohibit marriages between Catholics and Protestants, prohibit women from working outside the home, and create a committee of business and religious leaders to sanitize media stories. Such amendments would clearly run afoul of Article II, Sections 4, 3, and 7, respectively (not to mention their counterparts in the federal Constitution). Such amendments would themselves be inherently unconstitutional.

¶198 In the same fashion, the people do not have the power to constitutionalize religious doctrine. Again, by way of example, the people could not adopt an amendment that required all church worship services to be conducted on Sunday, or that denied certain governmental services to persons who were not "born again," or that prohibited women from being ordained as ministers. And for the same reasons, religious teachings that homosexuality is a sin cannot be made part of Montana's secular law—as the proponents of CI-96 have attempted to do through the Marriage Amendment. The Achilles heel of the Marriage Amendment is that it is the wolf of constitutionalized religious doctrine parading in the sheep-suit of social policy.

¶199 Unlike the Marriage Amendment, Article II, Section 5 is a "fundamental right." *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 25, 349 Mont. 475, 204 P.3d

122

693. It provides that "[t]he state shall make no law respecting an establishment of religion . . . ." Mont. Const. art. II, § 5. The Montana Constitution itself is "the supreme *law* of this State." *Associated Press v. Bd. of Pub. Educ.*, 246 Mont. 386, 391, 804 P.2d 376, 379 (1991) (emphasis added). Thus, when the State, through the initiative process, "makes a law" that serves no purpose other than to codify a religious canon—here, select portions of Genesis and Leviticus—the State clearly violates Article II, Section 5. One can only imagine the uproar if the State began incorporating doctrines from the Koran or some other religion's sacred text into the Constitution. Yet, that is precisely what the Marriage Amendment did. Through the initiative process, the State constitutionalized the biblical abhorrence for homosexuality by prohibiting same-sex couples not only from marrying but, according to the State and its amici, from enjoying any sort of legal protection for their relationships. Such protections are instead to be reserved to the biblically favored class of different-sex couples.

¶200 The Bible's condemnation of homosexuality aside, marriage clearly has—and has had for centuries—two separate components. There is the sectarian component: Various religions have doctrines, rituals, and proscriptions regarding marriage. Under the Free Exercise Clause, religions may choose to adopt any desired beliefs, practices, or rituals (within reason[13]). *See St. John's*, 252 Mont. at 523, 830 P.2d at 1276; *Griffith v. Butte Sch. Dist. No. 1*, 2010 MT 246, ¶ 62, 358 Mont. 193, 244 P.3d 321. If some religious institutions wish to condemn same-sex relationships, they are free to do so. Conversely,

---

[13] Under prevailing law, religions—at least in this country—cannot sanction incest, female genital mutilation, polygamy, honor killing, and similar practices, even if such practices are divinely inspired.

if others wish to perform same-sex marriages, they likewise are free to do so. Article II, Section 5 guarantees that each religion may adhere to its own doctrines, practices, and rituals. Under Article II, Section 5, the State cannot force any religion or sectarian organization to perform same-sex weddings or to recognize same-sex marriages, nor can it penalize any religion or sectarian organization for refusing to do so—Proponent's nonsensical statements in the 2004 Voter Information Pamphlet to the contrary notwithstanding.

¶201 The right of citizens to practice their religious beliefs is not what is at issue here, however. It is the other component of marriage—the secular component—that is at issue. Like many other states, Montana permits people to marry without the involvement of any institutionalized religion or sectarian organization. People may choose to marry in a completely civil ceremony. *See* § 40-1-301(1), MCA ("A marriage may be solemnized by a judge of a court of record, by a public official whose powers include solemnization of marriages, by a mayor, city judge, or justice of the peace, by a tribal judge, or in accordance with any mode of solemnization recognized by any religious denomination, Indian nation or tribe, or native group."). Importantly, what brings the marriage relationship into existence in the eyes of the law is the properly executed marriage license issued by *the State* and the completion of certain medical tests and legal prerequisites. *See* Title 40, chapter 1, parts 1 and 2, MCA; §§ 40-1-301(1), -321, -322, MCA. This is so regardless of the ceremony or ritual performed and regardless of who performs it.[14]

_____

[14] Montana also recognizes common-law marriage and marriage performed by "declaration" without solemnization. *See* § 40-1-403, MCA. Common-law and declared

124

"[L]aw (federal *or* state) is not concerned with holy matrimony. Government deals with marriage as a civil status . . . . A state may enforce and dissolve a couple's marriage, but it cannot sanctify or bless it. For that, the pair must go next door."[15] *Windsor v. United States*, 699 F.3d 169, 188 (2d Cir. 2012) (emphasis in original).

¶202 With the governmentally created and licensed relationship, there also springs into existence the various benefits and obligations at issue here. There is *no* religion or religious institution in Montana that can create, provide, or deny statutory benefits and protections incident to marriage. Only *the State* can do that. Certainly the State could choose to provide no benefits at all for married couples. *Marriage Cases*, 183 P.3d at 426 ("the constitutional right to marry clearly does not obligate the state to afford specific tax or other governmental benefits on the basis of a couple's family relationship"). Indeed, the State concedes in its brief that there is "no constitutional or judicially enforceable mandate for the Legislature to provide or fund spousal benefits."[16] But the point of this case is that the State *has* decided to make various benefits available to different-sex couples, who may obtain them by marrying in either sectarian or secular ceremonies, but has not made the same sorts of benefits available to same-sex couples who, by reason of the Marriage Amendment, cannot marry. Although the same-sex couples here do not claim the right to marry—acknowledging that the Marriage

---

marriages each have their own peculiar legal, but nonreligious, prerequisites. *See In re Marriage of Swanner-Renner*, 2009 MT 186, ¶ 17, 351 Mont. 62, 209 P.3d 238 (common-law marriage); §§ 40-1-311 to -313 and -323 to -324 (declaration of marriage).

[15] The court may have been referring to St. Andrews Roman Catholic Church, which is located next door to the Daniel Patrick Moynihan United States Courthouse.

[16] While the State's amici apparently take a different view, they have cited no authority whatsoever for their premise that the State is required to grant such benefits.

Amendment has denied them that ability—they do demand, and rightly so, that their government accord them *at least* the benefits and protections provided to different-sex married couples in the State's secular laws.

¶203 In denying Plaintiffs these protections through the conduit of the Marriage Amendment, the State conflates *religious* canons regarding marriage with the State's own *civil* laws. This is patently unconstitutional. When the State chooses to enact secular laws for the benefit of different-sex couples, but at the same time denies equal protection of those laws to same-sex couples because of sectarian proscriptions constitutionalized in the Marriage Amendment, the State is engaged in blatant discrimination grounded in religious doctrine. This sort of discrimination is unlawful not only under Article II, Section 5, but also under Article II, Section 4 ("Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of . . . religious ideas."). Indeed, when, on the basis of religious doctrine, the State denies committed intimate same-sex couples the secular benefits and civil rights incidental to the status of marriage, the State is guilty of at least three abuses of the Constitution: the Equal Protection and Nondiscrimination Clauses of Article II, Section 4; the Dignity Clause of Article II, Section 4; and the Establishment Clause of Article II, Section 5.

¶204 Before concluding this discussion, I have two final observations. First, to credit the implicit (and explicit) fears expressed in the amicus briefs of the religious and "family values" organizations, one is led to believe that same-sex marriages are going to overwhelm (or dilute, as the State puts it) the now heterosexually dominated institution.

126

These fears are completely irrational. Indeed, were it not for its religious underpinnings, such homophobia would be bizarre. For one thing, the lesbian, gay, bisexual, and transgender community is a relatively small minority. A Gallup report published in October 2012 reported that, nationally, 3.4 percent of U.S. adults answered "yes" when asked if they identify as lesbian, gay, bisexual, or transgender. Of the remaining, 92.2 percent answered "no" and 4.4 percent refused to answer or answered "don't know." Racial and ethnic minorities were more likely than white Americans to identify as lesbian, gay, bisexual, or transgender: 4.6 percent of African Americans, 4.3 percent of Asians, 4.0 percent of Hispanics, and 3.2 percent of Caucasians. And younger Americans (age 18 to 29) were more likely than seniors (age 65 and older) to identify as lesbian, gay, bisexual, or transgender: 6.4 percent versus 1.9 percent, respectively. *See* Gary J. Gates & Frank Newport, *Special Report: 3.4% of U.S. Adults Identify as LGBT*, http://www .gallup.com/poll/158066/special-report-adults-identify-lgbt.aspx (Oct. 18, 2012); Gary J. Gates & Frank Newport, *Gallup Special Report: The U.S. Adult LGBT Population*, http://williamsinstitute.law.ucla.edu/research/census-lgbt-demographics-studies/gallup-special-report-18oct-2012. Furthermore, in 2010, same-sex couples comprised a mere 1 percent of all "couple" households in the United States. *See* U.S. Census, *Same-Sex Couple Households*, at 1 (Sep. 2011), http://www.census.gov/prod/2011pubs/acsbr10-03.pdf. Permitting these couples to enjoy their full measure of civil rights—much less marry—would not denigrate the "institution of marriage" one iota. There is no actual evidence supporting the threat of ruination of families, businesses, churches, and childrearing in the irreversibly horrendous ways predicted. Indeed, the evidence is to the

127

contrary, as already discussed. The scare tactics, misinformation, and propaganda used by the promoters of the Marriage Amendment were then, and remain now, not only false, but patently absurd as well.

¶205 Second, the institution of marriage has been and is, of course, completely dominated by heterosexuals. However, for all of the sanctimonious hyperbole about the one-man/one-woman marital relationship, the nationwide rates of divorces in 1990, 2000, and 2009 were 48 percent, 49 percent, and 50 percent, respectively, relative to the rate of marriages performed those same years. In Montana, the numbers were even higher: 59 percent, 58 percent, and 55 percent, respectively. *See* U.S. Census Bureau, *Statistical Abstract of the United States: 2012*, at 98 (2011), http://www.census.gov/compendia/ statab. Those who insist on the nuclear mother-father-children model appear to be wholly detached from the reality of modern America. While the number of "family households" increased 8 percent between 2000 and 2010, the percentage of such households falling into the "husband-wife with own children" category dropped from 35 percent in 2000 to 30 percent in 2010. *See* U.S. Census Bureau, *Households and Families: 2010*, at 4-5 (Apr. 2012), http://www.census.gov/prod/cen2010/briefs/c2010br-14.pdf. In 2004, 58 percent of children lived with their married, biological parents, down from 60 percent in 2001 and 61 percent in 1996. *See* U.S. Census Bureau, *Living Arrangements of Children: 2004*, at 4 (Feb. 2008), http://www.census.gov/prod/ 2008pubs/p70-114.pdf. The "Beaver Cleaver" family of the 1950s simply does not represent modern America, and is not likely to be resurrected given the demographics, demands, and exigencies of contemporary life in this country. In any event, if sectarian

128

and "family values" organizations are intent on preserving the sanctity of marriage, it seems that their efforts and resources would be better spent focusing on the damage that *heterosexuals* are inflicting on the institution, rather than the imagined threat that homosexuals and bisexuals supposedly pose. Furthermore, if those organizations are setting out to reform American "morality" to the dictates of their own religious beliefs and to create a sort of Christian theocracy in this country not unlike the Islamic theocracies prevalent in certain Middle Eastern countries, then they ought to candidly disclose that fact rather than hiding behind the thoroughly disproved notion that reserving marriage to different-sex couples is necessary for the protection of children and essential for our survival as a nation.

¶206 In conclusion, assuming for the sake of argument that it is even applicable in this case, the Marriage Amendment cannot justify the State's approach. The Marriage Amendment is simply constitutionalized religious doctrine, and it cannot serve as a conduit for providing discretionary statutory benefits to some committed intimate couples while denying them to others. The benefits and obligations which the State creates under its secular law must not first be filtered through the sieve of religious doctrine in order to see who gets what. Article II, Section 5 ensures the separation of church and state. The constitutional quid pro quo is this: While the State is not permitted to be involved in the workings of religious institutions, neither is the State permitted to enforce the doctrines, canons, mandates, or proscriptions of any religion or sectarian organization. The State may not "target" a class of individuals for disparate treatment in order to advance a religious purpose or doctrine, without violating the Establishment Clause.

129

## VI. CONCLUSION

¶207   There are many who believe that gays and lesbians are second-class citizens; that they are morally inferior; that they are objects worthy of societal scorn, derision, and hatred; that they may be reviled and demonized on the floor of the Legislature with impunity; that they may be discriminated against by local governments; that they may be bullied in their schools and workplaces; and that they are not entitled to the same rights accorded to heterosexuals.  Such views parallel those held by many—even the United States Supreme Court—regarding racial minorities and women a century ago.  *Dred Scott v. Sandford*, 60 U.S. 393, 407 (1857) (African-Americans, whether slave or free, were "altogether unfit to associate with the white race, either in social or political relations," and "had no rights which the white man was bound to respect"); *People v. Hall*, 4 Cal. 399, 404-05 (Cal. 1854) (the Chinese were "a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point"); *Muller v. Oregon*, 208 U.S. 412, 421-23, 28 S. Ct. 324, 326-27 (1908) ("[t]hat woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious"; "history discloses the fact that woman has always been dependent upon man.  He established his control at the outset by superior physical strength, and this control in various forms, with diminishing intensity, has continued to the present").  We legitimize those similar, pernicious views about gays and lesbians when, as the Court does today, we abrogate our solemn obligation to declare and uphold the constitutional rights of all Montanans—*especially* those among us who have been subjected to majoritarian and state-imposed hatred and discrimination.

130

¶208 My abiding belief is that no person—no human being—in our society should be reviled, demonized, and discriminated against for being gay, lesbian, or bisexual, any more than they should be treated in that fashion for being Native American, Presbyterian, female, disabled, poor, or Irish. No person should be the object of state-sanctioned bigotry simply for being born homosexual or for choosing to love another person of the same sex. No person should be made to suffer the deprivation of their civil rights and liberties because of the religious beliefs and doctrines of others—doctrines that are now constitutionalized in the Marriage Amendment and enforced by Montana's government. And no person should be stripped of her or his inviolable human dignity based on sexual orientation. Ever!

¶209 It may be argued that gay, lesbian, and bisexual Montanans theoretically have won a token victory today. But that simply is not the case. Their victory, if any, must yet be determined in the multitude of lawsuits that will have to be filed in the District Court here and in other trial courts. I doubt that any of these citizens will have the time, the money, or the fortitude to wage the required litigation jihad against their own government simply to obtain the same rights that their heterosexual fellow citizens enjoy. Realistically the Plaintiffs here have gained nothing. The problem, it should be noted, is not with their counsel, who have done an excellent job of researching, briefing, and arguing the issues in this case. The problem, rather, is that this Court has chosen to punt. And in simply kicking the can down the road, the Court has denied Plaintiffs the dignity, respect, fairness, justice, and equality to which they are entitled—foremost as human beings, and legally under Montana's Constitution.

131

¶210 Sexual orientation is a big deal to those who demand that their personal religious beliefs, their Bible's abhorrence, and their partisan ideology concerning homosexuality must apply to everyone else, across the board, no exceptions. But future generations—indeed, most young people today—will not fear, much less honor, the sexual-orientation taboo. The taboo will die because of education, science,[17] and changing social mores, and because of the small, real victories that lesbian, gay, and bisexual citizens have won. *See e.g. Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997); *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, 325 Mont. 148, 104 P.3d 445; *Kulstad v. Maniaci*, 2009 MT 326, 352 Mont. 513, 220 P.3d 595. Most importantly, though, the taboo will die because the scare tactics, propaganda, and misinformation of those who would hang on to the maledictions and stereotypes have proven to be so patently false, malicious, and absurd. Most decent people just hate being lied to. Indeed, a not-too-distant generation of Montanans will consign today's decision, the Marriage Amendment, and the underlying intolerance to the dustbin of history and to the status of a meaningless, shameful, artifact.

### Epilogue

¶211 This will be my last opportunity to sit as a member of this Court on a case involving the fight for the dignity and the civil and human rights of lesbian, gay, bisexual, and transgender people. I had hoped—indeed, believed—that the work this Court started 15 years ago in *Gryczan* would be brought to fruition and successfully concluded with

---

[17] Indeed, with every advancement in science, religion loses ground. The more humans learn and understand about the laws that actually control the universe, the less is their need to rely on gods, miracles, and myths to explain that which they do not understand.

our decision in this case. Sadly, that is not to be. As I have, I can strenuously disagree with this Court's decision. Regrettably, however, I have been unsuccessful in doing more than that. I know how frustrating today's decision must be for the committed same-sex couples and for lesbian, gay, bisexual, and transgender Montanans across this State.

¶212 Our collective frustration and sadness aside, however, if we have learned anything as an evolving species, it is that no government, no religion, no institution, and no political party can long oppress the inviolable dignity and spirit of human beings in their fight for fairness in the courts, access to justice, and equal protection of the laws. Those are the seminal principles upon which our country was founded, and they are the birthright of *every* natural person on this planet, without exception. Those rights will not be long denied to those suffering the scourge of discrimination and hatred. The committed couples here—and lesbian, gay, bisexual, and transgender Montanans everywhere—must never lose sight of the fact that although today's battle has been lost, the war has not been. They must remain united in defeat because, in the end, they *will* overcome; they *will* prevail. Of that, I am absolutely certain.

¶213 For the foregoing reasons, I strenuously dissent.


/S/ JAMES C. NELSON

133

**APPENDIX 1 to DISSENT**
**(Listing of Statutes Attached to Plaintiffs' Motion to Alter or Amend the Judgment)**

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 1 | General Laws and Definitions | Chapter 1 | General Provisions | Part 2 | General Definitions of Terms Used in Code | Section 215(4) | Residence -- rules for determining | Defines residence of "unmarried minor" |
| Title 1 | General Laws and Definitions | Chapter 1 | General Provisions | Part 2 | General Definitions of Terms Used in Code | Section 219 | Relationship by Affinity | Defines affinity as relation that one spouse has with the other spouse's blood relatives. |
| Title 1 | General Laws and Definitions | Chapter 1 | General Provisions | Part 5 | State Symbols -- Official Designations | Section 515(3) | Montana medal of valor established | Medal of valor presented to recipient's spouse if recipient dies before award. |
| Title 2 | Government Structure and Administration | Chapter 2 | Standards of Conduct | Part 3 | Nepotism | Section 302 | Appointment of relative to office of trust or emolument unlawful -- exceptions -- publication of notice. | Bans appointment of person related by affinity within the second degree. |
| Title 2 | Government Structure and Administration | Chapter 2 | Standards of Conduct | Part 3 | Nepotism | Section 303 | Agreements to appoint relative to office unlawful | Bans appointment of person related by affinity within the second degree. |
| Title 2 | Government Structure and Administration | Chapter 2 | Standards of Conduct | Part 3 | Nepotism | Section 304 | Penalty for violation of nepotism law | Provides for penalty if appointment is made of person related by affinity within the second degree. |
| Title 2 | Government Structure and Administration | Chapter 15 | Executive Branch Officers and Agencies | Part 17 | Department of Labor and Industry | Section 1733(2) | Board of Pharmacy | Restricts from the Board any spouse of a member of the profession of pharmacy |
| Title 2 | Government Structure and Administration | Chapter 18 | State Employee Classification, Compensation, and Benefits | Part 6 | Leave Time | Section 601 | Definitions | Defines sick leave as absence with pay for time an employee is unable to perform job duties because of: the care for a member of the employee's immediate family, providing necessary care for a spouse, child, or parent with a serious health condition, as defined in the Family and Medical Leave Act of 1933; or death or funeral attendance of an immediate family member or, at an agency's discretion, another person. |
| Title 2 | Government Structure and Administration | Chapter 18 | State Employee Classification, Compensation, and Benefits | Part 7 | Group Insurance Generally | Section 704 | Mandatory Provisions | Lists a number of spousal protections, including the requirement that an insurance contracts must contain provisions that permit the surviving spouse of a member to remain a member of the group, as well as the surviving children. |
| Title 3 | Judiciary, Courts | Chapter 1 | Courts and Judicial Officers Generally | Part 3 | General Rules Regarding Procedure Generally | Section 313 | Sittings of Court -- when private | Allows for an action for dissolution of marriage to be private |
| Title 3 | Judiciary, Courts | Chapter 1 | Courts and Judicial Officers Generally | Part 8 | Disqualification of Judges Supreme Court Rule | Section 803 | Disqualification of judges -- all courts | Allows for disqualification of judge if related to either party/attorney/member of firm by affinity within the third degree. |
| Title 3 | Judiciary, Courts | Chapter 1 | Courts and Judicial Officers Generally | Part 11 | Judicial Standards Commission | Section 1108 | Nonparticipation of interested judicial officer | Prohibits a judicial officer who is a member of the Judicial standards commission or of the Supreme Court to participate in censure, suspension, removal or retirement proceeding involving that officer's spouse or the spouse of a relative related within the sixth degree. |
| Title 3 | Judiciary, Courts | Chapter 5 | District Courts | Part 9 | State Funding for District Courts | Section 901(1)(g) | State assumption of district court expenses | Provides for state funding of district court costs involving court-sanctioned educational program concerning the effects of dissolution of marriage on children. |
| Title 3 | Judiciary, Courts | Chapter 4 | Water Courts | Part 4 | Disqualification | Section 402 | When a substitute for judge called in | Discusses withdrawal or disqualification of water judge or master - includes relationships with water judge's or master's spouse. |
| Title 3 | Judiciary, Courts | Chapter 11 | City Courts | Part 2 | City Judges | Section 203 | When a substitute for judge called in | Substitute judge called in when judge is spouse of party or related to party by affinity within the sixth degree |
| Title 7 | Local Government | Chapter 4 | Officers and Employees | Part 26 | Office of County Clerk | Section 2613 | Documents subject to recording | Includes instruments describing or relating to the individual property of married persons. |
| Title 7 | Local Government | Chapter 4 | Officers and Employees | Part 26 | Office of County Clerk | Section 2619 | Indexes to recorded documents | Includes indexes related to marriage |
| Title 7 | Local Government | Chapter 4 | Officers and Employees | Part 27 | Office of County Attorney | Section 2704 | Limitations on activities of county attorneys and deputy county attorneys | Prohibits deputy county attorneys from engaging in private practice of law or sharing in profits of private practice except as to matters involving deputy county attorney's immediate family. |
| Title 7 | Local Government | Chapter 15 | Housing and Construction | Part 44 | Municipal Housing Authorities | Section 4402 | Definitions | Defines "Elderly families" to mean families in which the head of the family or that person's spouse is at least 60 years of age and who otherwise qualify as persons of low income. |
| Title 7 | Local Government | Chapter 15 | Housing and Construction | Part 44 | Municipal Housing Authorities | Section 4456 | Low-rent housing for the elderly | Enables a municipal housing authority to develop housing in order to provide accommodations designed for elderly families. Also allows the extension of a prior preference in occupancy to elderly families. |
| Title 7 | Local Government | Chapter 32 | Law Enforcement | Part 3 | Qualifications of Law Enforcement Officers | Section 303 | Peace officer employment, education and certification standards -- suspension or revocation -- penalty | Allows for extension of standards/training requirements if required due to illness of peace officer's immediate family. |
| Title 7 | Local Government | Chapter 32 | Law Enforcement | Part 22 | Detention Centers | Section 2227 | Inmate eligibility for participation | Excludes someone who is serving a sentence for family member assault to participate in a county jail work program. |
| Title 7 | Local Government | Chapter 32 | Law Enforcement | Part 22 | Detention Centers | Section 2246 | Temporary release from detention center | Allows for temporary release to attend to needs of inmate's family. |
| Title 7 | Local Government | Chapter 32 | Law Enforcement | Part 41 | Municipal Police Force | Section 4114 | Restrictions on activities of police officers | Person not restricted from political activity or public office just because spouse is a police officer. |
| Title 7 | Local Government | Chapter 35 | Cemetery Services | Part 22 | Cemeteries in Counties | Section 2205 | Veterans' cemetery | Allows State to receive allowances and collect charges authorized by state or federal law regarding burial of a veteran or veteran's spouse |
| Title 10 | Military Affairs and Disaster and Emergency Services | Chapter 1 | Militia | Part 9 | Montana National Guard Civil Relief | Section 902 | Death while on state duty -- death benefit | Defines dependant as spouse or minor child of a service member or any other person legally dependant on the service member for support. |
| Title 10 | Military Affairs and Disaster and Emergency Services | Chapter 1 | Militia | Part 12 | Active Duty Death Benefit | Chapter 1201 | Death while on state duty -- death benefit payment -- certification -- rules | Provides $50,000 death benefit for national guard member who dies in line of duty. |
| Title 10 | Military Affairs and Disaster and Emergency Services | Chapter 1 | Militia | Part 13 | Montana Military Family Relief Fund Act | All | N/A | Provides monetary grants to dependants of national guard members (as defined by section 902) who are activated for federal service in a contingency operation for more than 30 days |
| Title 10 | Military Affairs and Disaster and Emergency Services | Chapter 2 | Veterans | Part 4 | Montana Veterans' Homes | Sections 401, 403 | Location and function of homes -- persons admitted / Eligibility for residence in home | Allows spouses or surviving spouses of veterans to be admitted to Veterans' homes if space allows |
| Title 13 | Elections | Chapter 2 | Registration of Electors | Part 1 | Registrars | Section 115 | Certification of statewide voter registration list -- local lists to be prepared | Allows a law enforcement or reserve officer to request that his or her spouse's residential address not be disclosed for security reasons. Also allows victims of partner or family member assault to request that their address not be disclosed. |
| Title 13 | Elections | Chapter 4 | Election Judges | Part 1 | Appointment | Section 107 | Qualification of election judges | Excludes spouses of a candidate from being an election judge. |
| Title 13 | Elections | Chapter 13 | Election Procedure | Part 2 | Procedure for Electors Absent From the Polling Place | Section 225 | Special absentee election boards -- members -- appointment | Excludes spouses of candidates from being a member of a special absentee election board. |
| Title 13 | Elections | Chapter 21 | Montana Absent Uniformed Services and Overseas Elector Voting Act | Part 1 | General Provisions | Section 102 | Definitions | Definition of "absent uniformed services elector" includes spouse of member of uniformed services/merchant marine who, by reason of the member's active duty, is absent from residence where qualified to vote. |
| Title 13 | Elections | Chapter 37 | Control of Campaign Practices | Part 1 | Commissioner of Political Practices | Section 101 | Definitions | Defines "relative" to mean family member who is within second degree of consanguinity or affinity to commissioner. |
| Title 13 | Elections | Chapter 37 | Control of Campaign Practices | Part 2 | Campaign Finance | Section 240 | Surplus campaign funds | Includes candidate's immediate family in definition of personal benefit. |
| Title 15 | Taxation | Chapter 6 | Property Subject to Taxation | Part 1 | Classification | Section 193 | Classification | Provides exception allowing rate adjustments for change of ownership between husband and wife or changes pursuant to a divorce decree |
| Title 15 | Taxation | Chapter 7 | Appraisal | Part 3 | Specific Tax Credits and Tax Checkoffs | Section 307 | Realty Transfer Act | Exempts transfers of real property between a husband or wife from the requirement to disclose the amount of consideration on a realty transfer certificate |
| Title 15 | Taxation | Chapter 6 | Property Subject to Taxation | Part 2 | Tax-Exempt Property | Section 211 | Certain disabled or deceased veterans' residences exempt | Exempts from property tax certain types of homes owned and occupied by a veteran or a veteran's spouse under certain scenarios. |
| Title 15 | Taxation | Chapter 6 | Property Subject to Taxation | Part 2 | Tax-Exempt Property | Section 219 | Personal and other property exemptions | Allows for deductions of apparel of members of the family. Family is not defined. |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 21 | Rate and General Provisions | Section 2110 | Adjusted gross income | Allows married couples filing separately to file the same amount of deduction for educational expenses and loan interest as would be filed on a joint federal return split between the two separate returns. |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 21 | Rate and General Provisions | Section 2113 | Determination of marital status | Defines when a person is married with regard to an individual's tax year |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 21 | Rate and General Provisions | Section 2114 | Exemptions -- inflation adjustment | Provides for an additional exemption of $1,900 for the spouse of the taxpayer if a separate return is made by the taxpayer and if the spouse, for the calendar year in which the tax year of the taxpayer begins, does not have gross income and is not the dependent of another taxpayer. |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 21 | Rate and General Provisions | Section 2131 | Deductions allowed in computing net income | Allows for deductions of dependent care services for spouse as well as other misc deductions related to marriage. |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 21 | Rate and General Provisions | Section 2132 | Standard deduction | Establishes standard deduction for married spouses filing individually and jointly |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 23 | Specific Tax Credits and Tax Checkoffs | Section 2364 | Adoption tax credit - limitations | Provides for married taxpayers filing separately on the same form to allocate the legal adoption credit between spouses. |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 23 | Specific Tax Credits and Tax Checkoffs | Section 2366 | Credit for expense of caring for certain elderly family members | Credit for expense of caring for certain elderly family members (ones that are related by blood or marriage). |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 25, 26 | Estimated Tax and Withholding, Collection and Administration | Sections 2512, 2602, 2646, | N/A | Miscellaneous tax-related items |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 26 | Collection and Administration | Section 2632 | Deferment of taxes for person in military service -- filing of return | Allows for deferment of taxes for person in military service and person's spouse |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 30 | Special Income Tax Applications | Section 3002 | Definitions | Defines "Family farm corporation" as one that consists of immediately family members, which is defined as family members within second degree of consanguinity or affinity |
| Title 15 | Taxation | Chapter 30 | Individual Income Tax | Part 30 | Special Income Tax Applications | Section 3003 | Montana farm and ranch risk management account -- deposits -- exclusion from income | Provides for risk management accounts for family/farm corporations |
| Title 15 | Taxation | Chapter 61 | Medical Care Savings Account | Part 1 | General Provisions | Section 102 | Definitions | Defines "Dependent" as spouse of the employee or a child of the employee who meets certain requirements |
| Title 15 | Taxation | Chapter 61 | Medical Care Savings Account | Part 2 | Medical Care Savings Account -- Administration | Section 202 | Tax exemption -- conditions | Allows transfer of money in accounts between members of the person's immediate family without tax liability. |
| Title 15 | Taxation | Chapter 62 | Family Education Savings Act | All | N/A | All | N/A | Provides for family education savings accounts. Uses Federal definition of family, which is limited to consanguine relations and spouse. |
| Title 16 | Alcohol and Tobacco | Chapter 1 | Administration and Taxation | Part 1 | General Provisions | Section 106 | Definitions | Defines immediate family member as spouse, dependent children, or dependent parents. |

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 16 | Alcohol and Tobacco | Chapter 3 | Control of Liquor, Beer, and Wine | Part 2 | Regulation of Brewers, Beer Importers, and Beer Wholesalers | Section 201 | Possession, manufacture, importation, or disposal of beer in manner other than prescribed unlawful -- personal brewing | Allows for manufacture of beer for personal and family use |
| Title 16 | Alcohol and Tobacco | Chapter 3 | Control of Liquor, Beer, and Wine | Part 2 | Regulation of Brewers, Beer Importers, and Beer Wholesalers | Section 223 | Transfer of wholesaler's interest in business | Allows a wholesaler to sell or transfer business or interest in business to family among others. |
| Title 16 | Alcohol and Tobacco | Chapter 6 | Enforcement | Part 3 | Miscellaneous Prohibitions and Penalties | Section 301 | Transfer, sale, and possession of alcoholic beverages -- when unlawful | Allows for possession of beer produced for family use. |
| Title 19 | Public Retirement Systems | Chapter 2 | Public Employees' Retirement General Provisions | Part 3 | General Provisions | Section303 | Definitions | Includes spouse in Distributee definition (other designated person is also in definition, but spouse does not rely upon designation). Also includes distribution to spouse or surviving spouse in definition of Eligible rollover distribution. Also lists surviving spouse as statutory beneficiary |
| Title 19 | Public Retirement Systems | Chapter 2 | Public Employees' Retirement General Provisions | Part 8 | Beneficiaries | Section 802 | Effect of no designation or no surviving designated beneficiary | Payment of accrued public employee retirement benefits when no beneficiary designated and estate would only be probated for the benefit amount - spouse is at the top of the list as the next of kin whom is entitled to the payment. |
| Title 19 | Public Retirement Systems | Chapter 2 | Public Employees' Retirement General Provisions | Part 10 | Special Provisions | Section 1007 | Required distributions | Exempts portion of member's interest from having to be paid within five years. |
| Title 19 | Public Retirement Systems | Chapter 3 | Public Employees' Retirement System | Part 15 | Optional Forms of Benefit Payments | Section 1501 | Optional forms of benefits -- designation of contingent annuitant | Provides for survivorship benefit to be converted to an optional retirement benefit for the beneficiary. Spouse exempted from maximum age differential allowed in order for option to be chosen. |
| Title 19 | Public Retirement Systems | Chapter 5 | Judges' Retirement | Part 7 | Optional Benefit Payments | Section 701 | Optional forms of benefits -- designation of contingent annuitant | Provides for survivorship benefit to be converted to an optional retirement benefit for the beneficiary. Spouse exempted from maximum age differential allowed in order for option to be chosen. |
| Title 19 | Public Retirement Systems | Chapter 6 | Highway Patrol Officers' Retirement | Part 1 | General Provisions | Section 101 | Definitions | Defines "Survivor" as surviving spouse or dependant child of member. |
| Title 19 | Public Retirement Systems | Chapter 6 | Highway Patrol Officers' Retirement | Part 5 | Service Retirement Benefits | Section 505 | Payment of retirement benefits | Provides for surviving spouse to receive retirement benefit upon retired member's death |
| Title 19 | Public Retirement Systems | Chapter 6 | Highway Patrol Officers' Retirement | Part 6 | Disability Retirement Benefits | Section 601 | Disability retirement benefit | Upon death of member receiving disability retirement benefit, member's surviving spouse is eligible for benefits. |
| Title 19 | Public Retirement Systems | Chapter 6 | Highway Patrol Officers' Retirement | Part 9 | Survivorship Benefits and Death Payments | Section 901 | Survivorship benefits -- employment-related death | Provides for survivorship benefits to be paid to surviving spouse if member died in course of service. |
| Title 19 | Public Retirement Systems | Chapter 6 | Highway Patrol Officers' Retirement | Part 9 | Survivorship Benefits and Death Payments | Section 902 | Survivorship benefits -- death from other causes | Provides for survivorship benefits to be paid to surviving spouse if active or inactive member dies before reaching retirement age |
| Title 19 | Public Retirement Systems | Chapter 7 | Sheriffs' Retirement | Part 8 | Service Credit | Section 801 | Membership in municipal police officers' retirement system prior to or following city-county consolidation--payment of benefits by two systems | Provides for retirement benefit to be paid to surviving spouse upon death of retired member. |
| Title 19 | Public Retirement Systems | Chapter 7 | Sheriffs' Retirement | Part 10 | Optional Forms of Retirement Benefits | Section 1001 | Optional forms of benefits -- designation of contingent annuitant | Provides for survivorship benefit to be converted to an optional retirement benefit for the beneficiary. Spouse exempted from maximum age differential allowed in order for option to be chosen. |
| Title 19 | Public Retirement Systems | Chapter 8 | Game Wardens and Peace Officers' Retirement | Part 8 | Optional Forms of Benefit Payments | Section 801 | Optional forms of benefits -- designation of contingent annuitant | Provides for survivorship benefit to be converted to an optional retirement benefit for the beneficiary. Spouse exempted from maximum age differential allowed in order for option to be chosen. |
| Title 19 | Public Retirement Systems | Chapter 9 | Police Retirement -- Statewide Plan | Part 1 | General Provisions | Section 104 | Definitions | Defines "Survivor" as surviving spouse or dependant child of member. |
| Title 19 | Public Retirement Systems | Chapter 9 | Police Retirement -- Statewide Plan | Part 8 | Service Retirement Benefits | Section 804 | Amount of service retirement benefit--continuation of benefit after death of member | Provides for retirement benefit to be paid to surviving spouse upon death of retired member. |
| Title 19 | Public Retirement Systems | Chapter 9 | Police Retirement -- Statewide Plan | Part 9 | Disability Retirement Benefits | Section 903 | Amount of disability retirement benefit--continuation of benefit after death of member | Provides for disability benefit to be paid to surviving spouse upon death of retired member. |
| Title 19 | Public Retirement Systems | Chapter 9 | Police Retirement -- Statewide Plan | Part 11 | Survivorship Benefits and Death Payments | Section 1101 | Preretirement death benefits | Provides for death benefits to be paid to surviving spouse upon death of active member. |
| Title 19 | Public Retirement Systems | Chapter 9 | Police Retirement -- Statewide Plan | Part 12 | Deferred Retirement Option Plan (DROP) | Section 1206 | Survivorship benefits | Provides for payment of participant's DROP benefit to be paid to surviving spouse upon death of participant. |
| Title 19 | Public Retirement Systems | Chapter 13 | Firefighters' Unified Retirement System | Part 7 | Service Retirement Benefits | Section 704 | Amount of service retirement benefit | Provides for retirement benefit to be paid to surviving spouse upon death of retired member. |
| Title 19 | Public Retirement Systems | Chapter 13 | Firefighters' Unified Retirement System | Part 8 | Disability Retirement Benefits and Death Payments | Section 803 | Amount of service retirement benefit | Provides for disability benefit to be paid to surviving spouse upon death of retired member. |
| Title 19 | Public Retirement Systems | Chapter 13 | Firefighters' Unified Retirement System | Part 9 | Survivorship Benefits and Death Payments | Section 902 | Survivorship benefit | Provides for survivorship benefit to be paid to surviving spouse upon death of member. |
| Title 19 | Public Retirement Systems | Chapter 13 | Firefighters' Unified Retirement System | Part 10 | Postretirement Benefits and Benefit Increases | Section 1007 | Minimum benefit adjustment | Establishes minimum benefit to be paid to surviving spouse or member with 10 or more years of membership service. |
| Title 19 | Public Retirement Systems | Chapter 17 | Volunteer Firefighters' Compensation Act | Part 1 | General Provisions | Section 102 | Definitions | Defines "Survivorship benefit" to mean monthly benefit paid to surviving spouse or dependent child of deceased member |
| Title 19 | Public Retirement Systems | Chapter 17 | Volunteer Firefighters' Compensation Act | Part 1 | General Provisions | Section 106 | Pension trust fund established--restrictions on use | Limits use of pension trust assets to purposes for exclusive benefit of, among others, surviving spouses. |
| Title 19 | Public Retirement Systems | Chapter 17 | Volunteer Firefighters' Compensation Act | Part 4 | Pension, Disability, and Survivorship Benefits | Section 405 | Survivorship benefits to surviving spouse or dependent children | Provides for payment of survivorship benefits to surviving spouse. |
| Title 19 | Public Retirement Systems | Chapter 17 | Volunteer Firefighters' Compensation Act | Part 4 | Pension, Disability, and Survivorship Benefits | Section 406 | Termination of pension when no surviving spouse or child | Terminates pension benefits at end of month of member's death if no surviving spouse or minor child |
| Title 19 | Public Retirement Systems | Chapter 18 | Firefighters' Retirement | Part 2 | Management and Protection of Fund | Section 203 | Use of disability and pension fund | Restricts use of funds to, among other things, payment of benefits to surviving spouse |
| Title 19 | Public Retirement Systems | Chapter 18 | Firefighters' Retirement | Part 6 | Benefits | Section 601 | Benefits the association may provide | Limits use of member benefits to, among other things, payment of pensions to surviving spouse |
| Title 19 | Public Retirement Systems | Chapter 18 | Firefighters' Retirement | Part 6 | Benefits | Section 603 | Partial service pension | Provides for payment of a partial service pension to surviving spouse under certain circumstances |
| Title 19 | Public Retirement Systems | Chapter 18 | Firefighters' Retirement | Part 6 | Benefits | Section 605 | Pensions to surviving spouses and children | Provides for payment of pension to surviving spouse under certain circumstances |
| Title 19 | Public Retirement Systems | Chapter 18 | Firefighters' Retirement | Part 6 | Benefits | Section 612 | Protection of benefits from legal process and taxation--nonassignability | Protects pensions from judgments, garnishments, etc except for payment of spousal support or child support |
| Title 19 | Public Retirement Systems | Chapter 19 | Police Retirement -- Local Funds | Part 5 | Benefits | Section 503 | Death benefits | Provides for the payment of benefits to surviving spouse upon death of retired member. |
| Title 19 | Public Retirement Systems | Chapter 19 | Police Retirement -- Local Funds | Part 5 | Benefits | Section 504 | Protection of benefits from legal process and taxation | Protects pensions from judgments, garnishments, etc except for payment of spousal support or child support |
| Title 19 | Public Retirement Systems | Chapter 19 | Police Retirement -- Local Funds | Part 5 | Benefits | Section 506 | Supplement to certain pensions | Sets minimum payment for, among others, spouses receiving survivorship benefits |
| Title 19 | Public Retirement Systems | Chapter 20 | Teachers' Retirement | Part 2 | Administration of System | Section 212 | Exemption from taxation, legal process, and assessments | Protects pensions from tax, judgments, garnishments, etc except for payment of spousal support or child support. |
| Title 19 | Public Retirement Systems | Chapter 20 | Teachers' Retirement | Part 3 | Membership | Section 305 | Alternate payees -- family law orders | Allows for the modification of rights to be modified by a family law order (which includes former spouse's rights to benefits) |
| Title 19 | Public Retirement Systems | Chapter 20 | Teachers' Retirement | Part 4 | Creditable Service | Section 414 | Payment methods for purchase of service credit | Allows surviving spouse to complete payments required to purchase service if member dies before completing payments. |
| Title 19 | Public Retirement Systems | Chapter 20 | Teachers' Retirement | Part 7 | Benefits in General | Section 717 | Effect of no designation or no surviving beneficiary | If no designation or surviving beneficiary, husband or wife given first priority to payments (followed by consanguine relatives) |
| Title 20 | Education | Chapter 3 | Elected Officials | Part 1 | Superintendent of Public Instruction | Section 109 | Honorary high school diploma for certain veterans | Allows immediate family member of deceased or incapacitated veterans meeting certain requirements to apply for a diploma. |
| Title 20 | Education | Chapter 3 | Elected Officials | Part 2 | County Superintendent of Schools | Section 211 | Disqualification of county superintendent | Disqualifies superintendent from hearing/deciding matters of controversy involving relations (consanguine and affinity) within sixth degree |
| Title 20 | Education | Chapter 5 | Pupils | Part 3 | Attendance Outside School District | Section 320 | Attendance with discretionary approval | Defines "parent or guardian" to include an individual shareholder of a domestic corporation as defined in 35-1-113 whose shares are 95% held by related family members to the sixth degree of consanguinity or by marriage to the sixth degree of affinity. |
| Title 20 | Education | Chapter 5 | Pupils | Part 5 | Enrollment of Pupil by Caretaker Relative | Section 501 | Purpose--legislative intent--parental rights--definitions | Defines "Caretaker relative" of a child as an individual related by blood, marriage or adoption by another individual to a child. |
| Title 20 | Education | Chapter 5 | Pupils | Part 5 | Enrollment of Pupil by Caretaker Relative | Section 503 | Caretaker relative educational authorization affidavit--use--immunity--format | Caretaker affidavit requires person be related "by blood, marriage, or adoption" |
| Title 20 | Education | Chapter 20 | School Elections | Part 1 | General Provisions | Section 109 | Election judges -- qualifications -- training | Restricts election judges who are spouses of candidates or candidate's relatives |
| Title 20 | Education | Chapter 25 | University System | Part 3 | Administration of University System | Section 332 | Competition between for-profit fitness centers and university fitness centers prohibited--exception | Exempts immediate family members of a university student or employee from the restriction that university fitness centers cannot sell contracts or charge monthly fees to members of the public if a private fitness center is in area |
| Title 20 | Education | Chapter 25 | University System | Part 4 | Miscellaneous Finance | Section 421 | Charges for tuition--waivers | Allows regents to waive tuition and fees for surviving spouses of some Montanans |
| Title 20 | Education | Chapter 25 | University System | Part 5 | University Students -- Qualifications and Rights | Section 501 | Definitions | Includes in definition of "Resident student" the spouses of armed force members assigned to and residing in Montana. |
| Title 20 | Education | Chapter 25 | University System | Part 5 | University Students -- Qualifications and Rights | Section 503 | Presumptions and rules as to domicile | Allows person working full-time in Montana to fast track residency of spouse under certain circumstances |
| Title 23 | Parks, Recreation, Sports, and Gambling | Chapter 2 | Recreation | Part 5 | Boats | Section 505 | Owner's civil liability | Presumption that vessel is operated under knowledge and consent of owner if under control of owner's spouse, or other immediate family member |
| Title 23 | Parks, Recreation, Sports, and Gambling | Chapter 5 | Gambling | Part 1 | General Provisions, Proceedings, and Penalties | Section 184 | Disposition of Property | Prevents personal property from being sold to officer of agency that seized property or anyone related to an officer by blood or marriage |

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 25 | Civil Procedure | Chapter 5 | Parties | Part 2 | Capacity to be a Party -- Joinder | Section 202 | Who may defend when spouse sued | Allows spouses to defend for each other's rights |
| Title 25 | Civil Procedure | Chapter 7 | Trials | Part 2 | Selection of Jury | Section 223 | Challenges to jurors for cause | Allows challenge for cause if juror is related to a party by consanguinity or affinity within sixth degree |
| Title 25 | Civil Procedure | Chapter 13 | Execution of Judgment | Part 6 | Property Exempt from Execution | Section 608 | Property exempt without limitation--exceptions | Exempts from judgment burial plot for judgment debtor and the debtor's family. Allows for execution of judgment on veterans' and social security benefits for child support or maintenance to be paid to a spouse or former spouse |
| Title 25 | Civil Procedure | Chapter 13 | Execution of Judgment | Part 6 | Property Exempt from Execution | Section 614 | Earnings of judgment debtor | Sets maximum garnishment if debtor is required to support spouse |
| Title 25 | Civil Procedure | Chapter 13 | Execution of Judgment | Part 8 | Redemption of Real Property | Part 8 | Redemption of Real Property | Provides for special rules for redemption by judgment debtor's spouse |
| Title 26 | Evidence | Chapter 1 | Statutory Provisions on Evidence | Part 6 | Presumptions | Section 602 | Disputable presumptions | Establishes that a man and woman holding themselves out as husband and wife are presumed married |
| Title 26 | Evidence | Chapter 1 | Statutory Provisions on Evidence | Part 8 | Privileges | Section 802 | Spousal privilege | Establishes a marital communication privilege. |
| Title 26 | Evidence | Chapter 1 | Statutory Provisions on Evidence | Part 8 | Privileges | Section 814 | Privileges | Includes in definition of "Family" spouse, spouse's parents, and certain consanguine relations. Exempts statements made to family members from admissibility in malpractice action. |
| Title 27 | Civil Liability, Remedies, and Limitations | Chapter 1 | Availability of Remedies -- Liability | Part 2 | Damages | Section 223 | Damages for injuries or death inflicted in duel | Requires person who slays or permanently disables a person in a duel to provide for maintenance of that person's spouse. |
| Title 27 | Civil Liability, Remedies, and Limitations | Chapter 1 | Availability of Remedies -- Liability | Part 5 | Right to Bring Action or Assert Defense | Section 513 | Action for wrongful death | Establishes a wrongful death action that may be maintained by the personal representative of the decedent's estate. Per 72-3-503, if no personal representative designated, surviving spouse is appointed. |
| Title 27 | Civil Liability, Remedies, and Limitations | Chapter 1 | Availability of Remedies -- Liability | Part 5 | Right to Bring Action or Assert Defense | Section 515 | Protection of personal relations--abduction | States that the rights of personal relations forbid the "abduction or enticement" of a wife or husband from their spouse |
| Title 28 | Contracts and Other Obligations | Chapter 2 | Contracts | Part 4 | Circumstances Which Affect Validity of Apparent Consent | Section 402 | What constitutes duress | Defines duress under contract law as the unlawful confinement or detention of property of a person or the person's husband, wife, ancestor, descendant or adopted child. |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 8 | Termination, Cancellation, Nonrenewal, or Substantial Alteration of Farm Implements Dealership Agreements | Section 801 | Definitions | Defines "Designated family member" to include spouse and certain consanguine relations |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 8 | Termination, Cancellation, Nonrenewal, or Substantial Alteration of Farm Implements Dealership Agreements | Section 804 | Transfer | Prevents a grantor from unreasonably withholding consent of transfer to designated family member or designated successor. |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 8 | Termination, Cancellation, Nonrenewal, or Substantial Alteration of Farm Implements Dealership Agreements | Section 805 | Refusal to honor succession to ownership--notice required | Provides notice requirements if grantor believes good cause exists to refuse to honor transfer to designated family member or successor. |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 8 | Termination, Cancellation, Nonrenewal, or Substantial Alteration of Farm Implements Dealership Agreements | Section 806 | Procedure to determine right to succeed | Provides designated family member or successor a method to file a complaint if grantor refuses to honor transfer |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 9 | Termination, Cancellation, Nonrenewal, or Substantial Alteration, or Transfer of Construction Equipment Dealership Agreements | Section 901 | Definitions | Defines "Designated family member" to include spouse and certain consanguine relations |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 9 | Termination, Cancellation, Nonrenewal, or Substantial Alteration, or Transfer of Construction Equipment Dealership Agreements | Section 904 | Transfer | Prevents a grantor from unreasonably withholding consent of transfer to designated family member or designated successor. |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 9 | Termination, Cancellation, Nonrenewal, or Substantial Alteration, or Transfer of Construction Equipment Dealership Agreements | Section 905 | Refusal to honor succession to ownership--notice required | Provides notice requirements if grantor believes good cause exists to refuse to honor transfer to designated family member or successor. |
| Title 30 | Trade and Commerce | Chapter 11 | Sales | Part 9 | Termination, Cancellation, Nonrenewal, or Substantial Alteration, or Transfer of Construction Equipment Dealership Agreements | Section 906 | Procedure to determine right to succeed | Provides designated family member or successor a method to file a complaint if grantor refuses to honor transfer |
| Title 31 | Credit Transactions and Relationships | Chapter 1 | Credit Transactions | Part 3 | Wage Brokers | Section 306 | Spouse must join in assignment of wages--acknowledgment | Prevents the assignment of wages or salary to a wage broker by a married person who has a spouse residing in this state without the consent of such spouse, evidenced by the spouse's signature to said assignment |
| Title 31 | Credit Transactions and Relationships | Chapter 2 | Debtor and Creditor Relationships | Part 3 | Uniform Fraudulent Transfer Act | Section 328 | Definitions | Defines "Relative" to mean spouse, individual related by consanguinity, adoption or affinity within third degree |
| Title 32 | Financial Institutions | Chapter 5 | Consumer Loan Business | Part 3 | Operation of Business--Restrictions and Requirements | Section 310 | Wage assignments--limitations | Both husband and wife must sign assignment for benefit of a licensee of salary, wages, etc (unless husband and wife are separated at time of assignment) |
| Title 32 | Financial Institutions | Chapter 9 | Residential Mortgage Brokers, Lenders, and Loan Originators | Part 1 | Residential Mortgage Broker, Mortgage Lender, Mortgage Loan Originator Licensing Act | Section 103 | Definitions | Defines "Immediate family member" to include spouse and certain consanguine and adoptive relations |
| Title 32 | Financial Institutions | Chapter 9 | Residential Mortgage Brokers, Lenders, and Loan Originators | Part 1 | Residential Mortgage Broker, Mortgage Lender, Mortgage Loan Originator Licensing Act | Section 104 | Exemptions--proof of exemption | Exempts from provisions of Part an individual who offers or negotiates terms of a residential mortgage loan with or on behalf of an immediate family member. |
| Title 32 | Financial Institutions | Chapter 11 | Business and Industrial Development Corporations | Part 1 | General Procedures--Definitions--Purposes | Section 102 | Definitions | Defines "Close relative" to include parent, child, sibling, or spouse or someone related by marriage to the same degree |
| Title 32 | Financial Institutions | Chapter 11 | Business and Industrial Development Corporations | Part 3 | Acquisition and Merger | Section 301 | Disclosure of potential conflict of interest--terms and conditions--examples | Requires disclosure of conflicts. Includes "relatives" which is defined as spouse and consanguine and affinity relations within a certain degree. |
| Title 33 | Insurance and Insurance Companies | Chapter 4 | Farm Mutual Insurers | Part 5 | Insurance Operations | Section 501 | Insuring powers in general | Includes property owned by member's spouse in list of items that a farm mutual insurer shall insure |
| Title 33 | Insurance and Insurance Companies | Chapter 15 | The Insurance Contract | Part 2 | Insurable Interests | Section 201 | Restrictions on contracting for personal insurance -- insurable interests -- violation | "Insurable interest" defined as either substantial interest engendered by love and affection for those closely related by blood or law, or, for other persons, a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue. |
| Title 33 | Insurance and Insurance Companies | Chapter 15 | The Insurance Contract | Part 4 | Application, Issuance, Renewal, Assignment, and Return | Section 401 | Application required--life and disability insurance | Allows a spouse to effectuate insurance on other spouse and family policies to be issued upon application by a husband or wife. |
| Title 33 | Insurance and Insurance Companies | Chapter 17 | Insurance Producers, Adjusters, Consultants, and Administrators | Part 2 | Licensing and Appointment of Insurance Producers | Section 216 | Temporary insurance producer license | Allows temporary license to be issued to spouse, next of kin, or administrator/executor of licensed insurance producer upon death or disability. |
| Title 33 | Insurance and Insurance Companies | Chapter 17 | Insurance Producers, Adjusters, Consultants, and Administrators | Part 10 | Revocation, Suspension, and Penalties | Section 1005 | Restrictions on acting as legal guardian of insured or policyholder | Exempts immediate family members from restriction of insurance producers from acting as legal guardians for insured/policyholder. |
| Title 33 | Insurance and Insurance Companies | Chapter 17 | Unfair Trade Practices | Part 6 | Montana Use of Credit Information in Personal Insurance | Section 605 | Use of credit information | Includes death of immediate family member in list of "extraordinary events" that allow an insurer to provide reasonable underwriting or rating exceptions to an insurer whose credit record has been directly affected by such an extraordinary event |
| Title 33 | Insurance and Insurance Companies | Chapter 19 | Insurance Information and Privacy Protection | Part 1 | General Provisions | Section 104 | Definitions | Definition of "Medical record information" includes information obtained from the individual's spouse, parent or legal guardian. |
| Title 33 | Insurance and Insurance Companies | Chapter 20 | Life Insurance | Part 1 | Policy Provisions | Section 115 | Beneficiary--industrial policies | Under certain circumstances, payment of insurance may be made to the personal representative of the insured or to any relative of the insured by blood or legal adoption or connection by marriage or to any person appearing to the insurer to be equitably entitled thereto by reason of having been named beneficiary or by reason of having incurred expense for the maintenance, medical attention, or burial of the insured. |
| Title 33 | Insurance and Insurance Companies | Chapter 20 | Life Insurance | Part 2 | Standard Nonforfeiture Law Life Insurance | Section 203 | Cash surrender value--paid-up nonforfeiture benefit--life | Includes rules for family policies that provide term insurance on the life of a spouse |
| Title 33 | Insurance and Insurance Companies | Chapter 20 | Life Insurance | Part 10 | General Requirements for Group Life | Section 1001 | Group contracts required to meet group requirements | Excludes group policies insuring only individuals related by blood, marriage or adoption, or otherwise having an insurable interest in each other's lives from the prohibition on group life insurance policies in the State. |
| Title 33 | Insurance and Insurance Companies | Chapter 20 | Life Insurance | Part 11 | Groups and Group Retirements | Section 1111 | Dependents of employee and labor union groups--coverage | Group life policy may be extended to insure employees against loss due to death of spouses and minor children; spouses are entitled to individual policies in the event of termination of the group policy; if a spouse dies, the amount of insurance must be payable as a claim under the group policy. |
| Title 33 | Insurance and Insurance Companies | Chapter 20 | Life Insurance | Part 14 | Structured Settlement Protection | Section 1402 | Definitions | Definition of "Dependent" includes payee's spouse and any former spouse for whom the payee is legally obligated to provide support |
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 1 | General Provisions | Section 136 | Insurance for spouse and dependents of deceased peace officer, game warden, or firefighter | Entitles spouses and dependants of peace officers, game wardens and firefighters to renewal of group disability coverage if the officer dies within scope of employment. |

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 1 | General Provisions | Section 140 | Definitions | Defines dependant in terms of disability insurance as a spouse or unmarried child under 25 years of age. |
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 2 | Individual Policy Requirements | Section 201 | Format and content | Exempts eligible family members (including husband or wife) from requirement that policies insure only one person |
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 3 | Requirements for Certain Individual Coverages | Sections 306-311 | N/A | Provide for right of covered family members to continuity of coverage in event of death, divorce, annulment or legal separation. |
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 5 | Group Disability Insurance | Section 510 | Insured's family--conversion entitlement | Provides for conversion of policy for spouse under specific circumstances |
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 5 | Group Disability Insurance | Section 523 | Special enrollment periods | Requires that group health plans allow for dependent special enrollment periods for events such as marriage and adoption. |
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 18 | Small Employer Health Insurance Availability Act | Section 1803 | Definitions | Definition of "Dependent" includes spouse |
| Title 33 | Insurance and Insurance Companies | Chapter 22 | Disability Insurance | Part 20 | Small Business Health Insurance Purchasing Pool | Section 2006 | Premium incentive payments, premium assistance payments, and tax credits for small employer health insurance premiums paid--eligibility for small group coverage--amounts | Small employers may claim a tax credit for health insurance premiums for spouse and dependants. |
| Title 33 | Insurance and Insurance Companies | Chapter 25 | Montana Title Insurance Act | Part 1 | General Provisions | Section 105 | Definitions | Definition of "Associate" includes spouse, parent or child of a producer in title business |
| Title 33 | Insurance and Insurance Companies | Chapter 30 | Health Service Corporations | Part 10 | Health Service Corporation Plans | Section 1009 | Insured's family--conversion entitlement | Provides for conversion of policy for spouse under specific circumstances |
| Title 35 | Corporations, Partnerships, and Associations | Chapter 1 | Business Corporations | Part 4 | Directors and Officers | Section 461 | Definitions | Definition of "Related person" includes certain persons related to director by affinity |
| Title 35 | Corporations, Partnerships, and Associations | Chapter 9 | Montana Close Corporation Act | Part 2 | Share Transfer Restrictions | Section 202 | Share transfer prohibition | Excludes transfers to shareholder's immediate family (which includes spouse and spouses of descendants and siblings) from bar on transfer of shares of a statutory close corporation |
| Title 35 | Corporations, Partnerships, and Associations | Chapter 18 | Rural Cooperative Utilities | Part 3 | Operation--Members, Trustees, and Officers | Section 311 | Board of trustees--number--qualifications--removal--compensation--husband and wife | Restricts husbands and wives from both being elected trustees in cooperative in which they own a joint membership |
| Title 35 | Corporations, Partnerships, and Associations | Chapter 20 | Cemetery Associations | Part 2 | Operations Generally--Trustees of Association | Section 216 | Inalienability of lots | Establishes restrictions on whom may be interred in a lot. Husbands and wives of person having an interest (and relatives of those spouses) may be interred. |
| Title 35 | Corporations, Partnerships, and Associations | Chapter 21 | Mausoleum and Columbarium Authorities | Part 8 | Mausoleum-Columbarium Authorities | Section 812 | Removal of remains--when removal excepted | Spouse at top of list of people who may consent to the remains of a deceased person being removed from a plot. |
| Title 35 | Corporations, Partnerships, and Associations | Chapter 21 | Mausoleum and Columbarium Authorities | Part 8 | Mausoleum-Columbarium Authorities | Section 827 | Property interests in plot--estate tax | The spouse of an owner of a plot containing more than one interment space has a vested right to be interred in the plot. |
| Title 35 | Corporations, Partnerships, and Associations | Chapter 21 | Mausoleum and Columbarium Authorities | Part 8 | Mausoleum-Columbarium Authorities | Section 828 | Family plots | Order of whom may be interred in a family plot (when no disposition of plot was completed before owner died) includes spouse of owner and of owner's children. |
| Title 37 | Professions and Occupations | Chapter 19 | Morticians and Funeral Directors | Part 9 | Right of Disposition of Remains | Section 904 | Priority of rights of disposition | In the absence of pre-established instructions by the decedent, disputes, or the designation of a person with the right to control decedent's disposition, a surviving spouse is vested with the right to control the disposition of the remains of a deceased person, including the location, manner, and conditions of the disposition and arrangements for funeral goods and services. |
| Title 37 | Professions and Occupations | Chapter 19 | Morticians and Funeral Directors | Part 9 | Right of Disposition of Remains | Section 906 | Loss of right of disposition | Right of disposition of deceased person's remains does not vest in spouse if a petition to dissolve the marriage was pending at the time of the decedent's death |
| Title 37 | Professions and Occupations | Chapter 51 | Real Estate Brokers and Salespersons | Part 6 | Licensure of Property Managers | Section 602 | Definition of property management--exemptions from application | Excludes spouse of property owner from property management license requirements |
| Title 39 | Labor | Chapter 3 | Wages and Wage Protection | Part 4 | Minimum Wage and Overtime Protection | Section 406 | Exclusions | Provides for exemptions from overtime regulations for forms of employment involving employee's spouse and/or immediate family members. |
| Title 39 | Labor | Chapter 29 | Veterans' Public Employment Reference | Part 1 | General Provisions | Section 101 | Definitions | Definition of "Eligible relative" includes unmarried surviving spouse, spouse of disabled veteran and mother of disabled veteran (if mother's spouse is disabled) |
| Title 39 | Labor | Chapter 30 | Persons With Disabilities Public Employment Reference | Part 2 | Operative Provisions | Section 201 | Employment preference in initial hiring | Provides for public employment preference for a job applicant who is either a person with a disability or an eligible spouse of such a person, as long as the job applicant meets statutory eligibility requirements - subject to eligibility requirements listed in Section 202 and duration of preference as stated in Section 203 |
| Title 39 | Labor | Chapter 33 | General Limitations on Collective Bargaining Rights | Part 1 | Right to Work Without Union Interference in Certain Small Businesses | Section 103 | Unfair labor practice | Any union or member of a union who infringes or interferes with the right of an owner and the members of the owner's immediate family (defined as the owner's spouse or children under the age of 18 years) to do any work in the owner's place of business is guilty of an unfair labor practice. |
| Title 39 | Labor | Chapter 51 | Unemployment Insurance | Part 2 | Definitions | Section 201 | General definitions | Exempts from the definition of "wages," medical or hospitalization expenses in connection with sickness or accident disability, including health insurance for the employee or the employee's immediate family. |
| Title 39 | Labor | Chapter 51 | Unemployment Insurance | Part 2 | Definitions | Section 204 | Exclusions from definition of employment | Employment does not include service performed by a dependant or spouse of a sole proprietor. |
| Title 39 | Labor | Chapter 51 | Unemployment Insurance | Part 22 | Amount and Duration of Benefits | Section 2205 | Continuation of benefits at death of claimant | Provides for the payment of all accrued benefits due and payable at the time of death to any deceased claimant to the surviving spouse (if such person exists) |
| Title 39 | Labor | Chapter 51 | Unemployment Insurance | Part 23 | Benefit Disqualification | Section 2302 | Disqualification for leaving work without good cause | Includes as good cause for leaving employment leaving because of the mandatory military transfer of the individual's spouse. |
| Title 39 | Labor | Chapter 71 | Workers' Compensation | Part 1 | General Provisions | Section 116(4)(a) | Definitions | Under workers' compensation statutes, beneficiary is defined as a surviving spouse, unmarried child, dependant parent, or brother or sister under 18 (if other dependants do not exist) living with or legally entitled to be supported by the deceased at the time of injury. |
| Title 39 | Labor | Chapter 71 | Workers' Compensation | Part 1 | General Provisions | Section 123 | Wages defined | Exempts from the definition of "wages," medical or hospitalization expenses in connection with sickness or accident disability, including health insurance for the employee or the employee's immediate family and expenses related to death, including life insurance for the employee or the employee's immediate family. |
| Title 39 | Labor | Chapter 71 | Workers' Compensation | Part 7 | Compensation and Benefits Generally | Section 704 | Payment of medical, hospital, and related services--Fee schedules and hospital rates--Fee limitation | Provides for reimbursement of family of catastrophically injured worker's family (or designated person) for travel to be with injured worker. |
| Title 39 | Labor | Chapter 71 | Workers' Compensation | Part 7 | Compensation and Benefits Generally | Section 721 | Compensation for injury causing death--limitation | Requires that death benefits be paid to surviving spouse for 500 weeks subsequent to date of deceased employee's death. After this period, death benefits to be paid to beneficiaries. |
| Title 39 | Labor | Chapter 71 | Workers' Compensation | Part 7 | Compensation and Benefits Generally | Section 723 | How compensation to be divided among beneficiaries | Workers' compensation due to beneficiaries from must be paid to the surviving spouse, if none then divided equally among dependant children. If the spouse is a stepparent to the children, compensation is divided equally among all. |
| Title 39 | Labor | Chapter 73 | Silicosis Benefits | Part 1 | General Provisions | Section 109 | Payment of benefits to surviving spouse | Surviving spouse of person who received payments for silicosis is entitled to receive payments while remaining unmarried. |
| Title 40 | Family Law | Chapter 1 | Marriage | Part 4 | Validity of Marriages -- Declaration of Invalidity | Section 401 | Prohibited marriages - contracts | Prohibits marriages between persons of the same sex. Any contracts entered into for the purpose of forming a civil relationship contrary to this prohibition are contrary to public policy. |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 1 | Joint Interests, Obligations, and Powers | Section 101 | Mutual obligations of husband and wife | Husband and wife contract toward each other obligations of mutual respect, fidelity, and support. |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 1 | Joint Interests, Obligations, and Powers | Section 102 | Duties of husband and wife as to support | Establishes obligation of husband and wife to support each other "insofar as each is able." Includes nonmonetary support. |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 1 | Joint Interests, Obligations, and Powers | Section 103 | Support of spouse | If a married person fails to adequately support his/her spouse, a third party may provide that support and recover the reasonable value of that support from the married person. (exemptions contained in 40-2-104) |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 1 | Joint Interests, Obligations, and Powers | Section 104 | Liability of married person when abandoned by spouse | Spouse abandoned by other spouse is not liable for support of that spouse until the spouse offers to return unless spouse's misconduct was the reason the other spouse abandoned him/her. |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 1 | Joint Interests, Obligations, and Powers | Section 106 | Liability for acts or debts of spouse | Husband or wife are liable for each other's acts with regard to expenses necessary for family and education of children. |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 1 | Joint Interests, Obligations, and Powers | Section 108 | Married persons as personal representative, guardian, conservator, or trustee | A married person may be a personal representative, guardian, conservator, or trustee and may personally be bound and may bind the estate the person represents without any act or assent on the part of the person's spouse. |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 2 | Individual Property | All | N/A | Establishes: parameters for individual and joint property for couples who are married |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 3 | Power of Married Persons to Contract | All | N/A | Provides for separation agreements and settlement contracts for couples who are married |
| Title 40 | Family Law | Chapter 2 | Husband and Wife | Part 6 | Uniform Premarital Agreement Act | All | N/A | Premarital Agreement Act |
| Title 40 | Family Law | Chapter 3 | Reconciliation | N/A | N/A | All | Montana Conciliation Law | Provides for means for the reconciliation of spouses and amicable settlement of domestic and family controversies |
| Title 40 | Family Law | Chapter 4 | Termination of Marriage, Child Custody, Support | Part 1 | Separation -- Dissolution of Marriage | All | N/A | Establishes statutory structure regulating the separation/dissolution of marriage, including maintenance and support orders, injunctions, and restraining orders. |
| Title 40 | Family Law | Chapter 4 | Termination of Marriage, Child Custody, Support | Part 2 | Support, Custody, Visitation, and Related Provisions | All | N/A | Regulates support, custody, and visitation upon dissolution, including division of property. |
| Title 40 | Family Law | Chapter 4 | Termination of Marriage, Child Custody, Support | Part 3 | Family Law Mediation | All | N/A | Provides for family law mediation services |

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 40 | Family Law | Chapter 5 | Enforcement of Support | Part 1 | Uniform Interstate Family Support Act | All | N/A | Uniform Interstate Family Support Act - Provides for enforcement of support orders (including spousal support) |
| Title 40 | Family Law | Chapter 5 | Enforcement of Support | Part 2 | Administrative Enforcement of Support | All | N/A | Provides for measures to enforce support obligations of spouses. |
| Title 40 | Family Law | Chapter 5 | Enforcement of Support | Part 6 | Civil Contempt for Nonsupport | Section 601 | Failure to pay support--civil contempt | Establishes civil contempt charge for failure to pay support. |
| Title 40 | Family Law | Chapter 5 | Enforcement of Support | Part 7 | Suspension of Licenses For Nonsupport | All | N/A | Provides for suspension of licenses (including recreational licenses) for nonpayment of support (including spousal support) |
| Title 40 | Family Law | Chapter 6 | Parent and Child | Part 1 | Uniform Parentage Act | Section 105 | Presumption of paternity | Discusses presumptions of paternity which include if child is born during marriage or within 300 days of marriage. |
| Title 40 | Family Law | Chapter 6 | Parent and Child | Part 1 | Uniform Parentage Act | Section 106 | Artificial insemination | Husband treated as natural father when wife is inseminated with other man's sperm with consent of husband. |
| Title 40 | Family Law | Chapter 6 | Parent and Child | Part 2 | Obligations of Parents | Section 234 | When parental authority ceases | Ends authority of parent for minor child when child marries. |
| Title 40 | Family Law | Chapter 6 | Parent and Child | Part 5 | Caretaker Relative--Authorization for Medical Care | Section 501 | Purpose--legislative intent--parental rights--definitions | Defines "Caretaker relative" or "relative" as an individual related by blood, marriage, or adoption by another individual to the child whose care is undertaken by the relative, but who is not a parent, foster parent, stepparent, or legal guardian of the child. |
| Title 40 | Family Law | Chapter 6 | Parent and Child | Part 5 | Caretaker Relative--Authorization for Medical Care | Section 502 | Caretaker relative medical authorization affidavit--use--immunity--format | Caretaker affidavit requires person be related "by blood, marriage..." |
| Title 40 | Family Law | Chapter 6 | Parent and Child | Part 6 | Caretaker Relative--Child Custody Rights | Section 601 | Legislative finding and purpose--definitions | Defines "Caretaker relative" or "relative" as an individual related by blood, marriage, or adoption by another individual to the child whose care is undertaken by the relative, but who is not a parent, foster parent, stepparent, or legal guardian of the child. |
| Title 40 | Family Law | Chapter 15 | Partner and Family Member Assault, Sexual Assault, and Stalking -- Safety and Protection of Victims | Part 1 | General Provisions | Section 102 | Eligibility for order of protection | Enables victims of partner and family member assault to obtain an order of protection. |
| Title 40 | Family Law | Chapter 15 | Partner and Family Member Assault, Sexual Assault, and Stalking -- Safety and Protection of Victims | Part 1 | General Provisions | Section 106 | Notice of rights when partner or family member assault is suspected | Notice given by health care provider to patient seeking health care if partner of family member assault is suspected. |
| Title 40 | Family Law | Chapter 15 | Partner and Family Member Assault, Sexual Assault, and Stalking -- Safety and Protection of Victims | Part 1 | General Provisions | Section 110 | Partner and family member assault intervention and treatment fund account | Establishes a fund account for partner and family member assault treatment and intervention. |
| Title 40 | Family Law | Chapter 15 | Partner and Family Member Assault, Sexual Assault, and Stalking -- Safety and Protection of Victims | Part 1 | General Provisions | Section 116 | Definitions | References 45-5-206 definition for partner or family member assault. Does not include same-sex couples of any kind. |
| Title 40 | Family Law | Chapter 15 | Partner and Family Member Assault, Sexual Assault, and Stalking -- Safety and Protection of Victims | Part 2 | Order of Protection | Section 201 | Temporary order of protection | Enables victims of partner and family member assault to obtain an order of protection. |
| Title 41 | Minors | Chapter 1 | Rights and Obligations of Minors | Part 4 | Consent for Health Services | Section 402 | Validity of consent of minor for health services | Allows a minor to consent to health services if he or she professes to be married. May also give consent for spouse if spouse is unable to give consent. |
| Title 42 | Adoption | Chapter 2 | Adoption of Child | Part 6 | Petition to Terminate Parental Rights | Section 605 | Notice of hearing -- service | Requires notice to be given to spouse of parent relinquishing child for adoption if that person was married to the parent at any time from conception to birth |
| Title 42 | Adoption | Chapter 4 | Placements for Adoption | Part 4 | Adoption of Adults and Emancipated Minors | Section 403 | Consent to adoption | Spousal consent required for adoption of adult or emancipated minor under certain circumstances |
| Title 42 | Adoption | Chapter 5 | Legal Proceedings | Part 1 | Dispositional Hearing and Adoption Decree | Section 103 | Notice of hearing | Notice must be given to spouse of petitioner if spouse has not joined in the petition |
| Title 44 | Law Enforcement | Chapter 4 | Miscellaneous Functions of Department of Justice | Part 1 | Training Coordinator for County Attorneys | Section 111 | Request for special counsel services | Allows a coordinator to act as special counsel if case involves person related to member of governing body by consanguinity within the fourth degree or affinity within the second degree. |
| Title 44 | Law Enforcement | Chapter 4 | Miscellaneous Functions of Department of Justice | Part 3 | Board of Crime Control | Section 311 | Domestic violence intervention program | Provides for funding of program to monitor compliance with sentencing requirements for offenders convicted of partner or family member assault |
| Title 44 | Law Enforcement | Chapter 12 | Seizures Related to Controlled Substances | Part 2 | Procedure | Section 205 | Disposition of property following hearing | Prevents personal property from being sold to officer of agency that seized property or anyone related to an officer by blood or marriage |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Person | Part 2 | Assault and Related Offenses | Section 206 | Partner or family member assault--penalty | Provides penalty for partner or family member assault. "Family member" means mothers, fathers, children, brothers, sisters, and other past or present family members of a household; "Partners" means spouses, former spouses, persons who have a child in common, and persons who have been or are currently in a dating or ongoing intimate relationship with a person of the opposite sex. |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Person | Part 2 | Assault and Related Offenses | Section 209 | Partner or family member assault--no contact order--notice--violation of order--penalty | Provides penalty for violation of no contact order in partner or family member assault cases. |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Person | Part 2 | Assault and Related Offenses | Section 213 | Assault with weapon | A person convicted of assault with a weapon is also financially liable for a counseling assessment if victim is a partner or family member. |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Person | Part 2 | Assault and Related Offenses | Section 231 | Definitions | Defines "Assault on a partner or family member" in same way as Section 206 |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Person | Part 5 | Sexual Crimes | Section 501 | Definitions | Excludes from "without consent" definition certain types of marriages (i.e. patient and employee of community care service" and prisoner and employee of prison) |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Person | Part 5 | Sexual Crimes | Section 502 | Sexual assault | Excludes from instances when consent is ineffective certain types of marriages (i.e. patient and employee of community care service" and prisoner and employee of prison) |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Family | Part 6 | Offenses Against the Family | Section 603 | Aggravated promotion of prostitution | Defines aggravated promotion of prostitution. Person promotes the prostitution of one's spouse, child, ward, or any person for whose care, protection, or support the person is responsible. |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Family | Part 6 | Offenses Against the Family | Section 604 | Evidence in cases of promotion | Testimony of a person against their spouse in cases of prostitution is admissible. |
| Title 45 | Crimes | Chapter 5 | Offenses Against the Person | Part 6 | Offenses Against the Family | Section 621 | Nonsupport | A person commits the offense of nonsupport if the person fails to provide support that the person knows the person is legally obliged to provide to a spouse, child, or other dependent. |
| Title 45 | Crimes | Chapter 6 | Offenses Against Property | Part 3 | Theft and Related Offenses | Section 303 | Offender's interest in the property | Excludes misappropriation of household and personal effects or other property normally assessable to both spouses unless parties have ceased living together. |
| Title 45 | Crimes | Chapter 6 | Offenses Against Property | Part 3 | Theft and Related Offenses | Section 329 | Disposition of property and proceeds of sale | Prevents personal property from being sold to officer of agency that seized property or anyone related to an officer by blood or marriage |
| Title 45 | Crimes | Chapter 7 | Offenses Against Public Administration | Part 1 | Bribery and Corrupt Influence | Section 102 | Threats and other improper influence in official and political matters | Includes threats and injury to person's spouse |
| Title 45 | Crimes | Chapter 7 | Offenses Against Public Administration | Part 5 | Mediation of Criminal Proceedings | Section 502 | Mediation | Excludes from mediation any proceeding involving partner or family member assault charges |
| Title 46 | Criminal Procedure | Chapter 1 | General Provisions | Part 1 | General Provisions | Section 105 | Time of making arrest | Includes exception to rule prohibiting arrest at home at night for arrests related to partner or family member assault charges |
| Title 46 | Criminal Procedure | Chapter 6 | Arrest | Part 3 | Warrantless Arrest and Notice to Appear | Section 311 | Basis for arrest without warrant--arrest of predominant aggressor--no contact order | Summoning of peace officer to a residence by a partner or family member constitutes exigent circumstances for making arrest. Arrest is preferred response for these cases when weapon, threat, violation of restraining order or other imminent danger involved. |
| Title 46 | Criminal Procedure | Chapter 6 | Arrest | Part 6 | Domestic Violence Provisions | Section 602 | Notice of rights to victim in partner or family member assault | Requires peace officers to advise victim of resources and legal rights and remedies when person is arrested for partner or family member assault. |
| Title 46 | Criminal Procedure | Chapter 6 | Arrest | Part 6 | Domestic Violence Provisions | Section 603 | Partner or family member assault--seizure of weapon | Requires peace officer to seize weapon used or threatened in partner or family member assault |
| Title 46 | Criminal Procedure | Chapter 9 | Right to Counsel | Part 3 | Extent of Right--Indigency Repayment of Costs | Section 113 | Payment by defendant for assigned counsel--costs to be filed with court | Impact of cost on defendant's immediate family is considered |
| Title 46 | Criminal Procedure | Chapter 9 | Bail | Part 3 | The Amount of Bail | Section 302 | Bail schedule--acceptance by peace officer | Requires a person arrested for partner or family member assault appear before a judge before being granted bail |
| Title 46 | Criminal Procedure | Chapter 16 | Trial | Part 1 | General Provisions | Section 115 | Challenges for cause | Includes being a member of the family of the defendant as a reason for challenge for cause. |
| Title 46 | Criminal Procedure | Chapter 16 | Trial | Part 2 | Rules of Evidence for Criminal Cases | Section 212 | Competency of spouses | Neither spouse may testify to the communications or conversations between spouses that occur during their marriage, unless the defendant-spouse consents, is charged with criminal violence against the spouse, or abuse, abandonment or neglect against the spouse or children. |
| Title 46 | Criminal Procedure | Chapter 18 | Sentence and Judgment | Part 1 | Policy and Preliminary Procedure | Section 112 | Content of presentence investigation report | Harm caused to victim's immediate family included in investigation report |
| Title 46 | Criminal Procedure | Chapter 18 | Sentence and Judgment | Part 1 | Form of Sentence | Section 207 | Conditions of sexual offender treatment | Prohibits sex offender who is released early from contacting, among others, the victim's immediate family |
| Title 46 | Criminal Procedure | Chapter 18 | Sentence and Judgment | Part 2 | Form of Sentence | Section 232 | Payment of costs by defendant | Impact of cost on defendant's immediate family is considered |
| Title 46 | Criminal Procedure | Chapter 18 | Sentence and Judgment | Part 2 | Form of Sentence | Section 243 | Definitions | Definition of "victim" includes immediate family of a homicide victim |
| Title 46 | Criminal Procedure | Chapter 18 | Sentence and Judgment | Part 3 | Death Penalty | Section 302 | Evidence that may be received | Includes harm caused to victim's immediate family |
| Title 46 | Criminal Procedure | Chapter 18 | Sentence and Judgment | Part 10 | Home Arrest | Section 1001 | Definitions | Definition of "Home" excludes residences of non-immediate family members if more than one residence exists on a single piece of property |
| Title 46 | Criminal Procedure | Chapter 23 | Probation, Parole, and Clemency | Part 2 | Granting of Parole | Section 210 | Medical parole | Allows prisoner's spouse to request medical parole |
| Title 46 | Criminal Procedure | Chapter 23 | Probation, Parole, and Clemency | Part 10 | Supervision of Probationers and Parolees | Section 1005 | Misdemeanor probation offices--officers--costs | Offender convicted of partner or family member assault must pay for own misdemeanor probation supervision |

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 46 | Criminal Procedure | Chapter 23 | Probation, Parole, and Clemency | Part 10 | Supervision of Probationers and Parolees | Section 1022 | Parole services | Dept. of Parole may provide family counseling and other services. |
| Title 46 | Criminal Procedure | Chapter 24 | Treatment of Victims and Witnesses | Part 1 | General Provisions | Section 104 | Consultation with victim of certain offenses | Requires consultation with victim's family in case of minor child or homicide victim (Family not defined) |
| Title 46 | Criminal Procedure | Chapter 24 | Treatment of Victims and Witnesses | Part 1 | General Provisions | Section 106 | Crime victims--family members--right to attend proceedings--exceptions--right to receive documents--rights during interview | Provides for right of victim's family members to attend hearings with limited exceptions |
| Title 46 | Criminal Procedure | Chapter 24 | Treatment of Victims and Witnesses | Part 2 | Services to Victim, Witness | Section 205 | Notification to employer or creditor--limitations on employer | Prevents discharge by employer or discipline for participation at prosecutor's request in preparation for or attendance at a criminal justice hearing. Members of family means victim's spouse, child, stepchild, parent, stepparent, or sibling |
| Title 49 | Human Rights | Chapter 1 | Basic Rights | Part 1 | Basic Personal Rights | Section 103 | Right to use force | Provides for the right to use necessary force to protect from wrongful injury the person or property of one's self, of a wife, husband, child, parent, or other relative or member of one's family, or of a ward, servant, master, or guest. |
| Title 50 | Health and Safety | Chapter 5 | Hospitals and Related Facilities | Part 1 | General Provisions | Section 117 | Economic credentialing of physicians prohibited--definitions | Includes in conflict of interest definition a situation in which a person has a financial interest either individually or through an immediate family member (as defined by the tax code - which is based on consanguine or affinity relation) |
| Title 50 | Health and Safety | Chapter 9 | Rights of the Terminally Ill Act | Part 1 | | | Consent by others to withholding or withdrawal of treatment | End of life decisions When individual is no longer able to make decisions and has no effective declaration, spouse given top priority to make decisions regarding life-sustaining treatment. Persons granted lower priority are: adult child, parent, sibling, next closest adult relative by blood or adoption, or a full guardian) |
| Title 50 | Health and Safety | Chapter 15 | Vital Statistics | Part 1 | General Provisions | Section 121(1) | Copies from system of vital statistics | Except as provided in subsections (6) and (7), the department and county clerk and recorders shall, upon receipt of an application, issue a certified copy or copies of a vital record or a part of a vital record to the registrant, the registrant's spouse, children, parents, or guardian, or an authorized representative. |
| Title 50 | Health and Safety | Chapter 16 | Health Care Information | Parts 5, 8 | Uniform Health Care Information, Health Care Information Privacy Requirements for Providers Subject to HIPAA | Sections 522, 804 | Representative of deceased patient/ Representative of deceased patient's estate | Health Care Information - A personal representative of a deceased patient may exercise all of the deceased patient's rights under this part. If there is no personal representative or upon discharge of the personal representative, rights may be exercised by the surviving spouse. |
| Title 50 | Health and Safety | Chapter 16 | Health Care Information | Part 5 | Uniform Health Care Information | Section 529 | Disclosure without patient's authorization based on need to know | Allows disclosure of patient's health care information to immediate family or other individual with whom the patient is known to have a close personal relationship. |
| Title 50 | Health and Safety | Chapter 19 | Pregnant Women and Newborn Infants | Part 1 | Serological Test for Women Seeking Prenatal Care | Section 107 | Required and permissible exhibit of test results | Allows, upon request by the patient, the report of the results of the test to be exhibited to spouse of patient. |
| Title 50 | Health and Safety | Chapter 20 | Abortion | Part 1 | Montana Abortion Control Act | Section 108 | Protection of premature infants born alive | When premature infant is born alive and is viable, it becomes ward of state unless mother and/or mother's spouse has signed an agreement in which they accept the parental rights if infant survives abortion procedure. |
| Title 50 | Health and Safety | Chapter 20 | Abortion | Part 2 | Parental Notice of Abortion Act | Section 203 | Definition | Defines "Emancipated minor" as a minor who has been married or granted emancipation by a court. |
| Title 50 | Health and Safety | Chapter 21 | Cadavers and Autopsies | Part 1 | General Provisions | Section 103 | Limitations on right to perform autopsy or dissection | Requires surviving spouse to authorize autopsy when one is not required by law or authorized in writing by the decedent. |
| Title 52 | Family Services | Chapter 2 | Children's Services | Part 7 | Child Care | Section 703 | Definitions | Excludes from definition of "Day-care facility" a person who limits care to children who are related to the person by blood or marriage. |
| Title 52 | Family Services | Chapter 6 | Battered Spouses | Part 1 | Battered Spouses Grant Programs | All | N/A | Provides for a state-funded grant program that allocates money to local battered spouses and domestic violence programs. (refers to same family member and partner assault as found in other sections of MT code that exclude same-sex couples.) |
| Title 53 | Social Services and Institutions | Chapter 1 | General Administration of Institutions | Part 4 | Per Diem Payments for Institutional Care | Section 401 | Definitions | Defines "financially responsible person" to include spouse of a resident |
| Title 53 | Social Services and Institutions | Chapter 1 | General Administration of Institutions | Part 4 | Per Diem Payments for Institutional Care | Section 405 | Monthly payment amount | Determines certain reductions in monthly payments based on holdings of resident's spouse |
| Title 53 | Social Services and Institutions | Chapter 1 | General Administration of Institutions | Part 4 | Per Diem Payments for Institutional Care | Section 412 | Collections from estates | Ensures that collections are enforced only to extent that it does not deprive a surviving spouse of necessary expenses and real estate (if occupied by surviving spouse) |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 144 | Relative's responsibility | Lists husband or wife of individual among only relatives that may be held responsible for payment of medical assistance under the program |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 166 | Period of ineligibility for medical assistance when assets disposed of for less than fair market value--undue hardship exception-- department to adopt rules | Includes actions of spouse (with regard to disposition of assets) to determine eligibility for medical assistance |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 167 | Recovery of medicaid benefits after recipient's death | Prevents recovery by the State while there is a surviving spouse |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 171 | Department lien upon real property of certain medicaid recipients--conditions | Restricts the department of public health and human services from placing a lien on property lawfully resided in by the recipient's spouse for the recovery of medical assistance paid on behalf of the recipient. |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 178 | Department right of recovery--limitations | Prevents department from recovering on lien while there is a surviving spouse of the recipient |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 179 | Payment of amount due--periodic payments--substitute security | Allows department to agree with recipient's surviving spouse to accept substitute security and partial payment. |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 182 | Spouse's limited exemption from lien | Provides a recipient's surviving spouse with a limited exemption from a public health and human services lien. |
| Title 53 | Social Services and Institutions | Chapter 6 | Health Care Services | Part 1 | Medical Assistance -- Medicaid | Section 186 | Action by department or other person to preserve property subject to lien--recovery of costs | Provides exception allowing rate adjustments for change of ownership between husband and wife or changes pursuant to a divorce decree |
| Title 53 | Social Services and Institutions | Chapter 7 | Vocational Rehabilitation | Part 2 | Sheltered Workshops | Section 202 | Definitions | Provides support services to a person with a severe disability. Services include counseling for family members. |
| Title 53 | Social Services and Institutions | Chapter 9 | Services for Victims of Crime | Part 1 | The Crime Victims Compensation Act of Montana | Section 128 3(b) | Compensation benefits | Crime Victims Compensation Act - Requires that benefits owed to a victim who is killed due to criminally injurious conduct be paid to the spouse for the benefit of the spouse and other dependents unless the office determines that other payment arrangements should be made. |
| Title 53 | Social Services and Institutions | Chapter 20 | Developmental Disabilities | Part 1 | | Section 102 | Definitions | Includes spouse in "Next of kin" definition |
| Title 53 | Social Services and Institutions | Chapter 21 | Mentally Ill | Part 1 | Treatment of the Seriously Mentally Ill | Section 102 | Definitions | Includes spouse in "Next of kin" definition |
| Title 53 | Social Services and Institutions | Chapter 22 | Interstate Compact on Mental Health | Part 1 | General Provisions | Section 105 | Court review | Directs compact administrator to consult with immediate family of any proposed transferee |
| Title 53 | Social Services and Institutions | Chapter 24 | Alcoholism and Drug Dependence | Part 3 | Treatment of Alcoholics and Intoxicated Persons | Section 302 | Involuntary commitment of alcoholics--rights | Allows commitment upon petition of person's spouse or guardian or a relative |
| Title 61 | Motor Vehicles | Chapter 3 | Certificates of Title, Registration, and Taxation of Motor Vehicles | Part 2 | Certificates of Title | Section 222 | Surviving spouse or heir--small estates | Lists conditions by which the surviving spouse may secure transfer of a decedent's ownership interests in one or more motor vehicles if: "(a) the value of the entire estate, including any vehicles, vessels, or snowmobiles for which transfer of ownership is sought, less liens and encumbrances, does not exceed the limit set forth in 72-3-1101; (b) the decedent did not leave other property that requires the procuring of letters of administration or letters testamentary; and (c) the decedent did not by execution of a will otherwise bequeath the property." |
| Title 61 | Motor Vehicles | Chapter 3 | Certificates of Title, Registration, and Taxation of Motor Vehicles | Part 4 | Special Registration | Section 414 | Special motorcycle license plates for military personnel, veterans, and spouses--department to design--disposition | Provides for a surviving spouse of an eligible veteran who has not remarried to retain special motorcycle license plate |
| Title 61 | Motor Vehicles | Chapter 3 | Certificates of Title, Registration, and Taxation of Motor Vehicles | Part 4 | Special Registration | Section 458 | Special plates for military personnel, veterans, spouses, and gold star families | Provides for a surviving spouse of an eligible veteran who has not remarried to retain special vehicle license plate |
| Title 61 | Motor Vehicles | Chapter 3 | Certificates of Title, Registration, and Taxation of Motor Vehicles | Part 4 | Special Registration | Section 460 | Motor vehicle registration fee and veterans' cemetery fee waivers | Provides waivers for surviving spouses of veterans who have not remarried |
| Title 61 | Motor Vehicles | Chapter 4 | Sales and Distribution of Motor Vehicles | Part 1 | Dealers | Section 102 | Dealer plates--restriction of use--fees | Allows dealer's spouse to drive car with dealer plates |
| Title 61 | Motor Vehicles | Chapter 4 | Sales and Distribution of Motor Vehicles | Part 1 | Dealers | Section 131 | Definitions | Defines "Designated family member" to include spouse and certain consanguine relations |
| Title 61 | Motor Vehicles | Chapter 4 | Sales and Distribution of Motor Vehicles | Part 1 | Dealers | Section 132 | Right of designated family member to succeed in dealership ownership | Allows designated family members to succeed the dealer in the ownership of a dealership under an existing agreement |
| Title 61 | Motor Vehicles | Chapter 4 | Sales and Distribution of Motor Vehicles | Part 1 | Dealers | Section 133 | Refusal to honor succession to ownership--notice required | Requires notice to be given if designated family member's succession is not to be recognized |
| Title 61 | Motor Vehicles | Chapter 4 | Sales and Distribution of Motor Vehicles | Part 1 | Dealers | Section 134 | Procedure to determine right to succeed | Provides designated family member a method to file a complaint if manufacturer, etc. refuses to honor transfer |
| Title 61 | Motor Vehicles | Chapter 4 | Sales and Distribution of Motor Vehicles | Part 1 | Dealers | Section 141 | Manufacturer's right of first refusal | Exempts transfers or sales to members of dealer's family from right of first refusal |
| Title 61 | Motor Vehicles | Chapter 4 | Sales and Distribution of Motor Vehicles | Part 2 | Licensing of New Motor Vehicle Manufacturers, Distributors, and Importers | Section 205 | Limitations on cancellation and termination | Requires franchisor to give effect to a sale or transfer to dealer or wholesaler's family under certain circumstances |
| Title 61 | Motor Vehicles | Chapter 5 | Driver's Licenses | Part 1 | Licensing Provisions | Section 104 | Exemptions | Exempts from driver's license requirements spouses of active duty military personnel who are not working. |

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 61 | Motor Vehicles | Chapter 5 | Driver's Licenses | Part 1 | Licensing Provisions | Section 111 | Contents of driver's license, renewal by mail, renewal by mail license expirations, grace period, and fees for licenses, permits, and endorsements-- notice of expiration | Allows spouse of active duty military personnel stationed outside of Montana to renew by mail one additional time over other residents |
| Title 69 | Public Utilities and Carriers | Chapter 11 | Regulation of Carriers | Part 2 | Carriers of Passengers | Section 208 | Classes of persons who may receive free transportation | Includes families and surviving spouses of certain categories of people |
| Title 69 | Public Utilities and Carriers | Chapter 14 | Railroads | Part 10 | Railroad Personnel | Section 1006 | Liability for death or injury to railroad employees | Provides for damages to be paid for the benefit of the surviving spouse in the event of a death caused by the railroad |
| Title 70 | Property | Chapter 15 | Definitions and Kinds of Estates in Real Property | Part 3 | Powers | Section 303 | Married persons--execution | Married persons may execute a power with regard to real property during marriage without the concurrence of the spouse. |
| Title 70 | Property | Chapter 27 | Forcible Entry and Detainer Unlawful Detainer | Part 1 | Definitions and Preliminary Procedure | Section 111 | Parties defendant | If married person is a tenant, failure to join spouse is not a defense, but any execution of judgment can only be enforced on separate property |
| Title 70 | Property | Chapter 31 | Relocation Assistance Fair Treatment of Condemnees | Part 1 | General Provisions | Section 102 | Definitions | Definition of "Average annual net earnings" includes earnings of owner's spouse |
| Title 70 | Property | Chapter 32 | Homesteads | Part 2 | Homestead Exemption -- Execution | Section 202 | Execution allowed under certain judgments | Homestead subject to execution or forced sale when satisfying judgments on debts from mortgage on the property executed and acknowledged by both husband and wife or unmarried claimant. |
| Title 70 | Property | Chapter 32 | Homesteads | Part 3 | Conveyance, Encumbrance, and Abandonment of Homestead | Section 301 | How conveyed or encumbered--instrument | The homestead of a married person cannot be conveyed or encumbered unless the instrument by which it is conveyed or encumbered is executed and acknowledged by both husband and wife. |
| Title 70 | Property | Chapter 32 | Homesteads | Part 3 | Conveyance, Encumbrance, and Abandonment of Homestead | Section 302 | How abandoned--declaration | A homestead can be abandoned only by a declaration of abandonment or a grant thereof executed and acknowledged by the husband and wife if the claimant is married. |
| Title 71 | Mortgages, Pledges, and Liens | Chapter 3 | Liens | Part 5 | Construction Liens | Section 522 | Definitions | In definition of "Contracting owner" agency is presumed between spouses |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 1 | Uniform Probate Code General Provisions | Part 1 | Short Title, Definitions, Construction, and General Provisions | Section 103 | General definitions | Definition of "Heirs" includes surviving spouse. Definition of "interested person" includes spouse |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 1 | Intestate Succession | Section 112 | Share of spouse | Grants a share of decedent's intestate estate to the surviving spouse. If "no descendant or parent of the decedent survives the decedent," the surviving spouse is granted the entire intestate estate. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 2 | Elective Share of Surviving Spouse | All | N/A | Establishes a surviving spouse's right to an elective share of a decedent's estate. This share ranges from a supplemental amount to 50% of the augmented estate, depending on the length of marriage. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 3 | Spouse and Children Unprovided for in Wills | Section 331 | Entitlement of spouse--premarital will | Provides potential intestate inheritance rights to surviving spouse when a testator executed a will prior to marrying the surviving spouse. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 4 | Exempt Property and Allowances | Section 412 | Homestead allowance | Grants decedent's surviving spouse a homestead allowance of $20,000. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 4 | Exempt Property and Allowances | Section 413 | Exempt property | Grants surviving spouse up to $10,000 of exempt property in the decedent's estate. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 4 | Exempt Property and Allowances | Section 414 | Family allowance | Grants decedent's surviving spouse a maintenance allowance during the administration of the estate for up to one year. The maximum allowance is $18,000. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 4 | Exempt Property and Allowances | Section 415 | Source, determination, and documentation | If estate is otherwise sufficient, devised property may not be used to satisfy homestead allowance or exempt property. Surviving spouse may choose what property to use for these amounts. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 7 | Rules of Construction Applicable to Wills and Other Governing Instruments | Section 715 | Class gifts construed to accord with intestate succession | Provides for a child not born of the transferor to be a child of that person if child lived with that person or that person's parent, brother, sister, spouse or surviving spouse. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 7 | Rules of Construction Applicable to Wills and Other Governing Instruments | Section 721 | Interests in "heirs" and like | Excludes surviving spouse as "heir" if surviving spouse has remarried. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 8 | General Provisions Concerning Probate and Nonprobate Transfers | Section 812 | Effect of divorce, annulment, or degree of separation | Divorced or annulled spouses are not surviving spouses. However, separated spouses are surviving spouses. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 8 | General Provisions Concerning Probate and Nonprobate Transfers | Section 814 | Revocation of probate and nonprobate transfers by divorce--no revocation by other changes of circumstances | Provides for revocation of rights (by contract or court order) upon divorce or annulment. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 2 | UPC -- Intestacy, Wills, and Donative Transfers | Part 10 | Uniform Statutory Rule Against Perpetuities--Honorary Trusts | Section 1005 | Exclusions from statutory rule against perpetuities | Excludes spouse's election from rule against perpetuities, as well as certain pension-related plans |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 3 | UPC -- Probate and Administration | Part 3 | Formal Testacy and Appointment Proceedings | Section 305 | Notice of hearing on petition for formal testacy proceeding | Requires notice of hearing be given to surviving spouse as well as other heirs of decedent, any personal representatives, and any devisees and executors |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 3 | UPC -- Probate and Administration | Part 5 | Personal Representative Appointment Priorities, Bond, and Termination | Section 502 | Priorities for appointment | Provides for appointment of surviving spouse as a person's personal representative in probate in the absence of a person with priority as determined by a probated will, including a person nominated by a power conferred in a will. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 3 | UPC -- Probate and Administration | Part 6 | Personal Representative Powers, Duties, and Compensation | Section 615 | Transaction involving conflict of interest--voidable--exceptions | Sales to personal representative or representative's spouse can be voided by persons with interest in estate under specific circumstances. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 3 | UPC -- Probate and Administration | Part 9 | Special Provisions Relating to Distribution | Section 814 | Distribution in kind preferred--method--valuation | Provides for the priority of a spouse who has selected particular assets of an estate under exempt property. Also restricts instances when a homestead or family allowance can be paid in kind. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 3 | UPC -- Probate and Administration | Part 9 | Special Provisions Relating to Distribution | Section 917 | Distribution to person under disability | Allows distribution to be made to person's spouse under certain circumstances |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 5 | UPC -- Persons Under Disability Guardianship and Conservatorship | Part 1 | General Provisions | Section 104 | Informal discharge of duty to pay or deliver property to minor | Allows for distribution to minor if, among other scenarios, the minor is married |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 5 | UPC -- Persons Under Disability Guardianship and Conservatorship | Part 3 | Guardians of Incapacitated Persons | Section 302 | Testamentary appointment of guardian for incapacitated person--when effective--priorities | Allows spouse of minor to appoint by will or other writing a guardian for minor spouse under certain circumstances |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 5 | UPC -- Persons Under Disability Guardianship and Conservatorship | Part 3 | Guardians of Incapacitated Persons | Section 312 | Who may be guardian--priorities | Provides for spouse's appointment as guardian for an incapacitated person in the absence of a guardian nominated by the person prior to incapacitation. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 5 | UPC -- Persons Under Disability Guardianship and Conservatorship | Part 3 | Guardians of Incapacitated Persons | Section 314 | Notices in guardianship proceedings | Requires incapacitated person's spouse to receive notice |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 5 | UPC -- Persons Under Disability Guardianship and Conservatorship | Part 4 | Protection of Property of Minors and Persons Under Disability | Section 410 | Who may be appointed conservator--priorities | Provides for spouse's appointment as conservator or a protected person's estate in the absence of a court-appointed conservator or someone nominated by the protected person. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 5 | UPC -- Persons Under Disability Guardianship and Conservatorship | Part 4 | Protection of Property of Minors and Persons Under Disability | Section 427 | Powers of conservator in administration | Conservator retains all powers conferred under section until minor turns 18 or is married |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 5 | UPC -- Persons Under Disability Guardianship and Conservatorship | Part 4 | Protection of Property of Minors and Persons Under Disability | Section 434 | Transaction involving conflict of interest--voidable--exceptions | Sales to conservator or conservator's spouse can be voided by persons with interest in estate under specific circumstances. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 6 | Nonprobate Transfers on Death | Part 1 | Provisions Relating to Effect of Death | Section 122 | Rights of creditors and others | Rights of creditors do not trump allowances due to the surviving spouse and children |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 6 | Nonprobate Transfers on Death | Part 2 | Multiple-Party Accounts | Section 211 | Ownership during lifetime | Establishes a presumption that the net contribution of married people into a multiple-person account is equal |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 6 | Nonprobate Transfers on Death | Part 2 | Multiple-Party Accounts | Section 212 | Rights at death | If surviving spouse is an account holder, he/she gets the entire amount that decedent was entitled to |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 6 | Nonprobate Transfers on Death | Part 2 | Multiple-Party Accounts | Section 215 | Rights of creditors and others | Protects surviving spouse's estate and statutory allowances against transfers resulting from a right of survivorship or POD designation. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 6 | Nonprobate Transfers on Death | Part 2 | Multiple-Party Accounts | Section 216 | Community property and tenancy by entireties | Deposit of community property into account doesn't alter the community character of the property, but right of survivorship between married parties that arises from terms of account cannot be altered by will |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 9 | Disposition of Community Property Rights at Death | Part 1 | Uniform Disposition of Community Property Rights at Death | All | N/A | Addresses acquisition and distribution of property acquired by spouses in community property jurisdictions |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 16 | Estate and Generation-Skipping Taxes | Part 6 | Appointment of Taxes | Section 607 | Allowance for exemptions, deductions, and credits | No apportionment made against property passing to or in trust for a surviving spouse |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 17 | Anatomical Gift Act | Part 2 | Execution and Operation of Anatomical Gift | Section 214 | Making, revoking, and objecting to anatomical gifts by others | Decedent's spouse is listed as one of the people who may make an anatomical gift of all or part of decedent's body in the absence of an unrevoked refusal by decedent. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 33 | Trust Code General Provisions | Part 2 | Creation and Validity of Trusts Resulting and Constructive Trusts | Section 218 | Purchase money resulting trust | A purchase money resulting trust does not arise when the transferee is a spouse, child, or other natural object of the bounty of the person who paid the purchase price. |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 34 | Trust Code--Trust Administration | Part 4 | Montana Uniform Principal and Income Act | Section 424 | Adjustments between principal and income | Restricts adjustments to trusts that require all income to be paid at least annually to a spouse |
| Title 72 | Estates, Trusts, and Fiduciary Relationships | Chapter 34 | Trust Code--Trust Administration | Part 4 | Montana Uniform Principal and Income Act | Section 445 | Adjustments between principal and income | Allows person to require a trustee to modify a trust to increase spouse's income from a trust to maintain marital deduction |
| Title 76 | Land Resources and Use | Chapter 3 | Local Regulation of Subdivisions | Part 1 | General Provisions | Section 103 | Definitions | Defines "Immediate family" to mean spouse, children by blood or adoption and parents |

| Title | Title Desc. | Chapter | Chapter Desc. | Part | Part Desc. | Section | Section Desc. | Description |
|---|---|---|---|---|---|---|---|---|
| Title 77 | State Lands | Chapter 6 | Agricultural, Grazing, and Other Surface Leases | Part 2 | Leasing Procedure | Section 212 | Loss of preference right--cancellation of lease--subleasing--pasturing agreements | Increases maximum sublease period from 3 to 5 years when sublease is to family member (defined as spouse, son, daughter, adopted child or sibling). |
| Title 80 | Agriculture | Chapter 12 | Montana Agricultural Loan Authority Act | Part 2 | Loans | Section 202 | Immediate repayment | Exempts spouse, children, or corporation owned by spouse or children from rule that a bond must be repaid immediately if the land which was purchased using a bond issued by the authority is sold. |
| Title 81 | Livestock | Chapter 3 | Marks and Brands | Part 2 | Inspection of Marks and Brands | Section 211 | Inspection of livestock before change of ownership or removal from county--transportation permits | Defines "Members of the same family" to include spouse, and blood relatives and those relatives' spouses. Exempts change of ownership between family members from inspection requirements. |
| Title 87 | Fish and Wildlife | Chapter 1 | Organization and Operation | Part 2 | Department of Fish, Wildlife, and Parks | Section 266 | Hunter management program--benefits for providing hunting access-- nonresident landowner limitation--restriction on landowner liability | Allows a landowner who meets certain requirements to designate an immediate family member (defined as parent, grandparent, child, or grandchild by blood or marriage, a spouse, an adopted child, a sibling's spouse or niece or nephew) to receive a Class AAA combination sports license. |
| Title 87 | Fish and Wildlife | Chapter 2 | Fishing, Hunting, and Trapping Licenses | Part 1 | General Provisions | Section 102 | Resident defined | Allows member of the armed forces to maintain Montana residency for purposes of section if member's spouse and dependents continue to live in Montana and member meets remainder of residency criteria. |
| Title 87 | Fish and Wildlife | Chapter 2 | Fishing, Hunting, and Trapping Licenses | Part 1 | General Provisions | Section 106 | Application for license--penalties for violation--forfeiture of privileges | A resident may apply for and purchase a wildlife conservation license, hunting license, or fishing license for the resident's spouse. |
| Title 87 | Fish and Wildlife | Chapter 2 | Fishing, Hunting, and Trapping Licenses | Part 1 | General Provisions | Section 114 | Misdemeanor and felony possession of hunting or fishing license or permit--penalties | Allows a person to carry or have control over license or permit issued to person's spouse or to any minor when the person is hunting with that person |
| Title 87 | Fish and Wildlife | Chapter 2 | Fishing, Hunting, and Trapping Licenses | Part 5 | Game Animal Licenses | Section 526 | License for nonresident to hunt with resident sponsor or family member--use of license revenue | A nonresident may be licensed to hunt with resident sponsor or family member. Among other requirements, sponsor must be related to the nonresident within the second degree of kinship by blood or marriage. |

# APPENDIX 2 to DISSENT

# (Plaintiffs' Prayer for Relief)

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

(1)     A declaration that the State's failure to offer same-sex couples equal opportunity to obtain the protections and obligations that are available to different-sex couples through the legal status of marriage violates Plaintiffs' right to equal protection under Article II, Section 4 of the Montana Constitution.

(2)     A declaration that the State's exclusion of same-sex couples from the opportunity to obtain the protections and obligations the State provides to different-sex couples who marry violates Plaintiffs' right to privacy under Article II, Section 10 of the Montana Constitution.

(3)     A declaration that the State's exclusion of same-sex couples from the opportunity to obtain the protections and obligations the State provides to different-sex couples who marry violates Plaintiffs' right to dignity under Article II, Section 4 of the Montana Constitution.

(4)     A declaration that the State's exclusion of same-sex couples from the opportunity to obtain the protections and obligations the State provides to different-sex couples who marry violates Plaintiffs' right to pursue life's basic necessities under Article II, Section 3 of the Montana Constitution.

(5)     A declaration that State's exclusion of same-sex couples from the opportunity to obtain the protections and obligations the State provides to different-sex couples who marry violates Plaintiffs' right to due process under Article II, Section 17 of the Montana Constitution.

(6)     An order enjoining the State from continuing to deny Plaintiffs and their families access to a legal status and statutory structure that confers the protections and obligations the State provides to different-sex couples who marry.

(7)     An order requiring the State to offer same-sex couples and their families a legal status and statutory structure that confers the protections and obligations that the State provides to different-sex couples who marry, but not the status or designation of marriage.

(8)     An order awarding Plaintiffs their costs and their reasonable attorneys' fees.

(9)     An order awarding such other and further relief as the Court deems just and proper.